UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6154-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JOSEPH ROTUNNO,

      Defendant.

_____/

**NIGHT BOX
FILED**

JUL   7 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL'

### DEFENDANT JOSEPH ROTUNNO'S MOTION TO REVOKE, OR
### AMEND THE PRETRIAL DETENTION ORDER TO
### ESTABLISH REASONABLE CONDITIONS OF PRETRIAL RELEASE

COMES NOW the Defendant, Joseph Rotunno, by and through the undersigned attorney, and moves the Court to revoke the detention order, to conduct a *de novo* hearing, and to amend the pretrial detention order by setting reasonable conditions of pretrial release consistent with those imposed on the lead defendant, Reynolds Maragini.

### STATEMENT OF FACTS

1.     The Defendant is charged with conspiracy to engage in racketeering, conspiracy to engage in extortionate credit transactions, conspiracy to engage in the collection of extensions of credit by extortionate means, conspiracy to engage in money laundering, and conspiracy to engage in the interstate transportation of stolen property.

2. On Tuesday, June 27, 2000,[1] the Magistrate, at the government's request, conducted a pretrial detention hearing.[2] The government contended that there was serious risk of flight, and that the Defendant was a danger to the community.

---

[1] On Wednesday morning, June 28th, the next morning after the detention hearing, the Defendant ordered an expedited transcript of the detention hearing, which meant the transcript should have



3. The Magistrate found that the Defendant did not constitute a risk of flight. The Defendant does not have a passport. The government offered no proof that the Defendant was ever outside the country. The Defendant's mother, sister, son, daughter-in-law, daughter, and son-in-law live in Broward County, Florida. The Defendant has lived in South Florida for over 20 years.[3] The Defendant has serious health problems. James Trezza, M.D., a cardiologist and specialist in internal medicine, is the Defendant's regular treating physician. The Defendant suffers from arteriosclerotic heart disease, diabetes, hypertension (high blood pressure) and hyperlipidemia (elevation of fats in the blood stream). The Defendant had coronary by-pass surgery and within the past year suffered a stroke. His current medications include Glucophage 300 milligrams twice a day (diabetes), pradin 2 milligrams three times per day (diabetes), norvasc 5 milligrams twice a day (high blood pressure), pravachol 20 milligrams once at bedtime (cholesterol), and plavix 75 milligrams once a day (artheroscleriois). His treating physician opined that it is imperative that he take these medications and have frequent medical check-ups.[4]

4. The Magistrate found the Defendant a present danger to the community based on excerpts of tape-recorded conversations of the Defendant recorded by the FBI in the fall of 1998 and the spring of 1999. From October 16, 1998, through December 19, 1998, the FBI conducted a court-authorized wiretap of the Defendant's cellular telephone. The FBI intercepted and recorded approximately 1000 conversations. After the court-authorized wiretap expired, the FBI

---

been available by the end of the business day on Thursday, June 29th. However, the transcript was not made available until Monday, July 3rd at 5:00 p.m. This motion is promptly filed after receiving the transcript.

[2] 18 U.S.C § 3142 (f)(2); App. A, pg. 7

[3] App. A, pg. 58; Pretrial Services Report

[4] App. A, pg. 53-54

2

recorded dozens of in-person and telephone conversations between Al Polito, an informant, and the Defendant.[5] The government introduced selected excerpts from approximately 16 conversations that occurred over a year ago to establish that the Defendant is a present danger to the community. (emphasis added)

    5. The tape-recorded conversation introduced by the government were as follows:

    A. On October 18, 1998, the Defendant had a conversation with an unidentified male.

During the conversation, the Defendant stated:

> Defendant: Well, you gotta go grab this guy and you got to tell him, let's go get this JB.
>
> UM: That's what I've been telling them.
>
> Defendant: I'd go grab him by ... let me tell you something...I would grab the guy by his throat.
>
>         \* \* \*
>
> Defendant: Right now, what I would do, if it was me, I would be very aggressive, I'd go grab the guy, and tell him look...
>
> UM: (SC) .... (UI)...
>
> Defendant: .... Right now, get in the car, I want to talk to you, get him in the car and say now take me to this guy's house, otherwise your gonna have the biggest problem you ever had.[6]

The government acknowledged that the Defendant was giving advice to an unknown person on how to handle an unidentified person. The government admitted that it had no proof that the unknown person ever grabbed the unidentified person.[7]

---

[5] App. A, pg. 9-10

[6] App. A, pg. 14

[7] App. A, pg. 36

B. On October 21, 1998, the Defendant had a conversation with Al Polito, the informant,

and during the conversation stated:

> Defendant: Well. Let me tell you, he's all… wise ass motherfucker sometimes.
>
> AP: Oh yeah.
>
> Defendant: Tiny was ready….. Tiny was ready to put him in the fucking (UI)… no I don't do that yet.
>
> AP: Yeah.
>
> Defendant: He wanted to give him a fucking beating once.
>
> AP: Yeah.
>
> Defendant: He's a little motherfucker, this guy.[8]

The government acknowledged the conversation was about a bettor named "Alex," who won a lot of money and was paid in cash. Later, "Alex" lost a lot of money and paid with a check that "bounced". The government admitted it had no proof that "Alex" was ever threatened. In fact, the government never spoke to "Alex."[9]

C.    On October 28, 1998, the Defendant had a conversation with "Alex." the bettor. "Alex" told the Defendant to have co-defendant Percy Morris aka Tiny come to his store to pick up the money he owed.[10] Regarding this conversation, the government acknowledged that "Alex" paid his gambling debt with a "bad" check. This conversation concerns making good on the "bad" check.

D.    On October 26, 1998, the Defendant had a conversation with Al Polito, the informant. During the conversation the Defendant stated:

---

[8] App. A, pg 14

[9] App. A, pg. 37-38

[10] App. A, pg. 15

4

> Defendant: Yeah but if they, I'm not blaming you, I'm blaming, I'm blaming this
> fucking guy. This guy thinks he's a fucking wise guy. But you got to tell this guy
> I don't give a fuck what he bet this week. I want everything paid up.[11]

The government acknowledged that this conversation was about "Allen's" unpaid debt. The government never spoke to "Allen," and had no proof that "Allen" was ever threatened or harmed by the Defendant.[12]

E. On October 28, 1998, the Defendant had a conversation with co-defendant James LaPolla about who will be the telephone subscriber for a new business they were opening that the government characterized as an "illegal telemarketing room". The Defendant said he did not want anything in his name. The government introduced no proof that so-called "illegal telemarketing room" ever opened, or that any type of violence was associated with it.[13]

F. On October 29, 1998, the Defendant had a conversation with Joey DeFazio. During the conversation the Defendant stated:

> Defendant:   Well he is gonna get a fucking beaten if he don't get the money back.
>
> JD:   I thought ahh... Huey spoke to him Joe
>
> Defendant:   Naw. I want the money back now. I had it. I want the fucking money
> or you are going to see what's going to happen to this kid.
>
> JD: (UI)
>
> Defendant: He'll be sorry he ever fucking did it.
>
> JD: I got to tell you the truth (UI) I saw Huey the other day (UI) and number two,
> I don't really want to do it, I got my own now. You know what I mean?
>
> Defendant: I am just gonna get the kid. That's all. We are still trying to find him
> now. I will break his fucking jaw when I see him. You better bring the fucking

---

[11] App. A, pg. 15

[12] App. A, pg. 42-43

[13] App. A, pg. 15-16

money back. If you know him give him a call and tell him he better bring that fucking money back (UI)

JD: (UI)

Defendant: Huh?

JD:    (UI)

Defendant: Tell him he better have the fucking money back 'cause there are other people involved now.

JD: (UI)

Defendant: Nobody, nobody is robbing us. I don't hive a fuck… Not Huey its us now! [14]

The government acknowledged that this was a conversation between the Defendant and DeFazio was about someone named "Bob" who beat "Huey" out of money. They discussed what should be said to "Bob" if he did not repay the money. The government did not know "Bob's" identity. The government had no proof that "Bob" was ever threatened or harmed, or that DeFazio passed on the Defendant's on advice.[15]

   G. On November 5, 1998, the Defendant had a conversation with "Marty" whose last name was unknown. During the conversation, the Defendant stated:

Defendant: He mentioned my name?

Marty: Yeah, so I didn't say no more. I just , I just, I changed the subject. I didn't want. I thought maybe I don't know who the guy is. I heard from somebody that he's sounds good this guy.

Defendant:    He's what?

Marty: He's no good, he's a wiseguy.

Defendant: Is he ah, is he ah, is he Greek?

---

[14] App. A, pg. 16

[15] App. A, pg. 45-47

6

Marty: No, I don't think he's Greek, I don't think he's Greek, no. No.

Defendant: Go ahead and break his head.

Marty: What's that?

Defendant: Go ahead, break his head.

Marty: Okay

\* \* \*

Defendant: He wants to be wiseguy. We gotta do what we gotta do.

Marty: (UI). No I knew that, I, I just didn't like, he starts criticizing other people, you know, I mean I didn't like that.

Defendant: No you know what? If you're having a problem let me know, I'll come.

Marty: Okay.

Defendant: You know what I mean. I'll bring my boys with me.[16]

The government acknowledged that the Defendant gave "Marty" advice on how to handle two men that owed "Marty" a large amount of money. The government had no proof that "Marty" ever acted on the Defendant's advice, or that the two men were ever threatened.[17]

H. On November 11, 1998, the Defendant had a conversation with James Sacca. During the conversation the Defendant stated:

Sacca: Okay which money are you talking about exactly?

Defendant: I'm talking about the money that's owed the office, the shylock money. Alright?

\* \* \*

Defendant: It's all ours, It's all ours. You working anything, you're gonna pay anyway.

---

[16] App. A, pg. 17-18

[17] App. A, pg. 47-48

7

\* \* \*

Defendant: You're all gonna die anyway, You don't work out no fucking arrangements.

\* \* \*

Defendant: Let me tell you something, you little prick. Listen to me you little prick. I told you once that" ours. I told you twice that's ours, and I'm telling you again.

\* \* \*

Defendant: Now you shut up. You don't tell me what to do no more. You don't fucking do just what you want to do.[18]

The government acknowledged that later in the conversation, the Defendant asked that his comments be passed on to Sacca's uncle. The government had no proof Sacca relayed the comments to his uncle.[19]

I. On November 12, 1998, the Defendant had a conversation with co-defendant Percy Morris. According to the government, they were talking about trying to locate an individual that owed money.[20] **The Magistrate refused to allow the Defendant to present evidence about this conversation.** ( emphasis added)

J. On December 10, 1998, the Defendant and Percy Morris discussed a check-cashing place.[21] **The Magistrate refused to allow the Defendant to present evidence about the conversation.** (emphasis added)

K. On December 15, 1998, the Defendant and a group of men discussed "Alex" who owed money. During the conversation the Defendant stated:

Defendant: So you tell him the games are over ALEX (PH). Do you think you fucking around? If you want to be fucking a wise guy, then we'll meet him.

---

[18] App. A, pg. 18-19

[19] App. A, pg 51

[20] App. A, pg. 19-20

[21] App. A, pg. 20

8

* * *

Defendant: He wants to be fucking wise guy, tell him, we'll come there. We'll straighten your fucking ass out real fast.[22]

**The Magistrate refused to allow the Defendant to present evidence about this conversation. However, the Defendant specifically refers to "Alex", the bettor. In earlier questioning, the government acknowledged that it had no proof that "Alex" was ever threatened or harmed.** (emphasis added)

L.    On December 17, 1998, the Defendant had a conversation with Al Polito, the informant, about an unidentified debtor paying on time; otherwise the Defendant would collect from him.[23] **The Magistrate refused to allow the Defendant to present evidence about this conversation.** (emphasis added)

M.    On December 18, 1998, the Defendant had a conversation with Al Polito, the informant. During the conversation the Defendant stated:

Defendant: How much do I gotta put up with this guy. And you can tell him that too.

AP:    Yeah.

Defendant: Nobody wants to talk to this guy no one. Tiny wants to bust his skull. For chiseling and stealing.

* * *

Defendant: So don't go around bullshitting and don't let us here that you're saying anything about us, cause you're gonna have the biggest fuckin problem you've had in your fuckin life. [24]

---

[22] App. A, pg. 21

[23] App. A, pg. 21

[24] App. A, pg. 21

**The Magistrate refused to allow the Defendant to present evidence about this conversation.**

(emphasis added)

N. On April 2, 1999, the Defendant had a conversation with Al Polito, the informant.

During the conversation, the Defendant stated:

> Defendant: Tell him to go over the fucking mortgage and get the fucking money. You know, we tell him, we told him; otherwise we're coming after him. We want fucking money. I want it. We want our fucking money. I want it. We want our money.[25]

Later in the conversation the Defendant stated:

> Defendant: I know where he lives catch him right where he lives. And put in a fucking...Good thing he's going to the fucking hospital. This time he's going.[26]

Still later in the conversation, the Defendant stated:

> Defendant:    We only gave him a little beating. You know we gave him a few cracks a few kicks, but nothing you know really. And the way we first hit him.[27]

> \*\*\*

> Defendant:    Yeah, I hit him in the fuckin' center of the face while he was down. And I said that's my son, you mother fucker (UI). (UI) my son get (UI).[28]

> \*\*\*

> Defendant:    He paid. I mean, yeah, they all paid.

**The Magistrate did not allow the Defendant to present evidence about this conversation where the Defendant is giving advice to the Informant about how to collect a debt.** *However, it is doubtful the government allowed its Informant to threaten or harm anyone.* The **Defendant was not allowed to explore whether the "beating" actually happened, or whether the comments were mere bravado.** (emphasis added)

---

[25] App. A, pg. 21-22

[26] App. A, pg. 21

[27] App. A, pg. 22

O.     On April 16, 1999, the Defendant had a conversation with Al Polito, the

informant. During the conversation, the Defendant stated:

> Defendant:     He tried to start a problem with me. You got a "C" with another
> family. Told the other family to fuck themselves.[29]
> ***
> Defendant: Me and two guys were gonna get him. I'm waiting at the fucking
> house. I waited for one guy. [30]

**The Magistrate did not let the Defendant present evidence about this conversation.**

(emphasis added)

P.   On April 23, 1999, the Defendant had a conversation with Al Polito, the informant,

about obtaining fraudulent driver's licensees. The Defendant said he got a license in a different

name for insurance purposes.[31]

Q. On May 19, 1999, the Defendant had a conversation with Al Polito, the informant.

The prosecutor read excerpts of this long conversation into the record:

> Gave him a fucking shot. I was surprised I hit him so good. You know, he went
> down. I kicked him in the fucking nuts, went into his pocket, took the money.
> Ralphie ordered coke about two weeks ago. [32]

The prosecutor lead the Magistrate to believe that Ralphie ordered "coke aka cocaine about two

weeks ago." The conversation took place in a restaurant. The reference about "coke" referred to

---

[28] App. A, pg. 22

[29] App. A, pg. 23

[30] App. A, pg. 23

[31] App A, pg. 23-24

[32] App. A, pg. 25

a Coca-Cola with ice.[33] The reference to "two weeks ago" did not refer to Ralphie ordering a

Coca-Cola. The actual transcript reads:

> Defendant: (UI) Ralphie (UI)... two weeks ago. (UI)... I (UI) the fucking jerked
> me off (UI). I gave him a fucking shot, I'm surprised I hit him so good. You know
> and he went down. And I kicked him in the fucking nuts. Went into his pocket
> and I took the money. **Ralphie ordered Coke. (UI)... ice.**
>
> CW:    This was just recent?
>
> Defendant: About two weeks ago.

**The Magistrate refused to allow the Defendant to present evidence about this conversation.**

(emphasis added)

R. On June 23, 1999, the Defendant had conversation with Al Polito, the informant.

During the conversation, the Defendant stated:

> Defendant: We went up to fucking Cocoa Beach. We kidnapped two fucking guys
> right out of their fucking home. And not that we're heroes, but we ain't gonna let
> nobody make a fool out of us.[34]

**The Magistrate refused to allow the Defendant to present evidence about this conversation.**

(emphasis added)

6. In ordering the Defendant's pretrial incarceration, the Magistrate emphasized the

Defendant's prior "arrest" record as reflected in the Pretrial Services Report. Between February

1960 and March 1967, the Defendant was arrested eight times in New York. The government did

not know the disposition of any of these arrests that occurred 33 to 40 years ago.[35]

---

[33] If the government disputes this interpretation, the Defendant moves the Court to supplement
the record with the government's transcript.

[34] App. A, pg. 25-26

[35] App. A, pg. 52

12

7.      **Before the government returned its Indictment, the Defendant knew about the government's investigation, including that Al Polito was cooperating with the government. The Defendant voluntarily surrendered to FBI agents, without incident, at his attorney's office.**[36]

8.      The government advised the Magistrate that it was going to amend the Indictment to include allegations that the Defendant engaged in an organized fraud involving a company known as PRSI, Inc. In December 1999, the Defendant learned that PRSI, its principals and he were under both civil and criminal investigation. The Defendant retained counsel, the undersigned. On January 5, 2000, the Attorney General's Office served a temporary injunction on PRSI, which appointed a receiver and froze PRSI's bank account. Notwithstanding, that the Defendant knew that he and the other principals of PRSI were under investigation, there was no attempt to remove, hide or otherwise dispose of over $4 million in PRSI's bank account. Since January 5th the Defendant, by and through counsel, has vigorously contested the injunction, with full knowledge of an ongoing criminal investigation.[37] (emphasis added)

9.      Most of the conversations were conditional threats, or about future conduct, and/or doing harm in the future. **The government did not attempt to warn any of the persons mentioned in the conversations that their safety was in danger.** (emphasis added)

10.     The lead defendant, Reynolds Maragini, is not pretrial detained. He was released on a combination of bond, and house arrest with electronic monitoring. This is the same type of pretrial release requested by the Defendant.

---

[36] App. A, pg. 58

## MEMORANDUM OF LAW

Regarding the Defendant being a danger to the community, the Bail Reform Act of 1984 provides the judicial officer shall order the pretrial release of the person unless the judicial officer determines that such release will endanger the safety of any other person or the community. The Act provides a rebuttable presumption of danger to the community when a defendant has been previously convicted of certain crimes, has committed the alleged offense while released on bond for another offense, has recently been released from prison, or has been indicted for certain crimes.[38] The statute provides that the defendant "shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The facts supporting a finding that the defendant is a danger to the community must be supported by clear and convincing evidence.[39]

The government proffered that it intercepted and recorded approximately 1000 conversations involving the Defendant.    The government introduced excerpts from 16 conversations that occurred between October 1998 and June 1999. The government intercepted and tape-recorded the conversations approximately a year before the Defendant was indicted. During the year between the government intercepting and recording the conversations and the government indicting the Defendant, he lived and remained in South Florida.

During the year between the government recording the conversations and the government indicting him, the Defendant was actively defending a multi-million dollar civil case, which the government contends is related to this case. The government says that this Indictment is going to

---

[37] App. A, pg. 28-29

[38] 18 U.S.C. § 3142 (e)

[39] 18 U.S.C. § 3142 (f)

14

be amended to include additional charges emanating from the subject matter of multi-million dollar civil case. The civil case, involving a company known as PRSI, was filed and served on January 4-5, 2000. It includes a dispute as to whether the Defendant, including his co-defendants in the civil case, is entitled to over $4 million, which is presently frozen by a state court order. In this case, the government contends that a year ago that the Defendant suggested or offered to do violence to people who owed a few thousand dollars. Yet, the government did not introduce a scintilla of evidence that since January 2000, that the Defendant has offered to do violence, or that the Defendant has suggested that harm be done to any of the witnesses or parties, who within the past few months have deprived him and his civil co-defendants access to millions of dollars.

Consistent with the statutory mandate that a defendant must be allowed to confront his accusers, the Defendant was allowed to present evidence regarding about half of the conversations. As to the conversations that the Defendant was allowed to confront, the evidence viewed in a light favorable to the government revealed that the Defendant was a foul mouthed, tough-talking braggart, who talked to other persons about doing harm in the future to various third parties. **However, the government did not have a scintilla of evidence that these threats to do harm in the future were ever acted upon or carried out.** Regarding the excerpt from the October 18th conversation, the government admitted: (1) that the Defendant was giving advice to an unknown person on how to handle an unidentified person, and (2) that it had no proof that the unknown person ever acted upon the Defendant's advice or that anyone was ever harmed. Regarding excerpts from the October 21st and 28th conversations, the government admitted (1) that the conversation was about doing harm a bettor named "Alex," and (2) that it had no proof that "Alex" was ever threatened, because it had never attempted to speak to him. Regarding the excerpt of the conversation on October 26th, the Defendant told the government's informant that

15

"Allen's" unpaid debt must paid. The government did not have any proof that "Allen" was ever threatened or harmed by the Defendant. The excerpt of the October 28th conversation with co-defendant James LaPolla concerned who would be the telephone subscriber in a new business the government characterized as an illegal telemarketing operation. Nothing of a violent nature was discussed, and the government offered no proof that the new business ever opened. The excerpt of the October 29th conversation with Joey DeFazio concerned someone named "Bob" who beat" Huey" out of money, and what should be said to "Bob" if he did not repay the money. The government had no proof that "Bob" was ever threatened if he did not repay the money, or that DeFazio ever passed on the advice. The excerpt of the November 5th conversation concerned the Defendant giving "Marty" advice on how to handle two men that owed "Marty" a large amount of money. The government had no proof that "Marty" ever acted on the Defendant's advice, or that the two men were ever threatened.    (emphasis added)

**The Defendant was not allowed to present evidence to rebut or explain the excerpts of 8 conversations the government relied on to deny the Defendant's pretrial release. The defendant was denied the right to confront his accusers.** Regarding the excerpts of the conversations on November 12th, December 10th, 15th, 17th, and 18th, 1998, April 2nd, 16th, and 23rd, May 18th, and June 23rd, the Magistrate refused to allow the Defendant to present evidence to rebut, explain, or clarify these conversations. Remember regarding the earlier conversations that the Defendant was allowed to confront, it was established the Defendant was a tough-talking braggart, full of bluster and boasting, who talked to other persons about doing harm in the future to various third parties; however, the government did not have a scintilla of evidence that these threats to do harm in the future were ever acted upon or carried out. **Seeing that the government**

16

**had no proof that anyone was actually threatened, much less harmed, the Magistrate stopped the Defendant's presentation of evidence.** (emphasis added)

The Magistrate stopped the Defendant's presentation of evidence before he had an opportunity to rebut, explain, or clarify the excerpts from the April 2nd, May 19th and June 23rd conversations. In the April 2nd and May 19th conversations the Defendant made statements about some unidentified person being hit by him. In the June 23rd conversation he made statements about two unidentified people being kidnapped at some unspecified time in Cocoa Beach. The Magistrate specifically commented on and relied upon the statements made about a kidnapping and the statements made about the Defendant actually hitting someone to deny the his pretrial release.[40] The Magistrate found that the Defendant's "confessions," *without any evidence of a corpus*,[41] were clear and convincing evidence that the incidents occurred. It's a good thing the Defendant did not boast about being Lee Harvey Oswald's accomplice; otherwise there would be clear and convincing evidence that the Warren Commission was wrong.

Most of the conversations were about doing harm in the future to third parties; in other words, the Defendant was not talking about doing harm to the other person participating in the conversation. The FBI was aware of these purported threats as they were being made, because it was listening to the actual conversations as they were being recorded. Query: If the FBI considered these to be credible threats, why didn't it attempt to warn or protect those that were in harm's way? If it really believes that someone is in danger, doesn't the FBI have an obligation to try to prevent the person from being harmed? Actions speak louder than words: the FBI never

---

[40] App. A, pg. 59

[41] No proof was introduced that these unspecified events ever occurred. Given the Defendant's age and physical and medical condition, it is just as likely these statements are boasting or hyperbole.

17

attempted to warn or prevent harm to any of the people mentioned in the conversations, and to this day have not interviewed them to see if they were ever threatened or harmed. The FBI knew the Defendant was a braggart, so it took no action.

The government presented inaccurate information about drug dealing to inflame the Magistrate. The prosecutor told the Magistrate that the Defendant said, "Ralphie ordered coke (cocaine) about two weeks ago." In actuality, the Defendant, while in the middle of a conversation in a restaurant, commented to a waitress, "Ralphie ordered coke (Coca-Cola)...ice."

The Defendant is not a "clear and present danger." The Defendant, who is 65 years old, has serious health problems. He suffers from arteriosclerotic heart disease, diabetes, hypertension (high blood pressure) and hyperlipidemia (elevation of fats in the blood stream). The Defendant had coronary by-pass surgery and within the past year suffered a stroke. His current medications include Glucophage 300 milligrams twice a day (diabetes), pradin 2 milligrams three times per day (diabetes), norvasc 5 milligrams twice a day (high blood pressure), pravachol 20 milligrams once at bedtime (cholesterol), and plavix 75 milligrams once a day (artheroscleriois). A 65-year old man, who has undergone a coronary by-pass, who has suffered a recent stroke, and who presently suffers with heart disease, high blood pressure, diabetes and high cholesterol, may talk, tough but that's all.

## CONCLUSION

For the reasons expressed herein, the Court should revoke the detention order, conduct a *de novo* hearing, and amend the pretrial detention order by setting reasonable conditions of pretrial release consistent with those imposed on the lead defendant, Reynolds Maragini (i.e. bond, plus house arrest including electronic monitoring). The Court can easily fashion conditions of pretrial release that restrict the Defendant's movements, but which allow him to get

18

the regular medical attention he needs from his long-time treating physician. For example, the Defendant can be placed on electronic monitoring.[42] Given the Defendant's past propensity to talk on the telephone, his pretrial release can include a condition that he not use a cellular telephone, walkie-talkie, or portable telephone.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was mailed and/or faxed and/or hand delivered on the ⌐ day of ⊃⊃⌐ , 2000, to:

Paul Schwartz
Assistant U.S. Attorney
500 E. Broward Blvd., 7th floor
Fort Lauderdale, FL. 33301

Via fax 954-356-7336

H. DOHN WILLIAMS JR. P.A.
PO Box 1722
Fort Lauderdale, FL 33302
954-523-5432; 527-5565 (fax)

By: _____
H. Dohn Williams Jr.
Fla. Bar #166087

C:\clients\rotunno\pretrialdetain.1

---

[42] Use of the satellite system would disclose his whereabouts at anytime.

19

## APPENDIX A

## TRANSCRIPT OF PRETRIAL DETENTION HEARING

CASE # _00 - CR - 6154 - WPD_



# "Do Not Scan or Copy This Transcript."

DE # _____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

UNITED STATES OF AMERICA,        . CASE NO. 00-6154-CR-JORDAN
                                 .
            PLAINTIFF,            . MIAMI, FLORIDA
                                 . JUNE 27, 2000
       V.                        . 2:00 P.M.
                                 .
REYNOLDS MARAGNI, ET AL.,        .
                                 .
            DEFENDANTS.          .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF ARRAIGNMENT OF PERCY MORRIS AND PRETRIAL

DETENTION HEARING FOR JOSEPH ROTUNNO

HAD BEFORE THE HONORABLE STEPHEN T. BROWN,

UNITED STATES MAGISTRATE JUDGE.

- - - - -

PAGES 1 THROUGH 62

- - - - -

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING, TRANSCRIPT
PRODUCED BY COMPUTER.

```
APPEARANCES:

FOR THE GOVERNMENT:    PAUL F. SCHWARTZ
                       JULIA STILLER
                       ASSISTANT U.S. ATTORNEYS
                       99 N.E. 4TH STREET
                       MIAMI, FLORIDA 33132

FOR THE DEFENDANT      H. DOHN WILLIAMS, JR., ESQ.
ROTUNNO                721 N.E. 3RD AVENUE
                       P.O. BOX 1722
                       FT. LAUDERDALE, FLORIDA 33302

FOR THE DEFENDANT      WILLIAM M. MORRIS, ESQ.
MORRIS:                3225 AVIATION AVENUE, SUITE 300
                       COCONUT GROVE, FLORIDA 33133

FOR THE DEFENDANT      ALAN KAUFMAN, ESQ. (PHONETIC)
MARAGNI:

COURT REPORTER:        FRANCINE C. SALOPEK, R.M.R.
                       OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                       301 NORTH MIAMI AVENUE, ROOM 804
                       MIAMI, FLORIDA 33128-7709
                       (305)523-5568

                        -   -   -   -   -
```

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING, TRANSCRIPT
PRODUCED BY COMPUTER.

# NOT

# SCANNED

**PLEASE REFER TO COURT FILE**