PFS:df

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6154-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOSEPH ROTUNNO

    Defendant.
_____/

GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT ROTUNNO'S MOTION TO REVOKE OR
AMEND THE PRETRIAL DETENTION ORDER TO ESTABLISH
<u>REASONABLE CONDITIONS OF PRETRIAL RELEASE</u>

  Comes now the United States of America by and through undersigned counsel and respectfully responds in opposition to defendant's Motion to Revoke or Amend the Pretrial Detention Order to Establish Reasonable Conditions of Pretrial Release. In support thereof the government states the following:

### Introduction

  The instant case is the result of a two year investigation conducted by a task force consisting of the Federal Bureau of Investigation, the Broward Sheriff's Office, Florida Department of Law enforcement, Miami Dade Police Department, and other law enforcement agencies. A court authorized wire interception was conducted on defendant Rotunno's cell phone from October 16, 1998 to December 19, 1998. Search warrants were executed on January 17, 1999, relating to several locations used by the criminal enterprise to facilitate the illegal gambling and extortion activities.



Joseph Rotunno is a long time criminal associate of the Colombo LCN Family. Historically, Rotunno has engaged in a wide-range of criminal activities including illegal gambling, extortion and money laundering. Rotunno has been a significant target of federal, state and local law enforcement for the past twenty years. Rotunno currently supervises a crew of criminal associates who are engaged in various criminal activities, including, credit card fraud, illegal gambling, extortion and money laundering, among other crimes.

In or about the summer of 1998, Rotunno began coordinating the activities of several illegal gambling businesses (IGB's). The IGB's were being conducted by co-defendants Mike Capri, Bert Caskill, Gary Braseke, Michael Eddy, Marty Zarcadoolas and Scott Miller. Rotunno supervised the IGB's and collected the losses from losing bettors. The court authorized electronic interceptions reflect that Capri, Caskill, Eddy, Miller and Braeseke contacted Rotunno on a regular basis to report the total gambling winnings or losses and to discuss individual bettors. It is clear that Rotunno maintained a supervisory role and was responsible for collecting the gambling and loanshark debts. A large illegal gambling business located in Dade County, "B and D," was established by co-defendants Meisel and Hawkins and was staffed by co-defendants Travers and Drezek. Rotunno coordinated the placement of bettors between the businesses and gave instructions as to the payment of gambling proceeds and the collection of losses.

Co-defendants Caskill, Eddy, Miller, and Zarcadoolas were "sub-book's" (agents of the IGB). They placed bettors with various IGB's under Rotunno's control. Zarcadoolas, Caskill, Eddy and Miller had several telephone conversations with Rotunno wherein they discussed common bettors and the conversion of betting losses into extortionate extensions of credit.

Caskill, Eddy, Miller, Zarcadoolas and Rotunno planned to refer bettors to "B and D" and other IGB's in anticipation that the bettors would sustain significant losses. Rotunno would be responsible for collecting the losses and thereby Rotunno would insert himself into the operation of the IGB's and attempt to gain overall control. , Eddy, Caskill Miller, Zarcadoolas and Rotunno discussed the extortionate collection of loans from losing bettors.

The intercepted telephone conversations between Rotunno and various coconspirators reflect that Rotunno often converted the losses by bettors into extensions of credit at usurious rates. There are numerous conversations in which Rotunno instructed coconspirators to charge three percent interest per week (156% per annum) toward the repayment of losing wagers.

The bettors would make payments towards their loans by providing cash or checks to Percy Morris, aka Tiny, who in turn, would deliver the proceeds to Rotunno. The intercepted conversations reflect that Rotunno personally threatened victims and instructed Morris to threaten harm, if necessary, to individuals owing money to the enterprise.

The intercepted conversations further reflect that Reynolds Maragni, Bert Caskill, Gary Braeseke, James Lapolla, William Hawkins, Emro Capri, Martin Zarcadoolas, Scott Miller and Michael Eddy discussed extortionate collections with Rotunno. The conspirators further discussed using "Tiny" (Percy Morris) to assist in the collections.

In December 1998, the electronic interceptions revealed telephone conversation between Rotunno and co-defendants Kaiser Akel, Bert Caskill, Martin Zarcadoolas, Emro Capri, Michael Eddy, Gary Braeseke, and Percy Morris regarding the laundering of gambling proceeds.

Rotunno and Akel had telephone conversations and consensual recordings regarding the cashing of checks. They discussed checks totaling in excess of $500,000 that were cashed at Akel's store. The interceptions reflect conversations between Rotunno and Akel wherein they discussed Akel's ability to obtain money from "a friend" in order to cash the checks provided by Rotunno. Rotunno had further telephone conversations with Zarcadoolas and Bert Caskill regarding the use of the check cashing store to launder gambling proceeds.

The investigation has disclosed that co-defendant James Lapolla utilized a corrupt employee in the Florida Department of Motor Vehicles who obtained fraudulent drivers licenses on behalf of Rotunno, Maragni and other enterprise members.

<u>Pretrial Detention Hearing</u>

At the pretrial detention hearing, the government presented evidence regarding risk of flight and danger to the community.

The government proffered that the defendant's criminal history dates back to at least 1960 with eight arrests including <u>inter alia</u>, kidnaping, assault and possession of a weapon (transcript pretrial detention hearing, page 11). The defendant was convicted in 1984 in Broward County, Florida, on four counts of loansharking, one count of bookmaking and was sentenced to 3-1/2 years incarceration.

The government proffered that on or about June 24, 1998, the defendant declared bankruptcy, and therefore, was without any substantial assets. The government offered into evidence a fraudulent Florida State Driver's license in the name of John Rotunno. The intercepted conversations reflect that defendant utilized the fraudulent license.

The government recited relevant portions from its court authorized wire interceptions regarding the defendant's conversations with various co-conspirators. As reflected in the transcript of pretrial detention (pages 14 through 26) said transcript excerpts clearly reflect the defendant's statements regarding acts of violence both counseled by the defendant and committed by him.

Defendant alleges that the statements were merely threats to do harm in the future and were never acted upon or carried out. (Defendant's motion, page 15). Defendant fails to address his supervisory role in the criminal conspiracy as charged in the instant indictment.

Defendant's intercepted wire communications with members of the criminal enterprise reflect his instructions and advise to

various co-conspirators regarding the use or threatened use of violence. Defendant's supervisory role included arranging for the collection by extortionate means of loanshark and gambling debts by members of the conspiracy. Clearly, defendant's "threats to do harm in the future" are evidence of defendant's supervisory capacity in a violent extortion conspiracy.

The government presented evidence of defendant's own acts of violence. The government recited the defendant's statements regarding a vicious assault committed by the defendant (transcript pretrial detention, page 22). The government further presented evidence regarding the defendant's participation in a violent kidnaping. (Transcript pretrial detention hearing, page 25).

The defendant conducted a lengthy cross-examination of FBI Special Agent Neil Mathieson. (Transcript pretrial detention, pages 34-52). Even a cursory review of the transcript reflects that defendant had a full and fair opportunity to elicit responses to his inquiries regarding the case. At no time did Magistrate Judge Brown curtail any relevant area of questioning posed by defendant.

The defendant failed to rebut the government's evidence demonstrating the defendant's propensity for violence, affiliation with organized crime members and supervision of a large and complex criminal enterprise. Further, the defendant utterly failed to demonstrate that any condition or combination of conditions can assure the safety of the community.

Magistrate Judge Brown found, by clear and convincing evidence, that the defendant constitutes a danger to the community. The Court was not persuaded by defendant's arguments that the threats had not been carried out nor conveyed to the victims. The Court found that the government had presented abundant evidence regarding direct threats, actual acts of violence committed by the defendant and the defendant's participation in a kidnaping.

Defendant now argues that Magistrate Judge Brown refused to allow the defendant to present evidence and severely curtailed defendant's cross-examination of FBI Special Agent Mathieson. The transcript of the pretrial detention hearing, page 53, reflects that defendant's sole proffer of evidence to sustain his burden was the admission of a letter from defendant's physician. Defendant failed to offer any evidence demonstrating that he was not a danger to the community.

Defendant now argues that the Magistrate Judge curtailed his inquiry of Special Agent Mathieson. The Court at page 59 of the transcript of the pretrial detention hearing stated,

> "...even if I give the defendant the benefit of the doubt and all the tapes that Mr. Williams so excellently explained to the court and again, I cut you off not because I didn't like what you were saying but because you made your point, if you understand what I'm saying here, there is still an abundance of evidence of threats, direct threats, a kidnaping that occurred, actual acts of violence on behalf of this defendant that remain in the evidence of this case, that coupled with the indictment-and again the indictment constitutes probable cause—is substantial." (emphasis supplied)

Memorandum of Law

The Court in United States v. King, 849 F.2d 485, 490 (11th Cir. 1988), held that, after a detainee moves to revoke or amend a magistrate judge's pretrial detention order, the district court must decide whether it is necessary to hold an evidentiary hearing. If the district court, after a careful review of the pleadings and the evidence developed at the magistrate judge's detention hearing, determines that the magistrate judge's factual findings and legal conclusions are correct, it may explicitly adopt the magistrate judge's pretrial detention order without holding an evidentiary hearing. Such adoption of the magistrate judge's order would obviate the need for the district court to prepare its own written findings of fact and statement of reasons supporting pretrial detention. On the other hand, if the district court, after review of the pleadings and the proceedings before the magistrate judge, determines that additional evidence is necessary or that factual issues remain unresolved, it may conduct an evidentiary hearing for these purposes. In this instance, the district court must enter written factual findings and written reasons supporting it findings. If after conducting an evidentiary hearing, the district court concludes that the additional evidence does not affect the validity of the magistrate judge's findings and conclusions, the court may state the reasons therefore and explicitly adopt the magistrate judge's pretrial detention order.

Even a cursory review of the transcript of the pretrial detention hearing reflects that no further evidentiary proceeding is warranted.

The defendant failed in his burden to rebut the evidence produced by the government. Defendant's interpretation of the intercepted conversations regarding "future threats" is misplaced and not substantiated by the evidence. Defendant conveniently overlooks his supervisory role in the criminal enterprise. Further, his submission of a physician's letter regarding the defendant's physical condition is not sufficient to rebut the government's evidence. The defendant failed to produce any evidence to suggest that the defendant does not constitute a danger to the community. See United States v. Hurtado, 779 F.2d 1487, 1479 (11th Cir. 1985).

A district court may affirm the magistrate judge's order of pretrial detention by reliance on the transcript of the hearing that occurred before the magistrate judge. United States v. Gaviria, 828 F.2d 667, 668 911th Cir. 1987). A de novo review, does not require the district court to a hold de novo evidentiary hearing.

### Conclusion

Based upon the foregoing, the government respectfully submits that the Court may affirm the order of pretrial detention as issued by the magistrate judge by relying on the transcript of the pretrial detention hearing and the parties' submissions. A review thereof will demonstrate that the magistrate judge was

correct in his finding, by clear and convincing evidence, that defendant presents a danger to the community.

>Respectfully submitted,
>
>GUY A. LEWIS
>UNITED STATES ATTORNEY
>
>By: _____
>PAUL F. SCHWARTZ
>ASSISTANT UNITED STATES ATTORNEY
>Court ID #: A5500086
>500 E. Broward Blvd., 7th Floor
>Fort Lauderdale, Florida  33394
>Telephone: (954) 356-7392
>Facsimile: (954) 356-7230

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to the below named on this 12 day of July, 2000.

H. Dohn Williams, Esquire
721 N.E. 3rd Avenue
Fort Lauderdale, FL 33304

PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY