r-06154-WPD   Document 316   Entered on FLSD Docket 09/12/2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6154-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JOSPEH ROTUNNO, et al

    Defendants.

_____/

**NIGHT BOX**
**FILED**
**SEP 1 1 2000**

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

## MOTION IN LIMINE

COMES NOW the Defendant, Joseph Rotunno, by and through the undersigned attorney, pursuant to Fed.R.Crim.P. 12 and 17.1, and moves the Court for an order prohibiting or limiting the introduction of irrelevant, prejudicial evidence.[1] As grounds therefore the Defendant states:

### Statement of Facts

1.     The Defendant is charged with conspiracy to engage in racketeering, conspiracy to engage in extortionate credit transactions, conspiracy to engage in the collection of extensions of credit by extortionate means, conspiracy to engage in money laundering. All these offenses are related to illegal gambling and gambling debts incurred by the bettors. He is also charged with conspiracy to engage in the interstate transportation of stolen property.

2. The evidence and/or tape-recorded conversations that the Defendant objects to are:

A. On October 18, 1998, the Defendant had a conversation with an unidentified male. During the conversation, the Defendant stated:

---

[1] Prior to the deadline for filing pretrial motions, the government has not provided the required notice that it intends to introduce Rule 404(b) evidence. The Court has not excused the government from providing that notice.



> Defendant: Well, you gotta go grab this guy and you got to tell him, let's go get this JB.
>
> UM: That's what I've been telling them.
>
> Defendant: I'd go grab him by ... let me tell you something...I would grab the guy by his throat.
>
> \* \* \*
>
> Defendant: Right now, what I would do, if it was me, I would be very aggressive, I'd go grab the guy, and tell him look...
>
> UM: (SC) .... (UI)...
>
> Defendant: .... Right now, get in the car, I want to talk to you, get him in the car and say now take me to this guy's house, otherwise your gonna have the biggest problem you ever had.[2]

The government acknowledged that the Defendant was giving advice to an unknown person on how to handle an unidentified person. The government admitted that it had no proof that the unknown person ever grabbed the unidentified person.[3] The government does not whether this conversation pertains to the charges set forth in the Indictment.

B. On October 28, 1998, the Defendant had a conversation with co-defendant James LaPolla about who will be the telephone subscriber for a new business they were opening that the government characterized as an "illegal telemarketing room." The Defendant said he did not want anything in his name. The government has no proof that so-called "illegal telemarketing room" ever opened, or that was to be used to conduct illegal gambling, make of collect extortionate extensions of credit, or as part of the conspiracy regarding stolen property.[4]

---

[2] App. A, pg. 14

[3] App. A, pg. 36

[4] App. A, pg. 15-16

2

C. On October 29, 1998, the Defendant had a conversation with Joey DeFazio. During the conversation the Defendant stated:

> Defendant: Well he is gonna get a fucking beaten if he don't get the money back.
>
> JD: I thought ahh... Huey spoke to him Joe
>
> Defendant: Naw. I want the money back now. I had it. I want the fucking money or you are going to see what's going to happen to this kid.
>
> JD: (UI)
>
> Defendant: He'll be sorry he ever fucking did it.
>
> JD: I got to tell you the truth (UI) I saw Huey the other day (UI) and number two, I don't really want to do it, I got my own now. You know what I mean?
>
> Defendant: I am just gonna get the kid. That's all. We are still trying to find him now. I will break his fucking jaw when I see him. You better bring the fucking money back. If you know him give him a call and tell him he better bring that fucking money back (UI)
>
> JD: (UI)
>
> Defendant: Huh?
>
> JD: (UI)
>
> Defendant: Tell him he better have the fucking money back 'cause there are other people involved now.
>
> JD: (UI)
>
> Defendant: Nobody, nobody is robbing us. I don't hive a fuck... Not Huey its us now! [5]

The government acknowledged that this was a conversation between the Defendant and DeFazio was about someone named "Bob" who beat "Huey" out of money. They discussed what should be said to "Bob" if he did not repay the money. The government does not know "Bob's" identity. The government has no proof that "Bob" was ever threatened or harmed, that DeFazio passed on

---

[5] App. A, pg. 16

3

the Defendant's advice,[6] or that Bob's debt to Huey was related to illegal gambling, or a gambling debt converted to an extortionate extension of credit.

D. On November 5, 1998, the Defendant had a conversation with "Marty" whose last name was unknown. During the conversation, the Defendant stated:

Defendant: He mentioned my name?

Marty: Yeah, so I didn't say no more. I just, I just, I changed the subject. I didn't want. I thought maybe I don't know who the guy is. I heard from somebody that he's sounds good this guy.

Defendant:    He's what?

Marty: He's no good, he's a wiseguy.

Defendant: Is he ah, is he ah, is he Greek?

Marty: No, I don't think he's Greek, I don't think he's Greek, no. No.

Defendant:    Go ahead and break his head.

Marty: What's that?

Defendant: Go ahead, break his head.

Marty: Okay

* * *

Defendant: He wants to be wiseguy. We gotta do what we gotta do.

Marty: (UI). No I knew that, I, I just didn't like, he starts criticizing other people, you know, I mean I didn't like that.

Defendant:    No you know what? If you're having a problem let me know, I'll come.

Marty: Okay.

Defendant: You know what I mean. I'll bring my boys with me.[7]

---

[6] App. A, pg. 45-47

[7] App. A, pg. 17-18

4

The government acknowledged that the Defendant gave "Marty" advice on how to handle two men that owed "Marty" a large amount of money. The government has no proof that "Marty" ever acted on the Defendant's advice, that the two men were ever threatened,[8] or that money was related to illegal gambling, or a gambling debt converted to an extortionate extension of credit.

    E.  On April 2, 1999, the Defendant had a conversation with Al Polito, the informant. During the conversation, the Defendant stated:

> Defendant: Tell him to go over the fucking mortgage and get the fucking money. You know, we tell him, we told him; otherwise we're coming after him. We want fucking money. I want it. We want our fucking money. I want it. We want our money.[9]

Later in the conversation the Defendant stated:

> Defendant: I know where he lives catch him right where he lives. And put in a fucking...Good thing he's going to the fucking hospital. This time he's going.[10]

Still later in the conversation, the Defendant stated:

> Defendant:    We only gave him a little beating. You know we gave him a few cracks a few kicks, but nothing you know really. And the way we first hit him.[11]
>
>                               ***
>
> Defendant:    Yeah, I hit him in the fuckin' center of the face while he was down. And I said that's my son, you mother fucker (UI). (UI) my son get (UI).[12]
>
>                               ***
>
> Defendant:    He paid. I mean, yeah, they all paid.

---

[8] App. A, pg. 47-48

[9] App. A, pg. 21-22

[10] App. A, pg. 21

[11] App. A, pg. 22

[12] App. A, pg. 22

5

The Agent said the informant, Al Polito, said they were talking about Frederick Scarola. Polito did not witness the incident. It was just double or triple hearsay. The government did not interview Scarola, because he is an organized crime figure that it is planning on indicting.[13] Given the information set forth in the probable cause affidavit for the October 16th wiretap warrant, this conversation pertains to the wholesale car business, wherein Scarola cheated the Defendant out of money by submitting inflated (phony) invoices.

F.   On April 16, 1999, the Defendant had a conversation with Al Polito, the informant. During the conversation, the Defendant stated:

> Defendant:   He tried to start a problem with me. You got a "C" with another family. Told the other family to fuck themselves.[14]
>
> ***
>
> Defendant: Me and two guys were gonna get him. I'm waiting at the fucking house. I waited for one guy.[15]

The government does not know whom they were talking about.

G. On May 19, 1999, the Defendant had a conversation with Al Polito, the informant. The actual transcript reads:

> Defendant: (UI) Ralphie (UI)... two weeks ago. (UI)... I (UI) the fucking jerked me off (UI). I gave him a fucking shot, I'm surprised I hit him so good. You know and he went down. And I kicked him in the fucking nuts. Went into his pocket and I took the money. Ralphie ordered Coke. (UI)... ice.
>
> CW:   This was just recent?
>
> Defendant:  About two weeks ago.

---

[13] App. B, pg. 10-13

[14] App. A, pg. 23

[15] App. A, pg. 23

6

The government does not know if this conversation related to illegal gambling, or a gambling debt converted to an extortionate extension of credit.

H. On June 23, 1999, the Defendant had conversation with Al Polito, the informant. During the conversation, the Defendant stated:

> Defendant: We went up to fucking Cocoa Beach. We kidnapped two fucking guys right out of their fucking home. And not that we're heroes, but we ain't gonna let nobody make a fool out of us.[16]

The government knows that this conversation refers to an unrelated business venture known as PRSI located in Cocoa Beach. PRSI was a multi-level marketing company that was selling Internet websites to small businesses. The government previously advised the Magistrate that it was going to amend the Indictment to include allegations that the Defendant engaged in an organized fraud involving a multi-level marketing company known as PRSI. It has not done so; therefore the conversation is inadmissible.

## Legal Argument

A motion in limine is a speaking motion setting forth the anticipated objectionable evidence or conduct, and the reasons why the introduction would be improper. A motion in limine is the proper way to determine the admissibility of potentially highly improper testimony and evidence that may be so prejudicial, if wrongly introduced, that a curative instruction will not cure the error, thereby causing a mistrial. A motion in limine is a motion made in anticipation of an objectionable thing occurring. The motion is generally heard at a pretrial hearing, but maybe heard during trial out of the presence of the jury. The purpose of the motion is: (1) to prevent an attempt to introduce irrelevant and immaterial evidence, or (2) to exclude evidence whose probative value is outweighed by the danger of unfair prejudice, or (3) to exclude improper evidence. A motion in limine may be

---

[16] App. A, pg. 25-26

used to prevent anticipated improper conduct during trial by a witness, or even opposing counsel. A motion in limine is a preventive measure that avoids costly retrials caused by the introduction of improper evidence, or by improper conduct.

> "A motion in limine is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds." Commentary, "The Motion in Limine: Pretrial Trump Card in Civil Litigation," 27 U.Fla.Law.Rev. 531 (1975)

The government wants to introduce irrelevant and immaterial evidence, whose probative value is outweighed by the danger of unfair prejudice relating to: (1) unidentified advice to harm someone, (2) a proposed illegal telemarketing business, (3) somebody beating Huey out of money, (4) giving advice to someone named "Marty" on how to deal with someone that owed "Marty" money, (5) hitting a person who stole from the Defendant regarding an unrelated business deal involving cars, (6) a conversation about waiting for some identified person, (7) hitting someone for some unidentified reason, and (8) allegedly kidnapping someone connected with an unrelated business venture known as PRSI. The government has not shown these conversations are directly related to the conspiracy to engage in racketeering, conspiracy to engage in extortionate credit transactions, conspiracy to engage in the collection of extensions of credit by extortionate means, conspiracy to engage in money laundering, or the conspiracy to engage in the interstate transportation of stolen property. Given the content of the conversations, their probative value is outweighed by the danger of unfair prejudice.

### Conclusion

The Defendant prays that the Court exclude the evidence, and prohibit the government from arguing or using the evidence for any purpose.

**Certificate of Service**

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by mail and/or faxed this 11th day of September 2000 to:

Paul F. Schwartz, Esq.
Assistant United States Attorney
500 East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33394
(954-356-7336)

Allen Kaufman, Esq.
2900 North Dixie Highway, Suite 201
Oakland Park, FL 33334-2666
(954-563-6813)

William Norris, Esq.
3225 Aviation Avenue, Suite 300
Coconut Grove, FL 33133
(305-285-0699)

Dennis R. Bedard, Edq.
1717 N. Bayshore Drive, Suite 102
Miami, FL 33132
(305-530-9587)

James M. Stark, Esq.
524 S. Andrews Avenue, Suite 304N
Fort Lauderdale, FL 33301
(954-768-0738)

Martin Bidwell, Esq.
Assistant Federal Public Defender
101 N.E. Third Avenue, Suite 202
Fort Lauderdale, FL 33301
(954-356-7556)

Simon T. Steckle, Esq.
701 Brickell Avenue, Suite 3260
Miami, FL 33131
(305-536-6495)

Theodore Klein
800 Brickell Avenue, Penthouse Two
Miami, FL 33131-2944
(305-358-4010)

Phillip R. Horowitz, Esq.
12651 S. Dixie Highway, Suite 328
Miami, FL 33156
(305-232-1963)

Raymond Miller, Esq.
400 S.E. Sixth Street
Fort Lauderdale, FL 33301
(954-462-8594)

John F. Cotrone, Esq.
509 S.E. 9 Street, Suite 1
Fort Lauderdale, FL 33316
(954-779-7758)

Michael Dutko, Esq.
600 S. Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301
(954-764-5040)

Thomas D. Sclafani, Esq.
200 E. Broward Boulevard, Suite 1210
Fort Lauderdale, FL 33301
(954-524-8590)

Herbert Cohen, Esq.
200 S.E. 6th Street, Suite 205
Fort Lauderdale, FL 33301
(954-766-7969)

R. Michael Hursey, Esq.
305 S. Andrews Avenue, Suite 701
Fort Lauderdale, FL 33301
(954-779-7980)

H. DOHN WILLIAMS JR., P.A.
P.O. Box 1722
Fort Lauderdale, FL 33302
954-523-5432; 527-5565 (fax)

By: _____
H. Dohn Williams Jr.
Fla. Bar # 0166087

e:\clients\rotunno\limine.1

10