UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6154-CR-Dimitrouleas

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH ROTUNNO et al., | ) |
| | ) |
| Defendants. | ) |



## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT ROTUNNO'S AND DEFENDANT ZARCADOOLAS'S MOTIONS TO SUPPRESS EVIDENCE DERIVED FROM ELECTRONIC SURVEILLANCE

The United States of America by and through its undersigned attorneys hereby opposes

Defendants' motions to suppress the evidence derived from the court authorized electronic

surveillance conducted in this matter.[1] For the reasons set forth below, Defendants' motions are

without merit and should be denied.

## FACTUAL DISCUSSION

The instant case is the result of a two year task force investigation involving the use of

court authorized wire interceptions over Rotunno's cellular phone from October 16 to December

19, 1998, the execution of several search warrants at locations utilized by the criminal enterprise

to conduct its illegal gambling businesses and extortionate activities, and the placement of a

---

[1]Defendants Miesel, Akel, Brooks and Caskill have filed motions to join Defendants
Rotunno's and Zarcadoolas's motions to suppress. The government notes that Defendants
Miesel and Brooks are not aggrieved persons under 18 U.S.C. § 2518(10)(a) and, therefore, do
not have standing to contest the electronic surveillance conducted herein.

high-level cooperating witness. On June 6, 2000, a federal grand jury returned a six-count indictment against Joseph Rotunno and seventeen others, including Rotunno's co-movant Defendant Martin Zarcadoolas. The indictment charges Rotunno with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d) (Count 1), conducting an illegal gambling business in violation of 18 U.S.C. § 1955 (Count 2), conspiring to make and collect extortionate extensions of credit in violation of 18 U.S.C. §§ 892 and 894 (Counts 3 & 4), conspiring to commit money laundering in violation of 18 U.S.C. § 1956 (Count 5), and conspiring to sell and receive stolen property in violation of 18 U.S.C. § 2315 (Count 6).² Defendant Zarcadoolas is charged in each of these counts as well, with the singular exception of Count 6.

In sum, the underlying indictment charges that Rotunno is an associate of the Colombo Organized Crime Family, and from at least 1997 to the present supervised, on the Colombo Family's behalf, its South Florida crew of criminal associates and their related activities, including racketeering, fraud, illegal gambling, extortion and money laundering, among other crimes. To that end, in or about 1997, Rotunno began coordinating and supervising the activities of several illegal gambling businesses located in and around South Florida. Defendant Zarcadoolas acted as an agent of Rotunno's illegal gambling businesses and would place the bets of his underlying clientele with various gambling offices controlled by Rotunno and other co-conspirators.

In addition, one of Rotunno's primary roles as supervisor of the South Florida crew was

---

²The substantive offenses enumerated in Counts 2 through 6 of the Indictment also make up the pattern of racketeering activity alleged under the RICO Conspiracy charged in Count 1.

to collect either by himself or through other criminal associates, the gambling losses from

bettors. He facilitated this collection by converting bettor losses into extortionate extensions of

credit or loans at usurious rates averaging 3% interest per week, or 156% per annum. Initially,

the bettors would make payments towards their loans by providing cash or checks to co-

defendant Percy Morris, aka Tiny, -- Rotunno's strong-arm collector, -- who in turn, would

deliver the proceeds to Rotunno. When the debtors were unable to pay, Rotunno personally

threatened the victims and instructed Morris to threaten harm, if necessary, to ensure the

collection. To collect the loses incurred by his betting clientele, Zarcadoolas engaged the

extortionate services of Rotunno. Lastly, the proceeds of these gambling losses and extortionate

collections were laundered by Rotunno, Zarcadoolas and others through the check cashing store

of co-defendant Kaiser Akel.

## LEGAL DISCUSSION

**I.    THE OCTOBER 16, 1998 APPLICATION FOR PERMISSION TO INTERCEPT WIRE COMMUNICATIONS WAS AUTHORIZED BY A PROPERLY DESIGNATED DEPUTY ASSISTANT ATTORNEY GENERAL OF THE CRIMINAL DIVISION IN COMPLIANCE WITH THE REQUIREMENTS OF 18 U.S.C § 2516.**

On October 16, 1998, United States District Court Judge Wilkie D. Ferguson issued an

order authorizing the government to conduct electronic surveillance pursuant to Title III of the

Omnibus Crime Control and Safe Streets Act of 1968 over Defendant Rotunno's cellular phone.

(Attachment A, 10/16/98 Order at 2). This interception was extended for one thirty day period

again by order of Judge Ferguson on November 19, 1998. (Attachment F).

Before applying for the October judicial interception order, the United States requested

and received internal authorization to seek the electronic surveillance order from Deputy

-3-

Assistant Attorney General Kevin V. DiGregory.[3] (Attachment D). On October 15, 1998,

DAAG DiGregory's approval letter was transmitted to the United States Attorney's Office for the

Southern District of Florida by facsimile. It was accompanied by two additional letters: (1) a

copy of the Attorney General's 1995 Memorandum specially designating Assistant Attorney

Generals and Deputy Assistant Attorney Generals of the Criminal Division as persons authorized

to approve applications for the interception of wire communications (Attachment G); and (2) a

cover letter from Frederick D. Hess, the Director of the Office of Enforcement Operations, to

then United States Attorney Thomas Scott, informing Scott that "... an appropriate official of the

Criminal Division has authorized an application to be made to a federal judge ... for an order ...

authorizing the interception of wire communications to and from the cellular telephone ...

subscribed to by Joseph Rotunno" and explaining that copy of the memorandum of authorization

was enclosed. (Attachment E). As stated, all three documents: the authorization memorandum,

the Attorney General's 1995 memorandum, and the cover letter, were sent to the United States

Attorney's Office in a single telefax transmission from the Department of Justice.[4]

In support of its October request for permission to intercept the telephonic

communications occurring over Rotunno's cellular phone, the United States submitted an

application to Judge Ferguson accompanied by the affidavit of Special Agent Joseph Cicini.

---

[3]Deputy Assistant Attorney General Kevin V. DiGregory is a Deputy Assistant Attorney General in the Criminal Division of the United States Department of Justice and as such, pursuant to the Attorney General's Order Number 1950-95 is specially designated to authorize applications to a federal judge for orders approving the interception of wire communications. (Attachment G).

[4]Because the defense does not challenge the authorization process as it relates to the November interception order, the United States has set forth the facts surrounding only the October order.

-4-

(Attachment B, Application; Attachment C, Affidavit). The application stated that pursuant to 18 U.S.C. § 2516 an appropriate official of the Criminal Division had authorized the application and further, that a copy of the authorization memorandum was attached. (Attachment B, 10/16/98 Application at 3). Due to a collating error, however, the attached letter contained the first page of DAAG DiGregory's authorization memorandum; and, instead of the second page of that memorandum, which bore DiGregory's full signature, the attachment contained the second page of the cover letter to Scott, which bore Hess's signature. [5] (Attachment B).

This collating error came to the government's attention in July 2000. By letter dated August 3, 2000, it notified counsel of the error and provided the defendants with a complete and correct copy of DAAG DiGregory's internal authorization memorandum.[6] (Attachment D).

Defendants now contend that the authorization memorandum was signed by Hess, rather than DAAG DiGregory, and that the authorization was therefore invalid under 18 U.S.C. §

_____

[5]This collating error is best illustrated by the facsimile transmission data printed at the top of the relevant letters. DAAG DiGregory's letter was transmitted as pages 2 and 3 of a seven page fax from the Office of Enforcement Operations. Hess's letter was transmitted as pages 6 and 7 of this same facsimile. When examining the letter attached to the government's application for judicial authorization, however, the top of the first page of the letter bears the imprint that it is page 2 of the fax, whereas the second page of the attached letter, which should bear the imprint data that it is page 3 of the fax, instead carries the imprint that it is page 7 of the fax, that is, the second page of the Hess cover letter.

[6]Defense Counsel makes much of the fact that the United States objected to their request to unseal the original Title III documents in this case. As this Court is aware, in support of their request to unseal, the defendants provided a sealed ex parte submission to the Court after the United States filed its response. Because the United States did not contest the collating error and did not contend that the originals were in some way different from the certified copies previously provided to defense counsel, and because the defense provided no rationale in their public moving papers, the United States was left with no choice but to object to the request. As expected, the originals contained the same miscollated letter as the certified copies previously supplied to the defendants.

2516(1) because Hess is not an official designated by the statute to authorize Title III applications.[7] (Zarcadoolas Mot. at 9; Rotunno Mot. at 5). This argument is plainly wrong: DAAG DiGregory, a properly designated Department of Justice Official, actually authorized the October Title III application in this case. The government's technical collating error in transmitting this approval letter to the district court does not defeat DAAG DiGregory's actual authorization and therefore does not effect the validity of the court's subsequent interception order. Moreover, defendants' arguments are foreclosed by the Supreme Court's decision in United States v. Chavez, 416 U.S. 562 (1974).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 empowers the United States to seek authorization to intercept wire and oral communications where certain circumstances and conditions are uniformly met, and mandates detailed procedures that law enforcement officials must follow in applying for electronic surveillance orders. See generally, 18 U.S.C. §§ 2510-2520. Of relevance here, Title III limits who among federal officials may approve the submission of wiretap applications to the appropriate district court. Chavez, 416 U.S. at 564. Pursuant to Section 2516(1) any Assistant Attorney General or Deputy Assistant Attorney General of the Criminal Division specially designated by the Attorney General may authorize an interception application to a federal judge. The purpose of Section 2516 is to ensure

_____

[7]Rotunno also attempts to make the logically inconsistent argument that even if DAAG DiGregory approved the wiretap application, his letter is insufficient because it was transmitted to this office after regular business hours on October 15, 1998 and bears a rubber stamp signature of an unidentified person. In fact, the document was transmitted at 5:05 pm, well within the government's business day, and bears the handwritten signature of DAAG DiGregory above that portion of the signature block identifying it as such. Moreover, Defendant Rotunno's unsupported speculation regarding DAAG DiGregory's signature does not effect the presumptive validity of the application and order. See United States v. Nunez, 877 F.2d 1470, 1472-73 (10th Cir. 1989).

-6-

a responsible determination by the Department of Justice that a wiretap should be authorized.
United States v. Vogt, 760 F.2d 206, 208 (8th Cir. 1985). Importantly, it contains no requirement
that the authorization for an application be in writing. Id.[8]

Here, at all times actual authorization for the October wiretap application existed from
DAAG DiGregory. In transmitting this actual authority, the government simply miscollated
DiGregory's approval letter with the cover letter from Hess to the United States Attorney. That
is all. This error does not amount to a failure to satisfy the statutory requirements of Title III, nor
does it affect the fulfillment of the approval functions directed by Congress. As such, it does not
warrant the suppression of the October wiretap order.

The Supreme Court's decision in Chavez is directly on point. In Chavez, the Attorney
General authorized an application for a Title III order, but the application itself mistakenly
identified the approving official, and this mistake was thereafter included in the order. Chavez
416 U.S. at 565. In reversing the lower court's suppression of the wiretap evidence, the Court
concluded that the intercepted communications were admissible because approval by an
appropriate official existed in fact and the defect in the application did not exhibit a failure to
follow the statute's mandates or affect the fulfillment of any of the approval functions required
by Congress. Id. 571-75. In upholding the application and order, the Court looked behind the

_____

[8]Because there is no requirement that the authorization by submitted in writing to the
district court, the government contends, in addition to the arguments set forth supra, that AUSA
Schwartz's statement that he had received authority combined with the existing actual authority
of DAAG DiGregory were sufficient to authorize the wiretap application regardless of the
collating error. As a matter of procedure, the United States routinely provides to the district
court by way of attachment to the wiretap application the Attorney General's 1995 designation
memorandum and the authorization letter. The cover letter to the United States Attorney's Office
from the Office of Enforcement Operations is generally omitted from these materials and is
instead maintained in the internal files of the United States Attorney's Office.

face of the defective documents and noticed the Attorney General's actual authorization of the application, and hence its corresponding validity. Id.; see also. United States v. Traitz, 871 F.2d 368, 379 ( 3rd Cir. 1989) ("In determining whether there was substantial compliance with the statute we may look beyond the face of the order to the facts as they actually existed in order to determine if there was compliance with the substantive requirements of the statute").

In addition, every circuit to consider the issue whether a mistake in transmitting the Department of Justice's approval for a wiretap application warrants suppression has concluded that the mistake amounts to no more than a technical defect in the process which does not result in suppression. See Chavez, 416 U.S. at 565 (failure to correctly report the identity of the person authorizing the application does not warrant suppression when in fact appropriate official has given approval); United States v. London, 66 F.3d 1227, 1232-33 (1st Cir. 1995) (Assistant Attorney General properly authorized wiretap application where government committed collating error and submitted to the district court the first page of the Assistant Attorney General's letter and the second page of a cover letter signed by Frederick Hess); United States v. Citro, 938 F.2d 1431, 1436 (1st Cir. 1991); United States v. Smith, 726 F.2d 852, 859 (1st Cir. 1984) ("The absence of a compelling signature on a critical document can be remedied by proof of actual authority"); United States v. Swann, 526 F.2d 147, 148-49 (9th Cir. 1975) (reversing suppression of wiretap where actual authority from proper official existed despite incorrect signature on authorizing letter); United States v. Vigi, 515 F.2d 290, 293 (6th Cir. 1975) (wiretap authorization actually approved by Attorney General, thus under Chavez no additional discussion of approval process is needed); United States v. Acon, 513 F.2d 513, 518 (3rd Cir. 1975) (Attorney General's actual approval of wiretap was in substantial compliance with statute, despite signature by

-8-

unqualified person); United States v. John, 508 F.2d 1134, 1137-38 (8th Cir. 1975) (actual

wiretap authority by proper official is sufficient); United States v. Quintana, 508 F.2d 867, 870-

72 (7th Cir. 1974) (same); United States v. Falcone, 505 F.2d 478, 480-81 (3d. Cir. 1975)

(important consideration is not whose name appears on authorizations, and certainly not who

signed authorization, rather the important consideration is who actually granted the authority for

the wiretaps) overruled in part on sealing issue United States v. Vastola, 915 F.2d 865 (3d. Cir.

1990); United States v. Robertson, 504 F.2d 289, 291 (5th Cir. 1974) (relying on Chavez and

rejecting the defendant's argument that identification of wrong approving official warranted

suppression where in fact properly authorized official had approved wiretap application and

specifically distinguishing United States v. Giordano, 416 U.S. 505 (1974)); and cf. United States

v. Moore, 41 F.3d 370, 374-75 (8th Cir. 1995) (every circuit to consider the issue has held that the

wiretap statute does not require suppression if the facial insufficiency of the wiretap order is no

more than a technical defect and here court's failure to sign interception order where in fact court

intended to sign order, technical defect which did not suppression of wiretap evidence); Traitz,

871 F.2d at 376-78 (3rd Cir. 1989) (missing page in wiretap order technical defect not requiring

suppression).

   The cases relied on by defendants do not effect this analysis and are in any event

distinguishable because they involved facts where the official authorizing the application lacked

approval authority. In other words, in the defendants' cases, there was no error in transmitting

the approval; rather, the individual authorizing the application did not have the requisite authority

in truth of fact, hence derailing any claim of otherwise properly existing actual authority. See

e.g. United States v. Giordano, 416 U.S. 505, 523 (1974) (wiretap authorized by executive

assistant to Attorney General, rather than properly designated official). These cases are, therefore, inapposite and of no import to the issue here.

In light of DAAG DiGregory's actual authorization of the Title III application, the government's collating error can be viewed as no more than a technical defect which does not otherwise affect the validity of Judge Ferguson's October interception order. At bottom, Title III requires approval of a wiretap application by a properly designated Department of Justice official. In fact, such approval existed here, thereby defeating defendant's challenge to the government's internal authorization.

## II.     JUDGE FERGUSON CORRECTLY CONCLUDED THAT THE OCTOBER 1998 AND NOVEMBER 1998 TITLE III AFFIDAVITS CONTAINED A SUFFICIENT SHOWING OF PROBABLE CAUSE THAT PERTINENT CONVERSATIONS WOULD BE INTERCEPTED OVER ROTUNNO'S CELLULAR TELEPHONE.

Defendants advance two challenges to the probable cause determination made by Judge Ferguson in the case at bar. First, Defendants argue that the affidavit in support of the wiretap application lacked probable cause because it was based on stale information. (Zarcadoolas Mot. at 10-11; Rotunno Mot. at 24-25). Second, Defendant Rotunno asserts that the affidavit lacked probable cause because it did not establish that the illegal gambling business he conducted involved 5 or more persons as required by 18 U.S.C. § 1955. These claims are without legal or factual support.

18 U.S.C. § 2518(3) requires the issuing judge to determine prior to authorizing a wiretap application whether there is probable cause to believe that (1) an individual is committing, has committed, or is about to commit the offense charged; (2) particular communications concerning the offense will be obtained through the interception; and (3) the identified facility has been used,

-10-

is being used, or will be used in the commission of the offense. 18 U.S.C. § 2518(3)(a)(b) & (d); see also, United States v. Giacalone, 853 F.2d 470, 478 (6th Cir. 1988). The standards governing probable cause determinations for electronic surveillance are the same as those necessary for a search warrant. United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990). The issuing judge, thus, must make a practical common sense determination whether given the totality of the circumstances it is likely that evidence of the crime will be uncovered. United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994). Certainty is not required at this stage and the exact quantum of proof can best be described as "a fair probability" that such evidence will be discovered. Giacalone, 853 F.2d at 478 (citing Illinois v. Gates, 462 U.S. 213, 235 (1983)). Thus, finely tuned judicial standards such a proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the magistrates's decision. Gates, 462 U.S. at 235. Rather, "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" Id.

In reviewing challenges to Title III warrant applications, "great deference" is normally paid to the issuing judge's determination of probable cause, and the practical nature of the issuing judge's decision calls for upholding his findings even in marginal or doubtful cases. Nixon, 918 F.2d at 900 (citing United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982)). The judge's determination, therefore, must stand if the record contains a "substantial basis" for his probable cause findings. Id.

Of course, for probable cause to exist, the information supporting the government's application must be timely. Harris, 20 F.3d at 450. When reviewing staleness challenges, however, this court does not apply some talismanic rule which establishes arbitrary time

-11-

limitations for presenting information to the issuing judge; rather, it reviews each case on the unique facts presented. Id. In this case-by-case determination, the court may properly consider the maturity of the information, nature of the suspected crime, habits of the accused, character of the items sought, and nature and function of the premises to be searched. Id. Ultimately, even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material. Id.

Moreover, in conducting this case-by-case analysis, the length of time between the date on which all the facts supporting probable cause were known and the date the warrant was issued is only one factor. United States v. Domme, 753 F.2d 950, 953 (11ᵗʰ Cir. 1985). Probable cause is not determined merely by counting the number of days between the facts relied on and the warrant's issuance. Id. Indeed, when criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause. Id. In "such circumstances it is reasonable to assume that the activity has continued beyond the last dates mentioned in the affidavit and may still be continuing." Id. Further, time "becomes less significant in the wiretap context, because the evidence sought to be seized is not a tangible object easily destroyed or removed. Therefore, when police describe telephone activity occurring over an extended period of time, the stale information should be construed less rigorously." Id.

## A. The Information Establishing Probable Cause in the Wiretap Affidavit was Current.

An even cursory review of the information contained in the wiretap affidavit establishes that it contained current, updated information sufficient to warrant a finding of probable cause by the issuing judge. For example, the affidavit set forth that confidential source four (CS-4)

-12-

consensually recorded conversations with Polito in September 1997, and Rotunno and Polito in October 1997, regarding illegal gambling and loansharking. (Attachment C; Affidavit at pages 22-23, paragraphs 46-49). It likewise set forth that CS-1 had provided information to the government from March 1997 to the present, and in that capacity had heard Rotunno discuss, during June 1998 through September 1998, Colombo LCN criminal activities including loan sharking, illegal gambling and extortionate extensions of credit over his cellular telephone. Indeed, the affidavit stated that during the month of October 1998, the same month in which the court issued the electronic surveillance order, CS-1 discussed illegal gambling with Rotunno over the target cellular phone. (Attachment C; Affidavit at pages 14-17, paragraphs 22-31).

Similarly, the affidavit provided that CS-2, as recently as September 1998, had had discussions with Rotunno regarding his loansharking activities over the target cellular telephone. (Attachment C; Affidavit at page 19, paragraph 38). Further, as explained in the affidavit, CS-3 had been providing information to the government since April 1998 and that from in or about March 1998 had received and/or placed approximately 47 telephone calls to Rotunno's cellular phone wherein they discussed illegal gambling and usurious loans owed to various organized crime figures by CS-3. (Attachment C; Affidavit at page 21, paragraph 45). Lastly, CS-5 provided significant information relevant to the illegal activities occurring over Rotunno's cellular telephone up to his death in June 1998. (Attachment C; Affidavit at pages 23-26, paragraphs 50-58). Beyond the information provided by the confidential informants, the affidavit set forth pen register information up to October 13, 1998, three days before the application was approved, revealing hundreds of calls between Rotunno's cellular telephone and illegal gambling businesses conducted by Polito, as well as numerous calls between Rotunno and known Colombo

-13-

organized crime associates. (Attachment C; Affidavit at pages 26-29, paragraphs 59-67).

Considering these facts in light of the totality of the circumstances, at a minimum the affidavit provided probable cause to believe that Rotunno and others had been engaged in ongoing criminal activity from at least September 1997 through October 1998. Given the continuing nature of the criminal activity alleged in the affidavit it was reasonable for the issuing judge to assume that the activity had continued beyond the last dates mentioned in the affidavit and may still be continuing. Moreover, even if this Court were to merely count the number of days between the facts relied on and the warrant's date, the affidavit set forth facts relating to criminal activity occurring in the same month as the warrants issuance. Defendants' argument that the information was stale is, therefore, baseless.

## B. The Affidavit Established Probable Cause that Conversations Related to the Authorized Offenses would be Intercepted Over Rotunno's Cellular Phone.

Equally lacking in merit is defendant Rotunno's assertion that the affidavit did not provide probable cause to believe that 5 or more persons were involved in the illegal gambling businesses, as required to prove a violation of 18 U.S.C. § 1955. First, contrary to defendant's unsupported assertion, an affidavit need not make a prima facie showing as to each element of the alleged offense in order to set forth probable cause; rather, an affidavit is sufficient where it provides a fair probability that evidence of a crime will be uncovered in the place to be searched. See Gates, 462 U.S. at 235.[9]

_____

[9]In any event, the government notes that the affidavit was not limited to a violation Section 1955. Rather, the affidavit provided probable cause to believe Rotunno and others were committing offenses involving RICO conspiracy, extortionate extensions of credit, transportation of stolen goods, and interstate travel in aid of racketeering. (Attachment A; Order at 1-3). Defendant does not challenge the court's probable cause finding as to these offenses.

-14-

Second, even if this Court were to accept defendant's assertion that each element of the offense must be proven in the supporting affidavit, a review of the affidavit defeats his claim. The affidavit provided that Rotunno and others were members of a RICO enterprise engaged in various criminal activities including the operation of illegal gambling businesses. In furtherance of these businesses, the affidavit established that Polito, Capri, and Scarola operated bookmaking offices in South Florida for the benefit of the enterprise and that Rotunno was a partner in these gambling operations and provided strong-arm collection services. (Attachment C; Affidavit at page 14, paragraph 21). In addition to these four named individuals, the affidavit set forth, based on the affiant's experience, probable cause to believe that the gambling businesses utilized line services and commission men. (Attachment C; Affidavit at page 13, paragraph 20 C & E). Further, also in addition to the four named individuals, the affidavit set forth, based on information provided by confidential informants, that Rotunno was involved in the operation of several illegal gambling operations through the strong-arm collection of their losses and that Rotunno utilized the business of Howard Mandel as a meeting place to discuss bookmaking and loansharking. Above and beyond these additional individuals, a common sense review of the affidavit dictates that the sheer size of the gambling businesses described gives rise to a "fair probability" that they each were operated by more than one person. Considering all of these individuals under a totality of the circumstances, therefore, the affidavit established probable cause to believe that conversations related to a violation of Section 1955 would be intercepted over Rotunno's cellular phone.

## III.   JUDGE FERGUSON PROPERLY EXERCISED HIS CONSIDERABLE DISCRETION IN DETERMINING THAT EACH WIRETAP APPLICATION CONTAINED THE REQUISITE SHOWING OF NECESSITY.

Defendant Rotunno asserts that the wiretap authorized herein was unnecessary as an investigative technique because the government had received information from two confidential sources who were willing to testify regarding the operation of Rotunno's gambling businesses. (Rotunno Mot. at 21). Contrary to Defendants' assertions, each affidavit accompanying the Title III applications contained detailed information addressing the use of other investigative techniques, and explained why traditional techniques were insufficient to investigate and prosecute the alleged crimes. In addition, each affidavit contained case specific information setting forth what investigative methods had been utilized, including the use of confidential sources, their respective results, and why other methods appeared to be unlikely to succeed given the parameters of the investigation. Defendant's argument that the affidavits lacked the requisite necessity is, therefore, without merit.

The wiretapping statute requires that each application for an order authorizing the interception of telephonic communications contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This necessity provision is simply designed to ensure that the government makes a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to electronic surveillance. United States v. David, 940 F.2d 722, 727-728 (1st Cir. 1991). It is not meant to force the government to run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap; it simply requires that the application explain the retroactive or prospective failure of

-16-

several investigative techniques that reasonably suggest themselves. See United States v. Nixon, 918 F.2d 895, 901 (11th Cir. 1990); see also United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987). As such, this Court's review is limited to determining whether the facts set forth in the government's Title III application are minimally adequate to support the findings made by the issuing judge. United States v. O'Malley, 764 F.2d 38, 43 (1st Cir. 1985).

Here, the detailed, specific information in each affidavit more than established the requisite showing of necessity for the wiretap order. Agent Cicini, the affiant, set forth an extensive discussion regarding the use of other investigative techniques, including confidential sources, physical surveillance, undercover operatives, the grand jury process, witness interviews, search warrants, and telephone record analysis. As to the government's confidential sources, Agent Cicini, in sum, explained that although two were willing to testify, they neither possessed sufficient detail concerning their co-conspirators criminal conduct, nor were they part of the inner circle of the Colombo family and therefore were not privy to all of the activities of the criminal enterprise or those conversations between Rotunno and other crew members. (Attachment C; Affidavit at pages 29-35).

In the face of this detailed discussion, Defendant Rotunno simply argues that the wiretap was unnecessary because the government had two persons who could provide testimony related solely to Rotunno's gambling businesses. This argument, however, patently ignores the other objectives of the investigation and the corresponding lack of information these persons had with respect to those areas. It is, therefore, without merit.

-17-

## IV. THE FIRST JUDICIAL INTERCEPTION ORDER WAS CORRECTLY EXTENDED BECAUSE THE AUTHORIZED OBJECTIVES OF THE GOVERNMENT'S FIRST WIRETAP APPLICATION WERE NOT OBTAINED BY THE TIME OF ITS EXPIRATION.

Defendant Rotunno argues that the November wiretap was improperly authorized because the objectives of the government's investigation had been sufficiently met by the conclusion of the court's October interception order.[10] His contention is without factual or legal merit.

18 U.S.C. § 2815(5) provides that electronic surveillance interceptions must terminate upon the attainment of the wiretaps authorized objectives. A wiretap may properly be extended where the investigating officers have not yet learned the full extent of the conspiracy or the identity of its co-conspirators. See United States v. Nguyen, 46 F.3d 781, 783 (8th Cir. 1995). Here, the authorized objectives of the Title III investigation were to reveal fully the manner, identities, places of operation and scope of the RICO conspiracy, along with the underlying predicate crimes, alleged in the affidavit. (Attachment F; 11/18/98 Order at 4). As Agent Cicini explained in his November 19 affidavit, these objectives had not yet been obtained because the complete nature of the complex criminal enterprise had not been revealed and additional co-

---

[10]Defendant Rotunno alleges that he has requested, and the government has refused to provide, the ten day progress reports underlying the electronic surveillance. On September 6, 2000, Counsel for Rotunno inquired of Agent Cicini where the original progress reports were housed by the FBI. The AUSA responded that the reports were housed in Miami and if counsel intended to request the progress reports he would need to file a motion and litigate the issue because the government considered the reports "work product." The government does not construe the defendant's passing remarks in his brief regarding this conversation as a formal motion for the progress reports and, thus does not address this issue herein. The ten day reports are available for the Court's inspection and will be provided *in camera* should the Court so require.

-18-

conspirators remained unidentified.[11] (November 18 Affidavit at page 41, paragraph 86).

Because these objectives had not been obtained, the district court was well within its authority to

extend the electronic surveillance for a second thirty day period.

## V.    THE GOVERNMENT REASONABLY MINIMIZED THE WIRETAP.

Defendant makes a conclusory challenge to the minimization procedures utilized during

the electronic surveillance conducted herein and baldly asserts that the Court should conduct a

minimization inquiry.   Defendant's challenge to the government's minimization procedure is

baseless.

Title III requires the government to conduct electronic surveillance "in such a way as to

minimize the interception of communications not otherwise subject to interception." 18 U.S.C.

2518(5). The government's minimization efforts are judged against the objective reasonableness

of the monitoring agents' conduct based on the circumstances confronting them at the time. Scott

v. United States, 436 U.S. 128, 137 (1978); United States v. Moody, 977 F.2d 1425, 1433 (11th

Cir. 1992). Perfection in minimizing extraneous interceptions "is usually not attainable, and is

certainly not legally required." United States v. Uribe, 890 F.2d 554, 557 (1st Cir. 1989).

The minimization procedures utilized in this case were adequate, and the defendant has

offered nothing in his motion to suggest otherwise or to meet his burden of establishing

_____

[11]Contrary to Defendant Rotunno's argument several individuals named in the pending
indictment were not identified in the November affidavit. They are Daniel Meisel, William
Hawkins, James Travers, Barbara Drezek, Martin Zarcadoolas, Michael Eddy, Kaiser Akel,
Richard D'Onofrio, and Jeanne Brooks.

inadequate minimization.[12] Indeed, the three conversations set forth by the defendant in his moving papers as examples of inadequate minimization were utilized by the government in its Title III affidavit in support of probable cause and, therefore, must be considered not only pertinent but also properly intercepted. In short, defendant's challenge to the minimization procedures utilized during the wiretap is, therefore, without factual support and should be rejected by this Court.[13]

## CONCLUSION

The United States respectfully requests that the Court deny Defendants' motions to suppress the electronic surveillance conducted herein in all respects. The government further submits that the motions fail to present arguments which would require an evidentiary hearing, and respectfully requests that the motions be denied without an evidentiary hearing. If the Court

---

[12]The government notes neither Rule 16 nor the standing discovery order directs it to provide defense counsel with the minimization logs and that the logs were not otherwise requested by counsel. Defendant's motion is, therefore, wholly unsupported by fact.

[13]In addition to the contentions set forth above, Defendant Zarcadoolas also alleges that the government violated 18 U.S.C. § 2517(5) because it did not obtain permission "as soon as practicable" to intercept conversations related to money laundering. Section 2517(5) provides in sum that if the government intercepts wire communications related to offenses other than those specified in the order of authorization it must obtain permission from the court to disclose or use those conversations in any subsequent judicial proceeding. Here, the government was permitted by the Court's November 1998 order of authorization to intercept conversations relating to money laundering. Nothing more is required to utilize those conversations and Section 2517(5) is, therefore, inapplicable to the evidence challenged by Defendant. Even if this Court were to find that Section 2517(5) were somehow implicated, the challenged conversations were properly intercepted and disclosed with respect to the defendants involvement in the RICO, gambling, and extortionate offenses authorized in both the October and November orders. Once a communication is properly disclosed with respect to one offense, no additional concern is implicated by using it to prove a second offense. See United States v. Shields, 999 F.2d 1090, 1097 (7th Cir. 1993).

-20-

is inclined to grant an evidentiary hearing, the government requests that it be set as soon as

practicable.

DATED this ___19___ day of September 2000.

Respectfully Submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:     Paul F. Schwartz
        Assistant United States Attorney
        Court ID # A5500086

Julia J. Stiller
U.S. Department of Justice Trial Attorney
Court ID # A5500485
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33394
(954) 356-7255

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to the below

named on this __1 7__ day of September, 2000.

Allen Kaufman, Esquire
2900 N. Dixie Highway, Suite 201
Oakland Park, FL 33334
(Counsel for Reynolds Maragni)

Philip R. Horowitz, Esquire
Southpark Centre
12651 S. Dixie Highway
Miami, FL 33156
(Counsel for James Travers)

H. Dohn Williams, Esquire
721 N.E. 3rd Avenue
Fort Lauderdale, FL 33304
(Counsel for Joseph Rotunno)

Raymond Miller, Esquire
400 Southeast Sixth St.
Fort Lauderdale, FL 33301
(Counsel for Martin Zarcadoolas)

William Norris, Esquire
3225 Aviation Avenue, Suite 300
Coconut Grove, FL 33133-4741
(Counsel for Percy Morris)

David Vinikoor, Esquire
420 S.E. Twelfth St.
Fort Lauderdale, FL 33316
(Counsel for Martin Zarcadoolas)

Dennis R. Bedard, Esquire
1717 N. Bayshore Dr., Suite 102
Miami, FL 33132
(Counsel for Bert Caskill)

John Cotrone, Esquire
509 S.E. 9th St.
Fort Lauderdale, FL 33316
(Counsel for Michael Eddy)

James Stark, Esquire
524 S. Andrews Ave., Suite 304N
Fort Lauderdale, FL 33301
(Counsel for Gary Braeseke)

Michael Dutko, Esquire
600 South Andrews Ave., Suite 500
Fort Lauderdale, FL 33301
(Counsel for Kaiser Akel)

Ted Klein, Esquire
800 Brickell Avenue, Penthouse #2
Miami, FL 33131
(Counsel for Martin Halpern)

Thomas D. Sclafani, Esquire
200 East Broward Blvd., Suite 1210
Fort Lauderdale, FL 33301
(Counsel for Richard D'Onofrio)

Simon T. Steckel, Esquire
701 Brickell Ave., Suite 3260
Miami, FL 33131
(Counsel for William Hawkins)

Herb Cohen, Esquire
200 S.E. 6th St., Suite 205
Fort Lauderdale, FL 33301
(Counsel for Scott Miller)
(Counsel for Daniel Meisel)

Martin Bidwell, Esquire
Federal Public Defender's Office
101 N.E. 3rd Avenue, Suite 202
Fort Lauderdale, FL 33301-1100
(Attorney for Emro Capri)

Michael Hursey, Esquire
One River Plaza
305 S. Andrews Avenue, Suite 701
Fort Lauderdale, FL 33301-1853
(Counsel for Jeanne Brooks)

Larry Bronson, Esquire
80 Pine St., 32nd Floor
New York, NY 10005
(Counsel for Barbara Drezek)

JULIA J. STILLER
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION ) MISC. NO. _____
OF THE UNITED STATES OF AMERICA )
FOR AN ORDER AUTHORIZING THE ) **ORDER AUTHORIZING THE**
INTERCEPTION OF WIRE COMMUNICATIONS) **INTERCEPTION OF WIRE**
_____ ) **COMMUNICATIONS**

Application under oath having been made before me by Paul F. Schwartz, Assistant United States Attorney, Southern District of Florida, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, for an Order authorizing the interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

a. there is probable cause to believe that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, have committed, are committing, and will continue to commit offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving violations of a) Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth hereinafter in paragraphs (b), (c), (d), (e), and (f), and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d); b) Making, Financing and Collecting

Extortionate Extensions of Credit, in violation of Title 18, United States Code, Sections 892-894; c) Conducting an Illegal Gambling Business, in violation of Title 18, United States Code, Section 1955; d) Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314; e) Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315; f) Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952; g) Conspiring to commit any or all of the above-named offenses, in violation of Title 18, United States Code, Section 371;

b. there is probable cause to believe that particular wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, concerning the above-described offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the target cellular telephone bearing the number (954) 295-6672, bearing electronic serial number (ESN) 21102262845, subscribed to in the name of JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, will concern the specifics of the above offenses, including the manner and means of the commission of the offenses: (i) the nature, scope, extent, and modus operandi of the conspirators racketeering enterprise and illegal activities; (ii) the identities and roles of the conspirators and other participants in these illegal activities; (iii) the locations, tools, and means

2

used in furtherance of these illegal activities; (iv) the location of records maintained by or in relation to these illegal activities; v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and, (vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses;[1]

c.   it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

d.   there is probable cause to believe that the above-described target cellular telephone has been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Federal Bureau of Investigation are authorized, pursuant to an

---

[1] It is also expected that these communications will evidence violations of Section 2 of Title 18, United States Code; that is, causing or aiding and abetting the offenses enumerated herein.

3

Application authorized by a duly designated official of the Criminal Division, United States Department of Justice, under the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to intercept wire communications to and from the above-described telephone in connection with the commission of the above-described offenses.

PROVIDED that such interception shall not terminate automatically after the first interception that reveals the manner in which the above-named persons and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the full scope and nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after this Order is entered, whichever is earlier.

IT IS FURTHER ORDERED that the authorization apply not only to the target telephone number listed above, but also to any changed telephone number subsequently assigned to the same electronic serial number as the target cellular telephone within the thirty (30) day period. IT IS ALSO ORDERED that the authorization apply to background conversations intercepted in the vicinity of the

4

target telephone while the telephone is off the hook or otherwise
in use.

IT IS FURTHER ORDERED that in the event that the target
cellular telephone is transferred outside the territorial
jurisdiction of this Court, interceptions may take place in any
other jurisdiction within the United States.

IT IS FURTHER ORDERED that, based upon the request of the
Applicant pursuant to Section 2518(4) of Title 18, United States
Code, the BellSouth Telephone Company, BellSouth Mobility, and PCS
PrimeCo, electronic communication service providers as defined in
Section 2510(15) of Title 18, United States Code, shall furnish the
Federal Bureau of Investigation with all information, facilities
and technical assistance necessary to accomplish the interceptions
unobtrusively and with a minimum of interference with the services
that such provider is according the persons whose communications
are to be intercepted, with the service providers to be compensated
by the Applicant through the Federal Bureau of Investigation for
reasonable expenses incurred in providing such facilities or
assistance.

IT IS FURTHER ORDERED that, to avoid prejudice to the
Government's criminal investigation, BellSouth Telephone Company,
BellSouth Mobility, and PCS PrimeCo and their agents and employees
are ordered not to disclose or cause a disclosure of the Order or
the request for information, facilities, and assistance by the
Federal Bureau of Investigation, or the existence of the
investigation to any person other than those of their agents and

5

employees who require this information to accomplish the services hereby ordered. In particular, said communications service providers and their agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS FURTHER ORDERED that this Order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. The interception of wire communications must terminate upon the attainment of the authorized objectives, or, in any event, at the end of thirty (30) days, measured from the day on which investigative or law enforcement officers first begin to conduct an interception pursuant to this Order or ten (10) days after the Order is entered, whichever is earlier.

IT IS FURTHER ORDERED that Applicant or another Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the

6

above-ordered reports should become due on a weekend or holiday, IT IS FURTHER ORDERED that such report shall become due on the next business day thereafter.

IT IS FURTHER ORDERED that this Order, the Application, Affidavit, any resulting Orders, and all interim reports filed with the Court with regard to this matter shall be sealed until further order of the Court and kept in the possession, custody, care, and control of the Federal Bureau of Investigation, except that copies of the Orders, in full or redacted form, may be served upon the communications service providers as necessary to effectuate this Order.

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT COURT

Dated this 16th day of
OCTOBER , 1998.
Time 8:20 a.m.

Certified to be a true and
correct copy of the original.
Carlos Juenco, Clerk
U.S. District Court
Southern District of Florida
by _____ Clerk
Date 10-16-98

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )      MISC. NO.
FOR AN ORDER AUTHORIZING THE )
INTERCEPTION OF WIRE )
COMMUNICATIONS )      **SUBMITTED UNDER SEAL**
_____ )

## ORDER TO SERVICE PROVIDERS

This matter comes before the Court pursuant to the Application
of the United States of America for an order authorizing the
interception of wire communications pursuant to Title 18, United
States Code, Section 2518, to and from cellular telephone number
(954) 295-6672, bearing electronic serial number (ESN) 21102262845,
subscribed to in the name of JOSEPH ROTUNNO, billing address of
1700 N. St. Rd. 7, Hollywood, Florida.

The Court, having reviewed the Application and found that it
conforms in all respects to the requirements of Title 18, United
States Code, Sections 2516 and 2518, has this day signed an Order
conforming to the provisions of Title 18, United States Code,
Section 2518, authorizing the Federal Bureau of Investigation to
accomplish the aforesaid interception.

IT APPEARING FURTHER that the Applicant has requested that
BellSouth Telephone Company, BellSouth Mobility, and PCS PrimeCo be
directed to furnish, and continue to furnish, the Applicant and the
Federal Bureau of Investigation, with all information, facilities
and technical assistance necessary to accomplish the interceptions
unobtrusively and with a minimum of interference with the services

such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of interception of wire communications over the above-described telephones.

IT IS HEREBY ORDERED that BellSouth Telephone Company, BellSouth Mobility, and PCS PrimeCo shall furnish, and continue to furnish, the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of interception of wire communications over the above-described telephones.

IT IS ORDERED FURTHER that the service providers are to be compensated by the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that the furnishing of said information, facilities, and technical assistance shall terminate thirty (30) days measured from the earlier of the day that assistance is provided under this order or ten (10) days from the date this Order is entered, unless otherwise ordered by this Court; and

IT IS ORDERED FURTHER that this Order is sealed, except that copies of this Order may be served on the BellSouth Telephone Company, BellSouth Mobility, and PCS PrimeCo, and any other communication service providers on whom this Order is served, and

2

their agents and employees, shall not disclose or cause a disclosure of this Order or the request for assistance or the existence of this investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered, unless and until otherwise ordered by this Court. In particular, no such disclosure may be made to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

DATED this _16th_ day of October, 1998.

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT JUDGE

Certified to be a true and correct copy of the original.
Carlos ...
Sc...
By ...
Date _10-16-98_

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION    )    MISC. NO. _____
OF THE UNITED STATES OF AMERICA     )
FOR AN ORDER AUTHORIZING THE        )    **APPLICATION FOR**
INTERCEPTION OF WIRE COMMUNICATIONS )    **INTERCEPTION OF**
_____    )    **WIRE COMMUNICATIONS**

Paul F. Schwartz, Assistant United States Attorney, Southern
District of Florida, being duly sworn, states:

1.    I am an investigative or law enforcement officer of the
United States within the meaning of Section 2510(7) of Title 18,
United States Code, that is, an attorney authorized by law to
prosecute or participate in the prosecution of offenses enumerated
in Section 2516 of Title 18, United States Code.

2.    This application is for an order pursuant to Section 2518
of Title, 18, United States Code, authorizing the interception of
wire communications until the attainment of the authorized
objectives or, in any event, at the end of the thirty (30) days
measured from the day on which the investigative or law enforcement
officers first begin to conduct an interception under the Court's
order or ten (10) days after the Order is entered, whichever is
earlier, of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike
Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as
yet unknown to and from the target cellular telephone bearing the
number (954) 295-6672, bearing electronic serial number (ESN)
21102262845, subscribed to in the name of JOSEPH ROTUNNO, billing
address of 1700 N. St. Rd. 7, Hollywood, Florida, concerning
offenses enumerated in Section 2516 of Title 18, United States

Code, that is, offenses involving violations of a) Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth hereinafter in paragraphs (b), (c), (d), (e), and (f), and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d); b) Making, Financing and Collecting Extortionate Extensions of Credit, in violation of Title 18, United States Code, Sections 892-894; c) Conducting an Illegal Gambling Business, in violation of Title 18, United States Code, Section 1955; d) Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314; e) Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315; f) Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952; g) Conspiring to commit any or all of the above-named offenses, in violation of Title 18, United States Code, Section 371; that are being committed by JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown.

3.    Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General of the Criminal Division and any Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section

2

2516 of Title 18, United States Code, to authorize this Application. By special designation of the Attorney General pursuant to Order Number 1950-95 of February 13, 1995, an appropriate official of the Criminal Division has authorized this Application. Attached to this Application are copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this Application.

4. I have discussed all of the circumstances of the above-described offenses with Special Agent Joseph M. Cicini, of the Federal Bureau of Investigation, and have examined the Affidavit of Special Agent Cicini, which is attached to this Application and is incorporated herein by reference. Based upon that Affidavit, your Applicant states upon information and belief that:

a. there is probable cause to believe that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown have committed, are committing, and will continue to commit violations of a) Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth hereinafter in paragraphs (b), (c), (d), (e), and (f); and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d); b) Making, Financing and Collecting Extortionate Extensions of Credit, in violation of Title

3

18, United States Code, Sections 892-894; c) Conducting an Illegal Gambling Business, in violation of Title 18, United States Code, Section 1955; d) Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314; e) Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315; f) Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952; g) Conspiring to commit any or all of the above-named offenses, in violation of Title 18, United States Code, Section 371;

b.    there is probable cause to believe that particular wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, concerning the above-described offenses will be obtained through the requested interception. In particular, these communications will concern the (i) the nature, scope, extent, and modus operandi of the conspirators' racketeering enterprise and illegal activities; (ii) the identities and roles of the conspirators and other participants in these illegal activities; (iii)  t    h    e locations, tools, and means used in furtherance of these illegal activities; (iv) the location of records maintained by or in relation to these illegal activities; v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities;

4

and (vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph two (2), above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-stated offenses; and, [1]

      c.   normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in further detail in the attached Affidavit;

      d.   there is probable cause to believe that the above-described target cellular telephone number (954) 295-6672 has been and will continue to be used in connection with the commission of the above-described offenses.

     5.   The attached Affidavit contains a full and complete statement of facts concerning all previous applications which are known to have been made to any judge of competent jurisdiction for approval of the interception of oral, wire or electronic communications of any of the same persons, facilities, or places specified in this Application.

WHEREFORE, your applicant believes that there is probable cause to believe that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI,

---

[1] The United States also expects that these communications will evidence violations of Section 2 of Title 18, United States Code; that is, causing or aiding and abetting the offenses enumerated herein.

a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown are engaged in the commission of offenses described in paragraph two (2) above; that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others yet unknown are using target cellular telephone number (954) 295-6672, bearing electronic serial number (ESN) 21102262845, subscribed to in the name of JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, in connection with the commission of the above-described offenses; and that wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown will be intercepted over the above-described target cellular number.

Based on the allegations set forth in this Application and on the Affidavit of Special Agent Joseph M. Cicini, attached hereto, the Applicant requests this Court to issue an Order, pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the Federal Bureau of Investigation to intercept wire communications to and from the above-described target cellular telephone number until such communications are intercepted that reveal the manner in which the above-named persons and others as yet unknown participate in the specified offenses and reveal the identities of all coconspirators, places of operation, and the full scope and nature of the conspiracy, or for a period of thirty (30) days, measured from the day on which the investigative

6

or law enforcement officers first begin to conduct the interception or ten (10) days from the date of this Order, whichever is earlier.

IT IS REQUESTED FURTHER that the authorization given be intended to apply not only to the target telephone number listed above, but to any changed telephone number subsequently assigned to the same electronic serial number used by the target cellular telephone within the thirty (30) day period. It is also requested that the authorization be intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing the BellSouth Telephone Company, BellSouth Mobility, and PCS PrimeCo, electronic communications service providers as defined in Section 2510(15) of Title 18, United States Code, to furnish and continue to furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference to the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire communications over the above-described telephone. The service provider shall be compensated by the Applicant through the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS REQUESTED FURTHER that in the event that the target cellular telephone is transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction within the United States.

IT IS REQUESTED FURTHER, to avoid prejudice to this criminal investigation, that the Court order the providers of electronic communication service and their agents and employees not to disclose or cause a disclosure of this Court's Order or the request for information, facilities, and assistance by the Federal Bureau of Investigation or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. The interception of wire communications authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which investigative or law enforcement

8

officers first begin to conduct an interception or ten (10) days after the Order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that the Court order that either Applicant or another Assistant United States Attorney familiar with the facts of the case provide the Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the aforementioned reports should become due on a weekend or holiday, it is requested further that such report become due on the next business day thereafter.

IT IS REQUESTED FURTHER that the Court's Order(s), this Application and the accompanying Affidavit, and all interim reports submitted with regard to this matter be sealed until further order of this Court, except that copies of the orders, in full or redacted form, may be served on the service providers as necessary to effectuate the Court's orders.

IT IS REQUESTED FURTHER that the sealed Order(s), Application, and Affidavit be kept in the possession, custody, care, and control

9

of the Federal Bureau of Investigation in a safe and secure place
until further order of the Court.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:

PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY
Court ID #: A5500086
U.S. Courthouse/Federal Building
500 E. Broward Boulevard
Fort Lauderdale, Florida    33394
Telephone: (954) 356-7392
Facsimile: (954) 356-7230

SUBSCRIBED and SWORN to
before me this ___ day
of _____, 1998.

WILKIE D. FERGUSON, JR.

Certified to be a true and
correct copy of the original
Carlos Juenica, Clerk
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date _____

10



### Office of the Attorney General
### Washington, D. C. 20530

#### ORDER NO. 1950-95

**SPECIAL DESIGNATION OF THE ASSISTANT, ACTING ASSISTANT,
ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR
COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS
UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE**

By virtue of the authority vested in me by 28 U.S.C. §§ 509
and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full
recognition that 18 U.S.C. § 2516(1) empowers the Attorney General,
Deputy Attorney General, and Associate Attorney General to
authorize applications to a Federal judge of competent jurisdiction
for orders authorizing the interception of wire and oral
communications, I hereby specially designate the Assistant Attorney
General in charge of the Criminal Division, any Acting Assistant
Attorney General in charge of the Criminal Division, any Deputy
Assistant Attorney General of the Criminal Division, and any Acting
Deputy Assistant Attorney General of the Criminal Division, to
exercise the power conferred by section 2516(1) of title 18, United
States Code, to authorize applications to a Federal judge of
competent jurisdiction for orders authorizing or approving the
interception of wire or oral communications by the Federal Bureau
of Investigation or a Federal agency having responsibility for the

**INTERNAL ORDER/NOT PUBLISHED
IN F.R.**

investigation of the offense(s) as to which such application is
made, when such interception may provide evidence of any of the
offenses specified in section 2516 of title 18, United States Code.

Order No. 1709-93 of April 5, 1993, is revoked effective at
midnight of the day following the date of this order.

Date: February 13, 1995

JANET RENO
Attorney General

- 2 -

*FDH:MHK:JPW:PJ:pj*

*Washington, D.C. 20530*

OCT 15 1998

**MEMORANDUM**

TO:      Frederick D. Hess, Director
           Office of Enforcement Operations
           Criminal Division

FROM:    James K. Robinson
           Assistant Attorney General
           Criminal Division

SUBJECT:  Authorization for Interception Order Application

      This is with regard to your recommendation that
I, an appropriately designated official of the Criminal Division,
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
interception of wire communications to and from the cellular
telephone bearing the number (954) 295-6672, subscribed to by
Joseph Rotunno, 1700 N. St. Rd. 7, Hollywood, Florida, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 2, 371, 892, 893, 894,
1952, 1955, 1962, 2314, and 2315, by Joseph Rotunno, Albert
Polito, Emro Capri, Fred Scarola, Howard Mandel, Reynold Maragni,
and others as yet unknown.

      By virtue of the authority vested in the Attorney General of
the United States by Section 2516 of Title 18, United States
Code, the Attorney General has by Order Number 1950-95, dated
February 13, 1995, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing
the interception of wire or oral communications. As a duly
designated official in the Criminal Division, this power is
exercisable by me. WHEREFORE, acting under this delegated power,
I hereby authorize the above-described application to be made by
any investigative or law enforcement officer of the United States
as defined in Section 2510(7) of Title 18, United States Code.

Accordingly, you or any other attorney on your staff who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, are authorized to make the above-described application.

Please be advised that it is your obligation, as supervising attorney in this matter, to ensure that the tapes of the intercepted conversations are adequately protected, and that these tapes are sealed by the court on a regular basis if the interception should continue beyond thirty days, preferably at the end of each thirty-day interception period. If there should be a break in the interception period, you must have the tapes sealed as soon as practicable thereafter.

Sincerely,

James K. Robinson
Assistant Attorney General

By: Frederick D. Hess/cHr

Frederick D. Hess, Director
Office of Enforcement Operations

Enclosures

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    MISC. NO.
FOR AN ORDER AUTHORIZING THE ·      )
INTERCEPTION OF WIRE COMMUNICATIONS )    **SUBMITTED UNDER SEAL**
_____)

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Joseph M. Cicini, Special Agent, Federal Bureau of
Investigation, Miami, Florida, being duly sworn, depose and say:

1.   I am a Special Agent of the Federal Bureau of
Investigation (FBI).   As such, I am an investigative or law
enforcement officer of the United States within the meaning of
Title 18, United States Code (U.S.C.), Section 2510 (7), that is,
an officer of the United States who is empowered by law to conduct
investigations of and to make arrests for offenses enumerated in
Title 18, U.S.C., Section 2516.

2.   I have been employed as a Special Agent of the FBI for
approximately eight years. I am presently assigned to a squad of
FBI Special Agents that has the principal responsibility to
investigate the illegal activities of La Cosa Nostra ("LCN") in the
South Florida area, including criminal activity involving members
and associates of the Colombo Family of LCN.   In my capacity as an
FBI  Special  Agent,  I  have  participated  in  more  than  30
investigations during the course of which I have utilized physical
and electronic surveillance, conducted undercover transactions,
executed search warrants, reviewed numerous taped conversations of

organized crime members, and used other investigative techniques to obtain relevant information and admissible evidence.

3. This Affidavit is being submitted in support of an application that seeks an order authorizing the interception of wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown over target cellular telephone number (954) 295-6672 bearing electronic serial number 21102262845, subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, for a period of thirty (30) days.

A. Authorization is also sought to intercept communications from any other number assigned to the same Electronic Serial Number (ESN) as the target cellular telephone.

4. The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning offenses enumerated in Title 18, United States Code, Section 2516, in particular, the following offenses:

A. Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4) (The Colombo Organized Crime Family), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth in paragraphs 4(B); 4(C); 4(D); 4(E); and 4(F); below, and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d).

2

B.    Making,    Financing    and    Collecting    Extortionate
Extensions of Credit, in violation of Title 18, United States Code,
Sections 892-894;

C.    Conducting    an    Illegal    Gambling    Business,    in
violation of Title 18, United States Code, Section 1955;

D.    Transportation of Stolen Goods, in violation of
Title 18, United States Code, Section 2314;

E.    Sale or Receipt of Stolen Goods, in violation of
Title 18, United States Code, Section 2315;

F.    Interstate    Travel    in    Aid    of    a    Racketeering
Enterprise, in violation of Title 18, United States Code, Section
1952; and,

G.    Conspiring to commit any or all of the above-named
offenses, in violation of Title 18, United States Code, Section
371.

5.    Your    Affiant    has    personally    participated    in    the
investigation of the offenses referred to in paragraph 4 of this
Affidavit,    and    from    that    personal    participation    in    the
investigation and reports, oral and written, made to me by agents
of the Federal Bureau of Investigation (FBI) and other federal,
state, and local law enforcement agencies, I am familiar with the
facts and circumstances of the investigation.

6.    Prior to setting forth the facts and circumstances
constituting probable cause, I have reviewed numerous FBI reports
concerning information provided by confidential informants of known
reliability and other sources of information set forth below.

3

7.   The facts and circumstances set forth below demonstrate that:

A.   There is probable cause to believe that the offenses set forth in paragraph 4, above have been, are being and will continue to be committed by JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown, have used, are using and will continue to use cellular telephone number (954) 295-6672, bearing electronic serial number 21102262845, subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, for the purpose of discussing and executing the offenses enumerated in paragraph 4 above.

8.   In particular, I believe that  wire communications will occur over telephone number (954) 295-6672 (target cellular telephone), which will disclose:

(i) the nature, scope, extent, and modus operandi of the conspirators' racketeering enterprise and illegal activities;

(ii) the identities and roles of the conspirators and other participants in these illegal activities;

(iii) the locations, tools, and means used in furtherance of these illegal activities;

(iv) the location of records maintained by or in relation to these illegal activities;

(v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport

4

and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and

(vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph 4, above.

9. Normal investigative procedures have been used and have not succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES

## TO BE INTERCEPTED

10. According to subpoenaed records of Primeco PCS, cellular telephone number (954) 295-6672 bearing electronic serial number (ESN) 21102262845, is subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida.

## BACKGROUND OF INTERCEPTEES

11. JOSEPH ROTUNNO, a/k/a Joey Flowers, was born on August 14, 1935, and resides at 1090 N.W. 161st Ave., Pembroke Pines, Florida. ROTUNNO is an associate of the Colombo Organized Crime Family. A search of the records maintained by the FBI and Florida Department of Law Enforcement (FDLE) revealed the following criminal history: ROTUNNO was first arrested on 5/25/84, in Florida

by the Broward County Sheriff's Office and subsequently convicted of loan sharking, extortion, gambling, and fraud. ROTUNNO received an unspecified term of confinement for the above listed offenses. On 4/20/89, ROTUNNO was arrested in Florida by Broward County Sheriff's Office for loan sharking, no disposition is listed. ROTUNNO, through his association with the Colombo LCN Family, receives a percentage of the profits generated through illegal gambling businesses. ROTUNNO collects outstanding gambling debts from various illegal gambling businesses. ROTUNNO further collects extensions of credit through extortionate means.

12. ALBERT POLITO was born on 8/7/50 and resides at 5440 N.W. 55 Blvd., #207, Coconut Creek, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history:    POLITO was arrested and subsequently convicted on 2/12/82, in Westbury, New York, for 3rd Degree Grand Larceny. POLITO received 1 month confinement, 5 years' probation and a $500 fine.    POLITO operates and supervises a large scale illegal gambling business located in South Florida.

13. EMRO CAPRI, a/k/a Mike Capri was born on 1/20/52 and resides at 15734 S.W. 46th St., Miami, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history: On 1/5/84, CAPRI was arrested in Florida by Broward County Sheriff's Office for failure to remit sales tax. Disposition is not reported. On 10/16/89, CAPRI was arrested in Florida by Metro-Dade Police Department for fraud. Disposition is

6

not reported.     CAPRI owns and operates a large scale illegal gambling business.

14.   FREDERICK SCAROLA, an associate of JOSEPH ROTUNNO, was born on December 3, 1942 and resides at 8473 N.W. 61st St., Tamarac, Florida. A search of records maintained by the FBI and Florida Department of Law Enforcement documents the following criminal history: SCAROLA was first arrested in New York for possession of stolen property in 1959.     In 1967, SCAROLA was arrested in New York for possession of a dangerous weapon.     In 1968, SCAROLA was arrested in Miami Beach, Florida for disorderly conduct; he was convicted and sentenced to thirty days in jail.     In 1970, SCAROLA was arrested in St. Thomas, U.S. Virgin Islands for fraud and forgery.   In 1973, SCAROLA was arrested in New York for forgery, criminal possession of stolen property, possession of a forged instrument, grand larceny, and attempted theft of service; he was convicted of grand larceny and placed on five years probation.   In 1974, SCAROLA was arrested in New York for criminal possession of a forged instrument, possession of forged credit card, use of stolen credit card, speeding and unregistered vehicle; he was convicted of the use of a stolen credit card and sentenced to two years incarceration.   In 1976, SCAROLA was arrested in New York for driving while intoxicated.   In 1977, SCAROLA was arrested in Ft. Lauderdale for uttering a forged instrument; formal charges were never filed.   In 1977, SCAROLA was arrested in Miami, Florida for possession of counterfeit notes; he was convicted, given a suspended sentence of three years and placed on three years

7

probation.    In 1979, SCAROLA was arrested in Miami, Florida for violation of New York probation.    In 1985, SCAROLA was arrested in Miami, Florida for forgery, dealing in stolen property, uttering a forged instrument and grand theft auto.    In 1989, SCAROLA was arrested in Ft. Lauderdale, Florida for bookmaking.    In 1991, SCAROLA was arrested in Ft. Lauderdale, Florida for violation of probation.    In 1994, SCAROLA was arrested in Coral Springs, Florida for bookmaking and conspiracy to commit bookmaking.

15.    REYNOLD MARAGNI was born in New York on February 6, 1952, and currently resides at 4251 N.W. 10th Street, Pompano Beach, Florida.    MARAGNI is a high level associate of the Colombo Organized Crime Family. A search of the records maintained by the FBI and the Florida Department of Law Enforcement (FDLE) revealed the following criminal history: MARAGNI was first arrested in New York on February 17, 1976, for petit larceny, he received a $150 fine.    On October 13, 1977, in New York, MARAGNI was arrested for criminal possession of a weapon.    The disposition is unlisted.    On January 14, 1986, MARAGNI was arrested in Florida and charged with conspiracy to defraud the United States and credit card fraud. MARAGNI received a sentence of five years confinement and $12,000 restitution.

16.    HOWARD MANDEL was born on January 18, 1936, and resides at 3541 North Avenue, Hollywood, Florida.    MANDEL is an associate of the Colombo Organized Crime Family.    A search of records maintained by the FBI and the Florida Department of Law Enforcement (FDLE) revealed no criminal history for MANDEL.

8

## PREVIOUS APPLICATIONS

17.    I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation on October 1, 1998, and October 14, 1998,    and the Surveillance Indices of the Drug Enforcement Administration on October 9, 1998, to determine whether previous applications have been made to intercept wire, oral or electronic communications of ROTUNNO, POLITO, CAPRI, SCAROLA, MANDEL, MARAGNI, and facilities and places named in this Affidavit.  The search revealed the following:

A.    On December 12, 1995, the Honorable Norman S. Roettger, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the interception of wire communications of JOSEPH ROTUNNO and others over telephone numbers (407) 683-4575, (407) 687-5555 and (407) 615-9600 subscribed to by Florida Ventures, Inc., 920 N. Congress Ave., West Palm Beach, Florida, for a period of thirty days.

B.    On December 20, 1995, the Honorable Norman S. Roettger, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the interception of wire communications of JOSEPH ROTUNNO and others over telephone number (954) 772-4802, subscribed to by Mari Cresta, 205 Wahingtonia Ave., Apt. 5, Lauderdale by the Sea, Florida, for a period of thirty days.

C.    The search did not reveal any other applications to intercept wire, oral or electronic communications of these interceptees or the facility named in this Affidavit.

9

18. Unless otherwise noted, information derived from confidential sources was derived from conversations between the confidential sources and either myself or another law enforcement officer who communicated the information to me either directly or indirectly. Unless otherwise noted, all statements set forth herein that are attributed to confidential sources are stated only in substance and in part. In addition, unless otherwise noted, information set forth herein concerning physical surveillance is information that is based on my own participation in the surveillance or was communicated to me either directly or indirectly by other FBI agents or other law enforcement officers who conducted the surveillance. Because I submit this Affidavit only for the limited purpose of securing authorization for the requested interception of wire communications, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish a sufficient foundation for the Order which is herein sought.

## FACTS AND CIRCUMSTANCES

## ESTABLISHING PROBABLE CAUSE

### Structure of the LCN Colombo Family

19. Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Colombo Crime Family:

10

A.    The LCN is one of the most powerful and sophisticated organized crime groups in the United States.

B.    The LCN consists of approximately twenty-five separate organizational units known as families functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss and the second-in-command is the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo" or "Skipper." Caporegimes are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have non-member associates under their direction.

D.    There are five LCN families operating in the New York metropolitan area.    They are the Bonanno, Colombo, Gambino, Genovese, and Luchese LCN families.    Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking.    The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family.    Each of the five New York families has representatives in South Florida.

E.    The Colombo LCN Family, with approximately one-hundred twenty-two made members is one of the largest and most powerful LCN

11

families in the United States. The Colombo family is presently involved in numerous illegal activities including gambling, loansharking, extortion, labor racketeering, money laundering and stock manipulations.

20. As a result of my training and experience, your Affiant has knowledge of the following methods and operations of illegal interstate gambling businesses operated by the LCN, including the Colombo family:

A. The use of telephonic communications is essential to the furtherance of a gambling operation.

B. The "line" is a group of point-spreads which show relative strengths of two opposing teams in an athletic contest, for example, football and basketball contests. The "line" for a particular game is then used as a handicap for wagering purposes. The "handicap" is added to the underdog's final score or subtracted from the winner's final score to determine the winner of the wager. While "lines" for a game are supposed to balance the two teams, bookmakers require a bettor to risk ten (10) to twenty (20) percent more than the bookmaker risks as a fee for the privilege of wagering. This ten (10) or twenty (20) percent charge, commonly referred to as "vigorish" or "juice," enables the bookmaker to make a profit if the bookmaker accepts an even, or substantially even, amount of wagers on both teams in the contest, regardless of who wins the contest. In this way, the bookmaker operates on a profit margin and does not gamble on the outcome of the event.

12

C.    It is common for illegal sports bookmakers to obtain current "line" information by telephone. A bookmaker must know the opening "line" and obtain frequent updates on the "line." A bookmaker residing in the Fort Lauderdale, Florida, area would have to use a telephone or other telecommunications device to expeditiously obtain the current "line" information before it becomes outdated. After receiving the "line" information, the bookmaker would furnish the "line" to his customers, who would in turn study it, compare it with other "lines," and make wagers. In order for a bookmaker to balance, or nearly balance his books, it is typical for him to have another bookmaker with whom to re-bet the wagers. The other bookmaker is, in effect, acting as the primary bookmaker's insurer. The second bookmaker is known as a "lay-off bookmaker," and the aforementioned re-betting or balancing process is known as "laying off." In this way, the bookmaker does not gamble on the outcome of the event and simply operates on a profit margin.

D.    Bookmakers frequently obtain unpublished telephone numbers in fictitious names or in names other than their own, for use at their place of operation.

E.    Bookmakers will often utilize "commission men" to accept and accumulate wages from bettors. These wagers are thereafter relayed to the main gambling office. The bookmaker will compensate the commission man for this service by paying either a percentage of the commission man's gross wagers or profits.

13

## INTRODUCTION

21.   The facts and circumstances set forth below demonstrate that ROTUNNO, POLITO, CAPRI, SCAROLA and others are members of an enterprise that has been engaging in operating several illegal gambling businesses, loansharking, transporting stolen property, among other crimes.   POLITO, CAPRI and SCAROLA each operate bookmaking offices in South Florida for the benefit of the organization.   ROTUNNO, a partner in each of the bookmaking operations and a strong-arm collector, is responsible for collecting money from gamblers who have incurred debts with the gambling businesses.   When gambling victims are not able to pay their initial gambling debts, ROTUNNO converts the debt to an extortionate extensions of credit for which he charges the gambling victims usurious interest rates ranging from 1-1/2% to 3% per week (78% to 156% annually).   ROTUNNO then utilizes threats of violence as a means to collect the debts.   Where noted below telephone conversations and meetings described herein were consensually recorded.

### Confidential Source One

22.   Confidential Source ("CS-1") has provided reliable information to the FBI for approximately five years.   Information provided by CS-1 has been used in support of an electronic surveillance order and a criminal complaint. His information has further been used as the basis for eight FBI organized crime investigations, in which approximately forty-five previously

14

unknown LCN members and associates have been identified. The information provided by CS-1 is based on his longstanding friendship and involvement in criminal activities with Colombo members and associates, including some of the named interceptees herein. Based on this longstanding relationship and his prior dealings, members and associates of the Colombo LCN Family trust and perceive CS-1 as having the ability to obtain significant proceeds through criminal activity.

23. From in or about March 1997, until the present, CS-1 began meeting with members and associates of the Colombo Family in South Florida and has provided the information described below to law enforcement authorities. CS-1 has provided information on loansharking, gambling, narcotics trafficking, robbery and extortion by members and associates of the Colombo Family operating in South Florida. Since in or about 1997, CS-1 has attended meetings in South Florida with ROTUNNO wherein ROTUNNO discussed Colombo LCN criminal activities.

24. CS-1 has been informed by ROTUNNO and other members and associates of organized crime families that ROTUNNO is currently involved in loanshark activities. CS-1 has been further informed that ROTUNNO is currently financing extensions of credit at usurious rates ranging from 1-1/2% to 3% per week (78% to 156% annually).

25. CS-1 advised that ROTUNNO participates in several illegal gambling businesses by collecting outstanding gambling losses from individuals who have placed wagers with the gambling businesses.

15

26.    CS-1 advised that ROTUNNO frequently extends credit to
bettors who are unable to pay their losses.    ROTUNNO usually
collects three percent per week of the outstanding debt from the
losing bettors.

27.    CS-1 advised that ROTUNNO frequently uses threats of
force and violence to collect the extensions of credit from the
losing bettors.

28.    CS-1 further advised that in addition to collection of
gambling losses, ROTUNNO regularly finances extensions of credit at
usurious rates to individuals who are referred to him by other
members and associates of organized crime.    ROTUNNO frequently uses
threats of force and violence to collect these usurious loans.

29.    CS-1 advised that in 1997, ROTUNNO invested approximately
$800,000 provided by the New York hierarchy of the Colombo LCN
Family to finance the purchase of wholesale automobiles with FRED
SCAROLA and associates of the Bonnano LCN Family (see paragraphs
39-45 below).

30.    ROTUNNO provided CS-1 with the target cellular telephone
number in order that ROTUNNO and CS-1 could have conversations
regarding Colombo criminal activities in South Florida.

31.    During the past four months, June-September 1998, CS-1
has observed and overheard ROTUNNO utilize the target cellular
telephone to discuss the operation of illegal gambling businesses.
CS-1 has also overheard ROTUNNO use the target cellular telephone
to discuss the extortionate collection of extensions of credit.
CS-1 has overheard ROTUNNO use the target cellular telephone to

16

threaten violence to individuals owing extensions of credit from
various individuals.    CS-1    advised    that    ROTUNNO    receives
approximately $2,000 per week from his controlling interest in two
illegal gambling businesses.  CS-1 has placed telephone calls to
ROTUNNO at the target cellular telephone, wherein they discussed
ROTUNNO's illegal gambling and loansharking activities.  CS-1 has
received telephone calls from ROTUNNO over the target cellular
telephone  wherein  they  discussed  gambling  and  loansharking
activities.    (CS-1's    telephone    is    equipped    with    caller
identification.)    CS-1 most recently had a conversation with
ROTUNNO over the target cellular telephone to discuss illegal
gambling during the month of October, 1998.

### Confidential Source Two

32. Confidential Source Two ("CS-2") has provided reliable
information to the FBI regarding his knowledge of criminal
activities in South Florida, since in or about February 1998.  CS-2
has provided information concerning members and associates of
organized crime and organized crime activities such as bookmaking,
loansharking and narcotics.  All information provided by CS-2 has
been shown to be reliable and where possible has been corroborated
through information supplied by other confidential sources.  CS-2
has identified at least eight individuals previously unknown by law
enforcement officials to be members and/or associates of organized
crime.

33.    CS-2 has been an associate of the Colombo LCN Family,
both in New York City and South Florida, for approximately twenty

17

years.  CS-2 has participated in illegal gambling businesses and collection of gambling debts through extortionate means, on behalf of the Colombo LCN Family.

34.  CS-2 has informed your Affiant that ROTUNNO has been a significant associate of the Colombo LCN for approximately 20 years.  CS-2 advised that ROTUNNO is in the criminal crew supervised by Colombo LCN Captain Anthony Induisi, who was recently released from Federal prison to a half-way house in South Florida. CS-2 further advised that ROTUNNO communicates with Colombo LCN acting boss Alphonse Persico to discuss the criminal activities of the Colombo LCN Family in South Florida.[1]

35.  CS-2 has attended meetings with ROTUNNO and other members and associates of the Colombo LCN Family and other organized crime families during the past year (1998).  CS-2 advised that these meetings were conducted in order to discuss Colombo controlled illegal gambling businesses and loanshark activities in South Florida.

36.  CS-2 has been informed by ROTUNNO and other members and associates of organized crime families that ROTUNNO is currently receiving proceeds generated through illegal gambling activities controlled by the Colombo LCN Family and through the collection of gambling debts by extortionate means.

---

[1]    At this point there is no indication that ROTUNNO is contacting Persico over the target cellular telephone and therefore Persico is not listed as an interceptee.

37.  ROTUNNO provided CS-2 with the target cellular telephone number in order that ROTUNNO and CS-2 could have conversations regarding Colombo criminal activities in South Florida.

38.  During the past six months, CS-2 has had conversations with ROTUNNO over the target cellular telephone wherein they discussed ROTUNNO's loansharking activities.  CS-2 is aware that ROTUNNO collects loansharks payments from at least four (4) individuals.  The most recent conversation was during the month of September, 1998.

### Confidential Source Three

39.  Confidential Source ("CS-3") has provided information to the FBI since April 1998.  Prior to the commencement of his cooperation, CS-3 was involved in the wholesale car business that had been financed by the Bonanno and Colombo families.  CS-3 was a partner of ROTUNNO and FREDERICK SCAROLA in the wholesale car business.  (See paragraph 29 above).  Information developed during a subsequent investigation by the New York Police Department established that at least some of the cars sold through this business were stolen vehicles.

40.  In or about the fall of 1996, CS-3 met SCAROLA through mutual friends in South Florida and began placing bets with SCAROLA's bookmaking operation.  SCAROLA also referred CS-3 to POLITO's illegal gambling business in order that CS-3 may place larger wagers. CS-3 became indebted to SCAROLA over gambling debts and offered to enter into a business deal with SCAROLA to broker wholesale cars in order to pay off his gambling debts.  CS-3

19

utilized his contacts to purchase cars in the wholesale market and resell them for sizable profits to retail dealers and individuals. SCAROLA introduced CS-3 to ROTUNNO to provide financing for the wholesale car deals.   Initially ROTUNNO provided CS-3 with an extension of credit at 3% per week.   Thereafter ROTUNNO became partners with CS-3 and SCAROLA in the wholesale car business and provided financing for the business ventures. CS-3 was advised by ROTUNNO that the financing was derived from Colombo Family activities and that a portion of the money had been transported to South Florida from New York.

41.   In or about early 1997, CS-3 and SCAROLA had made a private agreement to falsely inflate the actual price which they paid for the vehicles in order to deceive ROTUNNO and split the excess sum between themselves.   CS-3 continued gambling with SCAROLA and POLITO and other bookmaking operations, gambling away any profits that were made from the car deals and eventually gambling away the money that ROTUNNO had invested on behalf of the Colombo Family.

42.   In or about the fall of 1997, CS-3 became concerned because ROTUNNO was suspicious that SCAROLA and he (CS-3) were skimming money from the car business.   CS-3 approached SCAROLA and expressed his concerns over the money provided by ROTUNNO which came from the Colombo Family in New York.

43.   In or about November, 1997, SCAROLA and CS-3 traveled to New York in order to meet SCAROLA's cousin, Bonanno Capo Anthony Graziano.   SCAROLA informed CS-3 that Graziano is the street boss

of the Bonanno Family.  SCAROLA and CS-3 then traveled to Brooklyn
to attend a social function hosted by Graziano.  SCAROLA introduced
CS-3 to Graziano, and Graziano advised CS-3 not to worry about the
Colombo money invested by ROTUNNO.  Graziano informed CS-3, "You're
with us.    Just continue making money and we'll take care of
everything."

A.    Based upon my training and experience, I know that
Graziano's use of the phrase "with us" means that CS-3 was under the
protection of the Bonanno Family, was thereby directed in his
dealings by the Bonanno Family, and was expected to share his
profits with the Family.

44.    CS-3 advised that in or about December, 1997, Bonanno
soldier William Riviello traveled to South Florida on behalf of
Graziano and CS-3 to meet with Colombo associates of ROTUNNO over
the money invested in the wholesale car business.    CS-3 advised
that Riviello traveled to South Florida two more times in December
of 1997 to meet with Colombo Family associates in an effort to
resolve the dispute over the money lost in the wholesale car deals.

45.    Since in or about March 1998, CS-3 has received and
placed approximately 47 telephone calls to ROTUNNO at the target
cellular telephone to discuss the above-described car purchases and
to  discuss  CS-3's  debt  incurred  from  his  illegal  gambling
activities.  CS-3 has further discussed with ROTUNNO usurious loans
owed to various organized crime individuals by CS-3.

21

A.    CS-3's    residence    and    cellular    telephones    are
equipped with caller identification features wherein CS-3 was able
to identify ROTUNNO's use of the target cellular telephone.

### Confidential Source Four

46.    Confidential    Source    ("CS-4")    has    provided    reliable
information to the FBI since in or about August 1997. CS-4 has
consensually recorded conversations with ROTUNNO regarding illegal
gambling,    loansharking    and    stolen    property.     As    hereinafter
recited, CS-4 consensually recorded conversations with POLITO
regarding illegal gambling activity.    Your Affiant has reviewed
transcripts of the consensually recorded conversations and reports
of law enforcement agents involved in the investigation.

47.    CS-4    advised    that    ROTUNNO    handled    collections    for
POLITO's illegal gambling business.

48.    On September 5, 1997, CS-4 consensually recorded a
conversation with POLITO.  CS-4 informed POLITO that he (CS-4) had
access to several individuals who wanted to place wagers on
sporting events through an illegal gambling business.    POLITO
advised CS-4 that he (POLITO) would obtain the approval of his
partners in the illegal gambling business.  POLITO informed CS-4 as
to the procedure used in acquiring new bettors.  POLITO stated that
winning bettors would be paid on Mondays and Tuesdays and that the
losers must pay their losses by Thursday.  POLITO advised CS-4 that
he (CS-4) could act as a collector from the losing bettors.  POLITO
asked CS-4 the number of bettors CS-4 would refer to POLITO.  CS-4
stated that he had access to approximately twenty bettors.  POLITO

22

informed CS-4 that he (CS-4) could charge usurious interest rates on the debts incurred by the losing bettors.    POLITO further acknowledged that ROTUNNO was also collecting gambling debts on behalf of his (POLITO's) bookmaking operation.

A.    Your Affiant based upon his training and experience understands that individuals involved in the collection of gambling losses often convert those debts into extortionate extensions of credit.

49.    On October 24, 1997, CS-4 had a consensually recorded conversation with ROTUNNO and POLITO.    ROTUNNO and POLITO informed CS-4 that he (CS-4) was being held responsible for the losses incurred by the bettors referred by CS-4.    ROTUNNO and POLITO advised that CS-4 was responsible for the payment of approximately $11,000 in gambling losses.    CS-4 agreed to repay ROTUNNO on a weekly basis.

### Confidential Source Five

50.    Confidential Source ("CS-5") began providing information to law enforcement authorities in or about 1991 (CS-5 died on June 15, 1998).    CS-5 consensually recorded conversations with targets ROTUNNO and CAPRI.    The information supplied by CS-5 has been determined to be reliable and where possible has been corroborated by information supplied by other confidential sources, physical surveillance, toll record analysis and consensual recordings made by other confidential sources.    CS-5 advised your Affiant that he (CS-5) began participating with CAPRI in illegal gambling activities in or about late 1997.    CS-5 operated a small scale

23

illegal gambling business and referred large wagers to CAPRI's gambling business.

51. In or about May 1998, three bettors who had been referred by CS-5 to CAPRI's gambling business failed to pay $25,000 in gambling debts. CAPRI advised CS-5 that he (CS-5) would be held responsible for repayment of the $25,000 debt. CAPRI advised CS-5 that ROTUNNO would collect the gambling debt from CS-5 and that ROTUNNO handled all collections on behalf of CAPRI's gambling business.

52. On or about May 26, 1998, CS-5 met with ROTUNNO and CAPRI regarding the gambling debt. CS-5 paid CAPRI $6,000 as partial payment towards the $25,000 gambling debt. ROTUNNO informed CS-5 that the $19,000 balance of the debt could be converted into an extension of credit at an usurious rate.

53. On May 27, 1998, CS-5 contacted the FBI and was interviewed by your Affiant. CS-5 agreed to consensually record conversations with ROTUNNO and CAPRI.

54. On June 4, 1998, CS-5 consensually recorded a telephone conversation with CAPRI. CS-5 informed CAPRI that he (CS-5) would be willing to convert the outstanding $19,000 gambling debt into an extension of credit at an usurious rate. CAPRI informed CS-5 that CS-5 would have to make arrangements with ROTUNNO regarding repayment of the debt. CS-5 offered to pay "vig" or "juice" of one percent per week.

A.    Your Affiant, through his training and experience understands that the terms "vig" and "juice" refer to payment of interest on extensions of credit at usurious rates.

55.    On June 4, 1998, CS-5 consensually recorded a telephone conversation with ROTUNNO on the target telephone. CS-5 informed ROTUNNO that he (CS-5) would pay one percentage point per week as an interest payment on the $19,000 gambling debt. ROTUNNO advised CS-5 that CS-5 would have to pay three percentage points per week. CS-5 stated that CAPRI agreed that CS-5 could pay one percentage point per week. ROTUNNO stated: "I don't give a fuck, hey listen, you're doing business with me." CS-5 advised ROTUNNO that he (CS-5) could not afford to pay three percentage points per week. ROTUNNO responded "I don't give a fuck, you go and get it, you fucking took this money." CS-5 and ROTUNNO thereafter agreed that CS-5 would pay one and one half percentage points per week.

56.    On June 4, 1998, CS-5 had a consensually recorded telephone conversation with CAPRI. CS-5 informed CAPRI that he (CS-5) and ROTUNNO had agreed on the terms of repayment of the gambling debt.    CAPRI informed CS-5 that he (CAPRI) has been involved in illegal gambling for 23 years.

57.    On June 11, 1998, CS-5 recorded a telephone call from ROTUNNO.    ROTUNNO instructed CS-5 to meet him (ROTUNNO) at a Denny's Restaurant in Hollywood, Florida, in order for CS-5 to make a payment.

A.    Toll records reflect that on June 11, 1998, a telephone call was placed from target cellular telephone number

25

(954) 295-6672 to (954) 985-0940. Your Affiant is aware, through conversations with CS-5 that (954) 985-0940 was CS-5's residence telephone number.

58.  On June 11, 1998, CS-5 met with ROTUNNO, POLITO and CAPRI at the Denny's Restaurant in Hollywood, Florida. CS-5 gave an envelope containing $270 to ROTUNNO for his weekly interest payment on the $19,000 gambling debt.

A.  Surveillance by law enforcement agents on June 11, 1998, reflects that CS-5 met with ROTUNNO, POLITO and CAPRI at the Denny's Restaurant in Hollywood, Florida.

### PEN REGISTER AND TOLL RECORD INFORMATION

59.  A Court Order authorizing the installation and use of a pen register, a trap and trace device and enhanced caller identification on target cellular telephone (954) 295-6672 for a period of sixty days was issued by the Honorable Barry S. Seltzer, United States Magistrate Judge on June 12, 1998. An extension Order was issued on August 12, 1998.

60.  Telephone toll records of target cellular telephone (954) 295-6672 subscribed to by Joseph ROTUNNO, billing address of 1700 N State Road 7, Hollywood, Florida were obtained for the period of March 1, 1998 to June 12,1998. Pen register on targeted cellular telephone number (954) 295-6672 was initiated on June 12, 1998. A total of 9,572 telephone calls have been registered on targeted telephone number (954) 295-6672 for the period of March 1, 1998 to October 13,1998.

61. Telephone toll and pen register records for targeted cellular telephone number (954) 295-6672 indicates that between March 1, 1998, and September 22, 1998, 548 calls were placed to telephone number (305) 710-1754 subscribed to by Seymour Winston located at 1401 NE 191 Street, North Miami Beach, Florida with the last call registered, being on August 31, 1998.

62. Pen register records for target cellular telephone number (954) 295-6672 indicates that between August 31, 1998, and October 13, 1998, 412 calls were placed to telephone number (954) 298-9154 subscribed to by Seymour Winston located at 1401 NE 191 Street, North Miami Beach, Florida with the last call registered, being on October 13, 1998.

A. Your Affiant is aware through analysis of pen register information and information provided by CS-1 and CS-3, that Seymour Winston is a nominee on behalf of ALBERT POLITO in POLITO's illegal gambling business and that POLITO uses telephone numbers (305) 710-1754 and (954) 298-9154 to facilitate his illegal gambling business.

63. Telephone toll and pen register records for target cellular telephone number (954) 295-6672 indicates that between March 1, 1998, and October 13, 1998, 181 calls were placed to telephone number (954) 570-3592 subscribed to by James Pflug located at 5440 N.W. 55 Boulevard, Apartment 207, Coconut Creek, Florida with the last call registered, being on October 13, 1998.

A. Your Affiant is aware through analysis of pen register information and information provided by CS-1 and CS-3,

27

that James Pflug is a nominee name used by POLITO as telephone subscriber identification. Your Affiant is aware through physical surveillance and public records check that ALBERT POLITO resides at 5440 N.W. 55th Boulevard, Apartment 207, Coconut Creek, Florida, and that POLITO uses telephone number (954) 570-3592 to facilitate his illegal gambling business.

64.   Telephone toll and pen register records for targeted cellular telephone number (954) 295-6672 indicates that between March 1, 1998 and October 13, 1998, 113 calls were placed to telephone number (954) 961-4262 subscribed to by Howard Mandel located at 3541 N 54 Avenue, Hollywood, Florida with the last call registered, being on October 12, 1998.

65.   Telephone toll and pen register records for targeted cellular telephone number (954) 295-6672 indicates that between March 1, 1998, and October 13, 1998, 121 calls were placed to telephone number (954) 985-8382, subscribed to by Huddle's Sports Cafe, located at 7100 Pines Boulevard, Unit 4, Pembroke Pines, Florida, with the last call registered, being on October 9, 1998.

A.   Your Affiant is aware through information provided by other law enforcement personnel, information provided by CS-4 and surveillance that HOWARD MANDEL is an associate of the Colombo LCN Family.   Your Affiant is further aware that members and associates of the Colombo Family, including ROTUNNO and POLITO utilize Mandel's businesses as meeting places to discuss bookmaking and loansharking activities, among other crimes.   Confidential

28

source information and public records reflect that Huddle's Sports Cafe is owned and operated by HOWARD MANDEL.

66.    Telephone toll and pen register records for targeted cellular telephone number (954) 295-6672 indicates that between March 1, 1998 and October 13, 1998, 60 calls were placed to telephone number (954) 721-2931, subscribed to by FRED M. SCAROLA located at 8473 NW 61 Street, Tamarac, Florida with the last call registered, being on October 10, 1998.

67.    Telephone toll and pen register records for targeted cellular telephone number (954) 295-6672 indicates that between March 1, 1998 and October 13, 1998, 19 calls were placed to telephone number (954) 968-7817, subscribed to by REYNOLD C. MARAGNI located at 4251 NW 10 Street, Coconut Creek, Florida, with the last call registered, being on September 29, 1998.

A.    Your Affiant is aware through information provided by other law enforcement personnel and confidential source information that REYNOLD MARAGNI is an associate of the Colombo LCN Family and is in the criminal crew of acting Colombo family boss Alphonse Persico.

### NORMAL INVESTIGATIVE TECHNIQUES

68.    We submit this application seeking authorization for the interception of wire communications because comparable alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or (b) are too dangerous to

attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

69.   CS-1 and CS-2 whose information is relied upon herein are unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families.   Although the CS-3 and CS-4 are willing to testify, they do not know all or sufficient   detail   concerning   their   co-conspirators'   criminal conduct, which is needed to ensure a successful prosecution.   This is, in part, because the targets of this investigation have been unwilling to discuss with CS-3 and CS-4 all of the details of their criminal activity.   For example, none of the CSs are in the inner circle of the Colombo Family; they are not privy to the many activities and businesses controlled by members of the Colombo Family.    Members and associates of organized crime keep their respective business dealings compartmentalized, and this has been especially true with respect to the CSs.    Thus, much of the information and evidence needed for prosecution of the targets herein is outside the scope of the CSs' knowledge and involvement. In addition, an attempt by the CSs to have more wide-ranging and far-reaching discussions with the targets would likely raise the targets' suspicions and thereby jeopardize the safety of the CSs as well as the continued viability and ultimate success of this investigation.   Furthermore, even if all sources were willing to testify, tape recordings are an invaluable and persuasive means of corroborating witness testimony, and thereby producing evidence

constituting proof of guilt beyond a reasonable doubt, which is one of the stated objectives of this investigation.

70. Although physical surveillance of the targets herein has been utilized, it has been relatively ineffective in obtaining information and evidence necessary for a prosecutable case. First, physical surveillance of such persons must be especially discreet because they are very surveillance-conscious individuals. They have articulated concern about law enforcement scrutinizing their movements and activities. Moreover, the targets have been reported to exercise caution in their movements in order to avoid law enforcement surveillance. Furthermore, surveillance agents have noticed during surveillances that several of the targets appear to be "looking" for surveillance and taking evasive measures to avoid law enforcement surveillance.

71. In any event, physical surveillance in and of itself is a limited investigative tool. It is useful mainly in placing individuals together, as set forth above, but provides limited evidence, standing alone, of the purpose of such meetings or the content of conversations. The information gained from the interception of wire communications will assist in establishing the various roles the targets play within the Enterprise, the nature and scope of their activities, the location of physical evidence, and the like. In addition, such interception may produce advance information as to planned meetings, including, for example, the date, time, and location, which would enable the FBI to employ other investigative techniques, such as advance preparation for

31

physical surveillance, thereby minimizing the risks of discovery inherent in simply following the targets.

72.    Having agents attempt to overhear conversations is also a technique of limited value and prospect for success, inasmuch as typically only a small portion of the conversation can be overheard and, therefore, a full understanding of the conversation cannot be achieved.

73.    Use of a federal grand jury, as discussed with the Assistant United States Attorney in charge of this investigation, does not appear to be a promising method of investigation at this time.    The witnesses who could provide evidence to the grand jury as to the identities and roles of the racketeering enterprise members and details of their activities are the identified members of the racketeering enterprise themselves and the targets of this investigation.    These targets have criminal exposure and therefore are unlikely to testify voluntarily.    Nor would it be desirable at this time to seek immunity for any of these individuals in order to compel their testimony; this course would thwart the public policy that they be held accountable for their illegal activities.    In addition, it would be premature to grant immunity at this juncture, when the scope of the targets' individual criminal participation and liability is still unknown.    Moreover, the targets may refuse to testify even if immunized and under threat of contempt of court particularly given their solid ties to the Colombo Family.    In any event, the granting of immunity is premature until the full scope of the illegal activities described above is known.    Likewise, the

32

issuance of grand jury subpoenas to non-targets at this time is unlikely to lead to the discovery of critical information and yet undoubtedly would alert the targets to the pending investigation.

74. For the reasons described in paragraph 70, above, FBI agents have not sought to interview subjects of this investigation.

75. Although sources have provided valuable information in connection with this investigation, they cannot fully discover the scope and methods of the criminal activities of the targets, and others known as yet unknown. The sources are not privy to all of the details concerning the criminal activities of these individuals. ROTUNNO is secretive in the conduct of his illegal activities. He typically compartmentalizes the activities of criminal associates; that is, typically ROTUNNO does not entrust one of his co-conspirators with details of the criminal activities of other co-conspirators. The result of ROTUNNO's compartmentalization of his operation, information, and personnel, is that few co-conspirators, if any, other than ROTUNNO himself have an overall view of the breadth and details of all or most of the criminal enterprise. For example, while ROTUNNO discusses some criminal activity with the CSs, the CSs are not privy to other conversations between ROTUNNO and other crew members, other Colombo Family members, or other LCN associates. In addition, CSs are not made members of the Colombo Family and thus are not allowed to participate in certain conversations between made LCN members. It appears at the present time that there is no realistic prospect that an undercover agent or informant can infiltrate this criminal

33

enterprise to the degree necessary to obtain the information that is likely to result from the interception of wire communications and that is necessary for a successful prosecution of the targets and others as yet unknown for the offenses set forth in paragraph 4 above. Moreover, even if an undercover agent were to be able to infiltrate this organization, I believe it would take several years for an agent to do so, and even then, it would be highly unlikely that the undercover agent could have significant criminal conversations with high-level members of the Colombo Family. Thus, it is highly unlikely that an undercover operation could yield the requisite evidence within a reasonable investigative time frame.

76. Although not set forth in the probable cause section of this Affidavit, telephone toll records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed telephonic contact between JOSEPH ROTUNNO and known LCN associates. However, like toll record information these records do not provide proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal

activity and do not identify the actual participants in the telephone contacts.

77.   Based upon my experience and the experience of other law enforcement agents, it is my belief that the use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept and the only evidence of a meeting would be the conversations.   To date, there is no corroborated information concerning the existence or location of any such records.   T h e Affiant is unaware of any information regarding the location of pertinent documents that may be maintained by the co-conspirators.

78.   Further investigation is required in order to determine, among other things, the relationship among the roles played by the various   known   conspirators,   the   identities   of   additional conspirators, and the means and locations they use to further their criminal activities.   Based upon all of the foregoing, it is my opinion that the interception of wire communications is essential to assist in uncovering the full scope of the criminal activities of Colombo Family members and their associates in the South Florida area.

## MINIMIZATION

79.   All interceptees of wire communications will be minimized in accordance with Chapter 119 of Title 18, United States Code. The FBI agents and investigative and/or law enforcement officers

who are to carry out the requested interceptions will be instructed concerning the steps that they must take to minimize the interceptions. Any interception will cease when monitoring personnel are able to determine that the conversation is not criminal in nature.

## PERIOD OF INTERCEPTION

80. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, aka Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, and the full nature of the criminal conspiracies involved therein, or for a period not to exceed thirty (30) days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins

36

to conduct an interception under the Order, or, ten (10) days after
the Order is entered, whichever is earlier.

JOSEPH M. CICINI
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
____ day of October, 1998

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
U.S. Dist. Court
Southern Dist. of Florida
By _____
Deputy Clerk
Date ___10-16-98___

37



**U.S. Department of Justice**

*FDH:MHK:JPW:PJ:pj*

*Washington, D.C. 20530*

OCT 1 5 1998

**MEMORANDUM**

TO:      Frederick D. Hess, Director
         Office of Enforcement Operations
         Criminal Division

FROM:    James K. Robinson
         Assistant Attorney General
         Criminal Division

SUBJECT: Authorization for Interception Order Application

This is with regard to your recommendation that I, an appropriately designated official of the Criminal Division, authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the interception of wire communications to and from the cellular telephone bearing the number (954) 295-6672, subscribed to by Joseph Rotunno, 1700 N. St. Rd. 7, Hollywood, Florida, in connection with an investigation into possible violations of Title 18, United States Code, Sections 2, 371, 892, 893, 894, 1952, 1955, 1962, 2314, and 2315, by Joseph Rotunno, Albert Polito, Emro Capri, Fred Scarola, Howard Mandel, Reynold Maragni, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 1950-95, dated February 13, 1995, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by me. WHEREFORE, acting under this delegated power, I hereby authorize the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone number listed above, but to any changed telephone numbers, or any other telephone numbers, subsequently assigned to or used by the instrument bearing the same electronic serial number as the target cellular telephone within the thirty-day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

James K. Robinson
Assistant Attorney General
Criminal Division

OCT 1 5 1998

Date

Kevin V. DiGregory
Deputy Assistant Attorney General



**U.S. Department of Justice**

*Criminal Division*
*Office of Enforcement Operations*
*P.O. Box 7600*
*Ben Franklin Station*

*Washington, D.C. 20044-7600*

OCT 15 1998

Honorable Thomas R. Scott
United States Attorney
Southern District of Florida
Miami, Florida

           Attention:     Paul Schwartz
                           Assistant United States Attorney

Dear Mr. Scott:

    This is to advise you that pursuant to the power delegated by special designation by the Attorney General of the United States under the authority vested in the Attorney General by Section 2516 of Title 18, United States Code, an appropriate official of the Criminal Division has authorized an application to be made to a federal judge of competent jurisdiction for an order under Section 2518 of Title 18, United States Code, authorizing for a thirty (30) day period the interception of wire communications to and from the cellular telephone bearing the number (954) 295-6672, subscribed to by Joseph Rotunno, 1700 N. St. Rd. 7, Hollywood, Florida, in connection with an investigation into possible violations of Title 18, United States Code, Sections 2, 371, 892, 893, 894, 1952, 1955, 1962, 2314, and 2315, by Joseph Rotunno, Albert Polito, Emro Capri, Fred Scarola, Howard Mandel, Reynold Maragni, and others as yet unknown.

    The authorization given is intended to apply not only to the target telephone number listed above, but to any changed telephone numbers, or any other telephone numbers, subsequently assigned to or used by the instrument bearing the same electronic serial number as the target cellular telephone within the thirty-day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

    A copy of the Attorney General's order designating specific officials in the Criminal Division to authorize applications for interception orders of this nature and a copy of the memorandum of authorization are enclosed.

Accordingly, you or any other attorney on your staff who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, are authorized to make the above-described application.

Please be advised that it is your obligation, as supervising attorney in this matter, to ensure that the tapes of the intercepted conversations are adequately protected, and that these tapes are sealed by the court on a regular basis if the interception should continue beyond thirty days, preferably at the end of each thirty-day interception period. If there should be a break in the interception period, you must have the tapes sealed as soon as practicable thereafter.

Sincerely,

James K. Robinson
Assistant Attorney General

By: Frederick D. Hess/cttr

Frederick D. Hess, Director
Office of Enforcement Operations

Enclosures

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION     )     MISC. NO. 98-14
OF THE UNITED STATES OF AMERICA      )
FOR AN ORDER AUTHORIZING THE         )     **ORDER AUTHORIZING THE**
CONTINUED INTERCEPTION OF            )     **CONTINUED INTERCEPTION**
WIRE COMMUNICATIONS                  )     **OF WIRE COMMUNICATIONS**
_____)

Application under oath having been made before me by Paul F. Schwartz, Assistant United States Attorney, Southern District of Florida, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, for an Order authorizing the continued interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

1.     there is probable cause to believe that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, have committed, are committing, and will continue to commit offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving violations of a) Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth hereinafter in sub-sections (b), (c), (d),

(e), (f), and (g), and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d); b) Making, Financing and Collecting Extortionate Extensions of Credit, in violation of Title 18, United States Code, Sections 892-894; c) Conducting an Illegal Gambling Business, in violation of Title 18, United States Code, Section 1955; d) Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314; e) Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315; f) Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952; g) Laundering of Monetary Instruments, in violation of Title 18, United States Code, Section 1956; h) Concealing of Assets, False Oaths and Claims in Bankruptcy, in violation of Title 18, United States Code, Section 152; i) Banruptcy Fraud, in violation of Title 18, United States Code, Section 157; and j) Conspiring to commit any or all of the above-named offenses, in violation of Title 18, United States Code, Section 371;

2. there is probable cause to believe that particular wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, concerning the above-described offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause

2

to believe that the interception of wire communications to and from the target cellular telephone bearing the number (954) 295-6672, bearing electronic serial number (ESN) 21102262845, subscribed to in the name of JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, will concern the specifics of the above offenses, including the manner and means of the commission of the offenses: (i) the nature, scope, extent, and modus operandi of the conspirators racketeering enterprise and illegal activities; (ii) the identities and roles of the conspirators and other participants in these illegal activities; (iii) the locations, tools, and means used in furtherance of these illegal activities; (iv) the location of records maintained by or in relation to these illegal activities; v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and, (vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses;

3.   it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be

3

LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown have committed, are committing, and will continue to commit violations of a) Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth hereinafter in paragraphs (b), (c), (d), (e), (f), and (g),; and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d); b)   Making, Financing and Collecting Extortionate Extensions of Credit, in violation of Title 18, United States Code, Sections 892-894; c) Conducting an Illegal Gambling Business, in violation of Title 18,- United States Code, Section 1955; d) Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314; e) Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315; f) Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952; g) Laundering of Monetary Instruments, in violation of Title 18, United States Code, Section 1956;   h) Concealing of Assets, False Oaths and Claims in Bankruptcy, in violation of Title 18, United States Code, Section 152; i) Banruptcy Fraud, in violation of Title 18, United States Code, Section 157; and j) Conspiring to commit any or all of the

4

above-named offenses, in violation of Title 18, United States Code, Section 371;

b. there is probable cause to believe that particular wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, concerning the above-described offenses will be obtained through the requested interception. In particular, these communications will concern the (i) the nature, scope, extent, and modus operandi of the conspirators' racketeering enterprise and illegal activities; (ii) the identities and roles of the conspirators and other participants in these illegal activities; (iii) the locations, tools, and means used in furtherance of these illegal activities; (iv) the location of records maintained by or in relation to these illegal activities; v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and (vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph two (2), above. In addition, the

5

communications are expected to constitute admissible evidence of
the commission of the above-stated offenses; and,

c.    normal investigative procedures have been tried and
failed, reasonably appear to be unlikely to succeed if tried, or
are too dangerous to employ, as is described in further detail in
the attached Affidavit;

d.    there is probable cause to believe that the above-
described target cellular telephone number (954) 295-6672 has been
and will continue to be used in connection with the commission of
the above-described offenses.

5.    The attached Affidavit contains a full and complete
statement of facts concerning all previous applications which are
known to have been made to any judge of competent jurisdiction for
approval of the interception of oral, wire or electronic
communications of any of the same persons, facilities, or places
specified in this Application.

WHEREFORE, your applicant believes that there is probable
cause to believe that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI,
a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI,
GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN
HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ,
BURT CASKILL, CLIFF PIERCE, and others as yet unknown are engaged
in the commission of offenses described in paragraph two (2) above;
that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri,
FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES
LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS

6

STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others yet unknown are using target cellular telephone number (954) 295-6672, bearing electronic serial number (ESN) 21102262845, subscribed to in the name of JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, in connection with the commission of the above-described offenses; and that wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike Capri, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown will be intercepted over the above-described target cellular number.

Based on the allegations set forth in this Application and on the Affidavit of Special Agent Joseph M. Cicini, attached hereto, the Applicant requests this Court to issue an Order, pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the Federal Bureau of Investigation to intercept wire communications to and from the above-described target cellular telephone number until such communications are intercepted that reveal the manner in which the above-named persons and others as yet unknown participate in the specified offenses and reveal the identities of all coconspirators, places of operation, and the full scope and nature of the conspiracy, or for a period of thirty (30) days, measured from the date of the Court's Order.

IT IS REQUESTED FURTHER that the authorization given be intended to apply not only to the target telephone number listed

7

above, but to any changed telephone number subsequently assigned to the same' electronic serial number used by the target cellular telephone within the thirty (30) day period. It is also requested that the authorization be intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing the BellSouth Telephone Company, BellSouth Mobility, and PCS PrimeCo, electronic communications service providers as defined in Section 2510(15) of Title 18, United States Code, to furnish and continue to furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference to the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire communications over the above-described telephone. The service provider shall be compensated by the Applicant through the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS REQUESTED FURTHER that in the event that the target cellular telephone is transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction within the United States.

8

IT IS REQUESTED FURTHER, to avoid prejudice to this criminal investigation, that the Court order the providers of electronic communication service and their agents and employees not to disclose or cause a disclosure of this Court's Order or the request for information, facilities, and assistance by the Federal Bureau of Investigation or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested.   In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. The interception of wire communications authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the date of the Court's Order.

IT IS REQUESTED FURTHER that the Court order that either Applicant or another Assistant United States Attorney familiar with the facts of the case provide the Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the

9

authorized objectives and the need for continued interception. If
any of the aforementioned reports should become due on a weekend or
holiday, it is requested further that such report become due on the
next business day thereafter.

IT IS REQUESTED FURTHER that the Court's Order(s), this
Application and the accompanying Affidavit, and all interim reports
submitted with regard to this matter be sealed until further order
of this Court, except that copies of the orders, in full or
redacted form, may be served on the service providers as necessary
to effectuate the Court's orders.

IT IS REQUESTED FURTHER that the sealed Order(s), Application,
and Affidavit be kept in the possession, custody, care, and control
of the Federal Bureau of Investigation in a safe and secure place
until further order of the Court.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:

PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY
Court ID #: A5500086
U.S. Courthouse/Federal Building
500 E. Broward Boulevard
Fort Lauderdale, Florida   33394
Telephone: (954) 356-7392
Facsimile: (954) 356-7230

SUBSCRIBED and SWORN to
before me this _____ day
of _____, 1998.

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT JUDGE

10





### Office of the Attorney General
### Washington, D. C. 20530

#### ORDER NO. 1950-95

**SPECIAL DESIGNATION OF THE ASSISTANT, ACTING ASSISTANT, ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE**

By virtue of the authority vested in me by 28 U.S.C. §§ 509 and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full recognition that 18 U.S.C. § 2516(1) empowers the Attorney General, Deputy Attorney General, and Associate Attorney General to authorize applications to a Federal judge of competent jurisdiction for orders authorizing the interception of wire and oral communications, I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division, to exercise the power conferred by section 2516(1) of title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the

INTERNAL ORDER/NOT PUBLISHED
IN F.R.

investigation of the offense(s) as to which such application is
made, when such interception may provide evidence of any of the
offenses specified in section 2516 of title 18, United States Code.

Order No. 1709-93 of April 5, 1993, is revoked effective at
midnight of the day following the date of this order.

Date: February 13, 1995

JANET RENO
Attorney General

U.S. Department of Justice

*FDH:MHK:JPW:PJ:pj*

*Washington, D.C. 20530*

NOV 1 8 1998

MEMORANDUM

TO:      Frederick D. Hess, Director
         Office of Enforcement Operations
         Criminal Division

FROM:    James K. Robinson
         Assistant Attorney General
         Criminal Division

SUBJECT: Authorization for Interception Order Application

        This is with regard to your recommendation that
I, an appropriately designated official of the Criminal Division,
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
continued interception of wire communications to and from the
cellular telephone bearing the number (954) 295-6672, subscribed
to by Joseph Rotunno, 1700 N. St. Rd. 7, Hollywood, Florida, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 152, 157, 371, 892, 893,
894, 1952, 1955, 1956, 1962, 2314, and 2315, by Joseph Rotunno,
Albert Polito, Emro Capri, Fred Scarola, Howard Mandel, Reynold
Maragni, Gary Braeseke, James Lapolla, Daniel Carver, Percy
Morris, Martin Halpern, Harris Steinhart, John Mamone, Scott
Miller, Alex Ruiz, Burt Caskill, Cliff Pierce, and others as yet
unknown.

        By virtue of the authority vested in the Attorney General of
the United States by Section 2516 of Title 18, United States
Code, the Attorney General has by Order Number 1950-95, dated
February 13, 1995, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing
the interception of wire or oral communications.  As a duly
designated official in the Criminal Division, this power is
exercisable by me.  WHEREFORE, acting under this delegated power,
I hereby authorize the above-described application to be made by
any investigative or law enforcement officer of the United States
as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone number listed above, but to any changed telephone numbers, or any other telephone numbers, subsequently assigned to or used by the instrument bearing the same electronic serial number as the target cellular telephone within the thirty-day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

James K. Robinson
Assistant Attorney General
Criminal Division

11-18-99

Date

John C. Keeney
Deputy Assistant Attorney General

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    MISC. NO. 98-14
FOR AN ORDER AUTHORIZING THE        )
CONTINUED INTERCEPTION OF WIRE      )    SUBMITTED UNDER SEAL
COMMUNICATIONS                      )
_____ )

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Joseph M. Cicini, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI). As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code (U.S.C.), Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, U.S.C., Section 2516.

2. I have been employed as a Special Agent of the FBI for approximately eight years. I am presently assigned to a squad of FBI Special Agents that has the principal responsibility to investigate the illegal activities of La Cosa Nostra ("LCN") in the South Florida area, including criminal activity involving members and associates of the Colombo Family of LCN. In my capacity as an FBI Special Agent, I have participated in more than 30 investigations during the course of which I have utilized physical and electronic surveillance, conducted undercover transactions, executed search warrants, reviewed numerous taped conversations of

organized crime members, and used other investigative techniques to obtain relevant information and admissible evidence.

3.    On October 16, 1998, the Honorable Wilkie D. Ferguson, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order authorizing the interception of wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike CAPRI, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, and others as yet unknown over target cellular telephone number (954) 295-6672 bearing electronic serial number 21102262845, subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, for a period of thirty (30) days.

A.    A copy of the original Affidavit filed in support of the Application for the Order to intercept wire communications, dated October 16, 1998, is attached hereto and incorporated by reference as Exhibit A.

4.    This Affidavit is being submitted in support of an application that seeks an order authorizing the continued interception of wire communications of JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike CAPRI, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown over target cellular telephone number (954) 295-6672 bearing electronic serial number 21102262845, subscribed to by

2

JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, for a period of thirty (30) days.

A. Authorization is also sought to intercept communications from any other number assigned to the same Electronic Serial Number (ESN) as the target cellular telephone.

5. The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning offenses enumerated in Title 18, United States Code, Section 2516, in particular, the following offenses:

A. Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4) (The Colombo Organized Crime Family), the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity, consisting of the offenses set forth in paragraphs 4(B); 4(C); 4(D); 4(E); 4(F); and 4(G); below, and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d).

B. Making, Financing and Collecting Extortionate Extensions of Credit, in violation of Title 18, United States Code, Sections 892-894;

C. Conducting an Illegal Gambling Business, in violation of Title 18, United States Code, Section 1955;

D. Transportation of Stolen Goods, in violation of Title 18, United States Code, Section 2314;

3

E.    Sale or Receipt of Stolen Goods, in violation of Title 18, United States Code, Section 2315;

F.    Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952;

G.    Laundering of Monetary Instruments, in violation of Title 18, United States Code, Section 1956;

H.    Concealing of Assets, False Oaths and Claims in Bankruptcy, in violation of Title 18, United States Code, Section 152;

I.    Bankruptcy Fraud, in violation of Title 18, United States Code, Section 157; and

J.    Conspiring to commit any or all of the above-named offenses, in violation of Title 18, United States Code, Section 371.

6.    Your Affiant has personally participated in the investigation of the offenses referred to in paragraph 5 of this Affidavit, and from that personal participation in the investigation and reports, oral and written, made to me by agents of the Federal Bureau of Investigation (FBI) and other federal, state, and local law enforcement agencies, I am familiar with the facts and circumstances of the investigation.

7.    Prior to setting forth the facts and circumstances constituting probable cause, I have reviewed numerous FBI reports concerning information provided by confidential informants of known reliability and other sources of information set forth below.

4

8.    The facts and circumstances set forth below demonstrate that:

A.    There is probable cause to believe that the offenses set forth in paragraph 5 above have been, are being and will continue to be committed by JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike CAPRI, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown, have used, are using and will continue to use cellular telephone number (954) 295-6672, bearing electronic serial number 21102262845, subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida, for the purpose of discussing and executing the offenses enumerated in paragraph 5, above.

9.    In particular, .I believe that  wire communications will occur over telephone number (954) 295-6672 (target cellular telephone), which will disclose:

(i) the nature, scope, extent, and modus operandi of the conspirators' racketeering enterprise and illegal activities;

(ii) the identities and roles of the conspirators and other participants in these illegal activities;

(iii) the locations, tools, and means used in furtherance of these illegal activities;

(iv) the location of records maintained by or in relation to these illegal activities;

5

(v) the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and

(vi) the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph 5, above.

10. Normal investigative procedures have been used and have not succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES

## TO BE INTERCEPTED

11. According to subpoenaed records of PCS PrimeCo, cellular telephone number (954) 295-6672 bearing electronic serial number (ESN) 21102262845, is subscribed to by JOSEPH ROTUNNO, billing address of 1700 N. St. Rd. 7, Hollywood, Florida.

## BACKGROUND OF INTERCEPTEES

12. JOSEPH ROTUNNO, a/k/a Joey Flowers, was born on August 14, 1935, and resides at 1090 N.W. 161st Ave., Pembroke Pines, Florida. ROTUNNO is an associate of the Colombo Organized Crime

6

Family. A search of the records maintained by the FBI and Florida Department of Law Enforcement (FDLE) revealed the following criminal history: ROTUNNO was first arrested on 5/25/84, in Florida by the Broward County Sheriff's Office and subsequently convicted of loan sharking, extortion, gambling, and fraud. ROTUNNO received an unspecified term of confinement for the above listed offenses. On 4/20/89, ROTUNNO was arrested in Florida by Broward County Sheriff's Office for loan sharking, no disposition is listed. ROTUNNO, through his association with the Colombo LCN Family, receives a percentage of the profits generated through illegal gambling businesses. ROTUNNO collects outstanding gambling debts from various illegal gambling businesses. ROTUNNO further collects extensions of credit through extortionate means.

13. ALBERT POLITO was born on 8/7/50 and resides at 5440 N.W. 55 Blvd., #207, Coconut Creek, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history: POLITO was arrested and subsequently convicted on 2/12/82, in Westbury, New York, for 3rd Degree Grand Larceny. POLITO received 1 month confinement, 5 years' probation and a $500 fine. POLITO operates and supervises a large scale illegal gambling business located in South Florida.

14. EMRO CAPRI, a/k/a Mike CAPRI was born on 1/20/52 and resides at 15734 S.W. 46th St., Miami, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history: On 1/5/84, CAPRI was arrested in Florida by Broward County Sheriff's Office for failure to remit sales tax.

7

Disposition is not reported.  On 10/16/89, CAPRI was arrested in Florida by Metro-Dade Police Department for fraud.  Disposition is not reported.   CAPRI owns and operates a large scale illegal gambling business.

15.  FREDERICK SCAROLA, an associate of JOSEPH ROTUNNO, was born on December 3, 1942 and resides at 8473 N.W. 61st St., Tamarac, Florida. A search of records maintained by the FBI and Florida Department of Law Enforcement documents the following criminal history: SCAROLA was first arrested in New York for possession of stolen property in 1959.  In 1967, SCAROLA was arrested in New York for possession of a dangerous weapon.  In 1968, SCAROLA was arrested in Miami Beach, Florida for disorderly conduct; he was convicted and sentenced to thirty days in jail.  In 1970, SCAROLA was arrested in St. Thomas, U.S. Virgin Islands for fraud and forgery.  In 1973, SCAROLA was arrested in New York for forgery, criminal possession of stolen property, possession of a forged instrument, grand larceny, and attempted theft of service; he was convicted of grand larceny and placed on five years probation.  In 1974, SCAROLA was arrested in New York for criminal possession of a forged instrument, possession of forged credit card, use of stolen credit card, speeding and unregistered vehicle; he was convicted of the use of a stolen credit card and sentenced to two years incarceration.  In 1976, SCAROLA was arrested in New York for driving while intoxicated.  In 1977, SCAROLA was arrested in Ft. Lauderdale for uttering a forged instrument; formal charges were never filed.  In 1977, SCAROLA was arrested in Miami, Florida

8

for possession of counterfeit notes; he was convicted, given a suspended sentence of three years and placed on three years probation.   In 1979, SCAROLA was arrested in Miami, Florida for violation of New York probation.   In 1985, SCAROLA was arrested in Miami, Florida for forgery, dealing in stolen property, uttering a forged instrument and grand theft auto.   In 1989, SCAROLA was arrested in Ft. Lauderdale, Florida for bookmaking.   In 1991, SCAROLA was arrested in Ft. Lauderdale, Florida for violation of probation.   In 1994, SCAROLA was arrested in Coral Springs, Florida for bookmaking and conspiracy to commit bookmaking.

16.   REYNOLD MARAGNI was born in New York on February 6, 1952, and currently resides at 4251 N.W. 10th Street, Pompano Beach, Florida.   MARAGNI is a high level associate of the Colombo Organized Crime Family.  A search of the records maintained by the FBI and the Florida Department of Law Enforcement (FDLE) revealed the following criminal history: MARAGNI was first arrested in New York on February 17, 1976, for petit larceny, he received a $150 fine.  On October 13, 1977, in New York, MARAGNI was arrested for criminal possession of a weapon.  The disposition is unlisted.  On January 14, 1986, MARAGNI was arrested in Florida and charged with conspiracy to defraud the United States and credit card fraud. MARAGNI received a sentence of five years confinement and $12,000 restitution.

17.   HOWARD MANDEL was born on January 18, 1936, and resides at 3541 North Avenue, Hollywood, Florida.  MANDEL is an associate of the Colombo Organized Crime Family.   A search of records

9

maintained by the FBI and the Florida Department of Law Enforcement (FDLE) revealed no criminal history for MANDEL.

18.   GARY BRAESEKE was born on January 19, 1961, and resides at 1610 East Hawthorne Circle, Hollywood, Florida.  A search of records maintained by the FBI and FDLE did not reveal any criminal history associated with BRAESEKE.

19.   JAMES LAPOLLA was born on January 24, 1954, and resides at 9905 Pineapple Tree Drive #2, Boynton Beach, Florida.  LAPOLLA was arrested on July 8, 1980, in South Florida by Metro Dade Police Department (MDPD) and charged with selling barbiturates/traffic Quaaludes, possession of a firearm during commission of a felony and conspiracy.  Adjudication was withheld on the conspiracy charge and LAPOLLA received a sentence of three months confinement.  On November 6, 1980, LAPOLLA was arrested by MDPD for intent to sell barbiturate.  No further disposition for the previous charge is reported.   On February 21, 1986, LAPOLLA was arrested by the Broward   Sheriff's   Office   (BSO)   and   charged   with   cocaine trafficking.  LAPOLLA received a 15 year mandatory sentence.  On September 2, 1995, LAPOLLA was arrested by BSO and charged with felon in possession of a weapon and his probation was subsequently revoked.

20.   DANIEL CARVER, AKA "DANNY ONIONS" was born on April 11, 1957 and currently resides in a half way house in South Florida under supervised federal probation.  A search of records maintained by the FBI and FDLE revealed the following criminal history:   On December 7, 1974, in New York, CARVER was arrested by the New York

10

City Police Department and charged with assault with intent to cause serious injury, criminal possession of a weapon, resisting arrest and menacing. CARVER was subsequently resentenced for the above listed charges and found guilty of one count robbery in the third degree for which he received three years incarceration. On July 29, 1976, CARVER was arrested in New York and charged with assault with intent to cause serious injury and criminal possession of a firearm in the 4th degree. Both charges were subsequently dismissed. On November 16, 1981, CARVER was arrested and charged with possession of stolen property, unauthorized use of a motor vehicle and willful defacement of a machine gun. CARVER received 18 months' to three years' confinement. On August 25, 1987, CARVER was charged in New York with possession of stolen property. On April 10, 1991, CARVER was arrested in South Florida and charged with extortion. CARVER was subsequently found guilty and received a 48 month sentence. On August 11, 1995, CARVER was charged with use of a communication facility to commit a drug offense. CARVER received a sentence of 48 months' confinement and one year supervised release.

21. PERCY MORRIS, AKA "TINY" was born on August 12, 1964, and resides at 3760 SW 61st Avenue, Apartment 7, Davie, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history: MORRIS was arrested on July 8, 1993, in Florida by Broward County Sheriff's Office (BSO) and subsequently charged with probation violation relating to possession of cocaine, and possession of drug paraphernalia (Note:

11

NCIC records do not list an arrest prior to July 9, 1993, it is unknown why MORRIS was on probation). On November 13, 1995, MORRIS was arrested by BSO for probation violation relating to possession of cocaine. An arrest warrant was subsequently issued and MORRIS was re-arrested.

22.   MARTIN HALPERN, was born on February 15, 1955, and resides at 9354 NW 18th Place, Plantation, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history:  HALPERN was arrested on November 6, 1972, in Queens, New York by New York City Police Department for possession of a forged instrument. This charge was subsequently dismissed. On June 26, 1974, HALPERN was arrested in Hempstead, New York and charged with sale of a controlled substance and possession of a controlled substance. HALPERN was convicted and sentenced to 60 days to one year maximum and 58 months' probation.

23.   HARRIS STEINHART, AKA "HUEY" was born on November 30, 1942, and resides at 5044 NW 87th Terrace, Coral Springs, Florida. A search of records maintained by the FBI and FDLE did not reveal any criminal history associated with STEINHART.

24.   JOHN MAMONE, was born on June 12, 1951, and resides at 1960 Augusta Terrace, Coral Springs, Florida. A search of records maintained by the FBI and FDLE revealed the following criminal history:  MAMONE was arrested on December 16, 1991, in New Jersey by Jersey City Police Department for harassing communication, this count was subsequently dismissed. MAMONE was arrested on August 16, 1993, in Florida by FBI Miami and subsequently charged with

12

destruction of vessel by owner, and mail fraud.   On October 3,
1994, MAMONE was arrested in New Jersey by the New Jersey State
Police and charged with terroristic threats, theft by extortion,
commercial   bribery,   tampering   with   a   witness/informant,
racketeering and one count racketeering/conspiracy.      Mamone
received a sentence of probation. On March 31, 1995, MAMONE was
found guilty of one count conspiracy to destroy a vessel and
received 48 months' probation and ordered to pay $94,444 in
restitution.

      25.   SCOTT MILLER was born on June 2, 1961, and resides at
1050 Harrison Street, Hollywood, Florida.   A search of records
maintained by the FBI and Florida Department of Law Enforcement
(FDLE) revealed the following criminal history:  MILLER was first
arrested on February 9, 1985, in New Jersey by Livingston Township
Police Department and subsequently convicted of fraud.   MILLER
received a $125 fine.

      26.   ALEX RUIZ - A search of records maintained by the FBI and
Florida Department of Law Enforcement (FDLE) failed to disclose
background information due to a lack of identifying information.

      27.   BURT CASKILL was born on January 10, 1952, and resides at
20944 NE 37th Avenue, Aventura, Florida.   A search of records
maintained by the FBI and FDLE revealed the following criminal
history: On February 29, 1980, CASKILL was arrested by Broward
County Sheriff's Office (BSO) and charged with bribe-offering-
athletic contest.   CASKILL was convicted.   No disposition is
reported.   On September 23, 1985, CASKILL was arrested by Metro

13

Dade Police Department for bookmaking and attempted solicitation for first degree felony. CASKILL was convicted and received a fine of $75 dollars and an unspecified period of probation.

28. CLIFF PIERCE was born on November 13, 1939 and resides at 4216 Cleveland Street, Hollywood, Florida. A search of records maintained by the FBI and Florida Department of Law Enforcement (FDLE) revealed the following criminal history: PIERCE was arrested by DEA Miami on July 5, 1979, for sale of cocaine. PIERCE was convicted and sentenced to 180 months confinement and 72 months special parole. PIERCE was arrested by U.S. Postal Inspection Service, Atlanta, on November 5, 1981 for conspiracy and mail fraud. No dispostion for these charges were listed.

## PREVIOUS APPLICATIONS

29. I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation on November 9, 1998 and November 18, 1998, to determine whether previous applications have been made to intercept wire, oral or electronic communications of ROTUNNO, POLITO, CAPRI, SCAROLA, MANDEL, MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and facilities and places named in this Affidavit. The search revealed the following:

A. On January 16, 1991, the Honorable Robert J. Ward, United States District Judge, Southern District of New York, signed a Court Order which authorized the interception of oral communications of JOHN MAMONE and others for a period of thirty

14

(30) days. Extension Orders authorizing the continued interception of oral communications of JOHN MAMONE and others were issued on February 16, 1991, March 13, 1991, April 17, 1991 and May 16, 1991.

B.   On September 12, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, signed a Court Order which authorized the interception of wire communications of JOHN FRANCIS MAMONE and others over telephone numbers (908) 469-8424 and (908) 469-1657 located at 13 Rambling Brook Lane, Warren, New Jersey for a period of thirty (30) days. Extension Orders authorizing the continued interception of wire communications of JOHN FRANCIS MAMONE and others on telephone numbers (908) 469-8424 and (908) 469-1657 located at 13 Rambling Brook Lane, Warren, New Jersey were issued on October 16, 1991 and November 15, 1991.

C.   Other than the information contained in the original Affidavit, paragraph 17 (A and B) attached hereto and incorporated by reference as Exhibit A, and in the application referred to in paragraph three (3) above, the search did not reveal any other applications to intercept wire, oral or electronic communications of these interceptees or the facility named in this Affidavit.

30.   Because I submit this Affidavit only for the limited purpose of securing authorization for the requested interception of wire communications, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish a sufficient foundation for the Order which is herein sought.

## FACTS AND CIRCUMSTANCES

### ESTABLISHING PROBABLE CAUSE

### Description of organization

31. The criminal organization which is the subject of this Affidavit is fully described in the Original Affidavit, attached as Exhibit A, and incorporated herein by reference. All telephone calls summarized below involving the target telephone number described in paragraph 4 above have been verified where possible by pen register and trap and trace information.

32. Based upon the facts and circumstances showing probable cause contained in the attached Original Affidavit (Exhibit A), and the review of Court authorized wire and interceptions, your Affiant is aware that JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, a.k.a. Mike CAPRI, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown are currently involved in ongoing criminal activities and are participating in a complex criminal enterprise.

33. The court authorized interceptions reflect that ROTUNNO and the other named interceptees are participating in an ongoing criminal enterprise. The targets of the investigation are involved in large-scale illegal gambling activities. The illegal gambling business generates enormous proceeds for the benefit of the co-conspirators. The debts of the losing bettors are converted into

16

extortionate extensions of credit by ROTUNNO and the other interceptees. ROTUNNO supervises a crew of criminal associates who collect the extensions of credit through threats of force and violence.

## COURT AUTHORIZED WIRE INTERCEPTIONS

34. On October 16, 1998, at approximately 10:39 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to BURT CASKILL, at telephone number (305)215-3437, subscribed to by Lynn Scapicchio, 345 Madision Street, Hollywood, Florida. ROTUNNO made plans to meet BURT CASKILL at a bar in Hollywood, Florida. BURT CASKILL informed ROTUNNO that he (BURT CASKILL) is to meet "a guy" to pick up 21 or 22 "dimes" ($21,000 or $22,000) in checks. BURT CASKILL stated that he would give the checks to ROTUNNO. ROTUNNO advised that he would "take care" of the checks but hated to give them to "that guy" because it will cost "300 to get it done." BURT CASKILL and ROTUNNO discussed whether the checks would be payable to cash or to someone else's name. BURT CASKILL advised that he doesn't want his name on any checks that have to be brought into the bank. BURT CASKILL and ROTUNNO agreed that the checks should be made payable to cash.

A. Your Affiant understands that losing bettors sometimes satisfy their gambling debts by providing checks to ROTUNNO and other targets of this investigation. Your Affiant further understands that the above recited conversation reflects that BURT CASKILL and ROTUNNO are engaged in the laundering of monetary instruments.

17

35. On October 16, 1998, at approximately 1:15 p.m., a court authorized interception was made on telephone number, (954)295-6672. ROTUNNO placed a call to telephone number (954)570-3592, a telephone utilized by AL POLITO at his residence. ROTUNNO informed POLITO that he (ROTUNNO) is on his way to meet Mike (CAPRI) at Huddles (Sports Cafe). POLITO stated, "maybe he'll come clean." ROTUNNO stated, "he's not gonna come clean - he's a fucking liar little cocksucker...I'm gonna tell him. With all the bullshit you put me in the middle of everything." POLITO advised ROTUNNO that he (POLITO) will meet him at Huddles for the meeting. ROTUNNO stated "I got the checks, did you talk to him yet?", ROTUNNO advised POLITO that,"he may be going to get the money".

A.    Your Affiant understands that the above-recited conversation reflects that CAPRI will distribute proceeds generated from the illegal gambling business to ROTUNNO and POLITO.

36. On October 17, 1998, at approximately 9:51 a.m., a court authorized interception was made on telephone number (954) 295-6672. ROTUNNO placed a call to a cellular telephone utilized by AL POLITO, (954)298-9154. The telephone was answered by MARTY HALPERN. ROTUNNO told HALPERN they will have a meeting a 4:00 p.m. to straighten out financial matters. ROTUNNO advised HALPERN that BURT CASKILL already gave him (ROTUNNO) two checks plus $11,000 that he (ROTUNNO) laid out. ROTUNNO advised that BURT CASKILL will deliver an additional $40,000 in cash today. ROTUNNO also told HALPERN that POLITO's guy will give POLITO cash Monday and the balance Wednesday.

18

A.   Your Affiant understands that the above-recited conversation reflects that HALPERN is the financier of the illegal gambling business.

37.   On October 17, 1998, at approximately 1:54 p.m, a court authorized interception was made on telephone number (954)295-6672. ROTUNNO called telephone number (954)340-0134, subscribed to by Gabriel Ponzio, 10900 NW 15th Street, Coral Springs, Florida.   An unidentified male (UM) advised ROTUNNO that he let Freddy SCAROLA know that he (UM) wanted 25% of everything he (UM) "wrote" for SCAROLA's bookmaking operation.   The UM told ROTUNNO that SCAROLA wants to "make the guys up north happy" but all he (UM) was asking for was 25%.   The UM told ROTUNNO that SCAROLA would have to pay his (UM's) Father.   ROTUNNO told the UM that he (UM) was doing the right thing.

A.   Your Affiant understands that the phrase "make the people up north happy", means that a portion of the illegal bookmaking operation's proceeds are supplied to the hierarchy of the organization in New York.

38.   On October 17, 1998, approximately 1:03 p.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO called telephone number (305)861-2766.   ROTUNNO spoke with CLIFF PIERCE who he (ROTUNNO) identified as his accountant. ROTUNNO stated "Can you get me some office space for some friends, who are looking for a spot with at least three phone lines, you know what I mean?"

19

A.   Your Affiant understands that ROTUNNO and PIERCE were discussing obtaining office space to be used for an illegal gambling business.

39.   On October 18, 1998, at approximately 9:51 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO received an incoming telephone call from Gary BRAESEKE. ROTUNNO told BRAESEKE to give him (ROTUNNO) the "figures" from last night and for the week.   BRAESEKE reviewed records and provided ROTUNNO with the status of various bettors.   BRAESEKE told ROTUNNO that they are down "14 or 15" for the week.   BRAESEKE told ROTUNNO that Mike CAPRI had recently made statements that indicated BRAESEKE was not going to be paid.   ROTUNNO told BRAESEKE, "do you remember what I told you, you get 30-35 that's what you get." ROTUNNO told BRAESEKE, "well he (CAPRI) better not do anything stupid, if he mentions anything like going to the cops,   anything happens to that office, your (BRAESEKE) gonna get in trouble and I'm gonna come looking for him (CAPRI) and Bobby."

A.   Your Affiant understands that the above-recited conversation   reflects   that   ROTUNNO   and   BRAESEKE   discussed BRAESEKE's monitoring interest in the illegal gambling business.

40.   On October 18, 1998, at approximately 10:43 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone utilized by Al POLITO, (954)298-9154.   ROTUNNO asked POLITO, "how much did you tell Alan, two and a half?"   POLITO told ROTUNNO that he (POLITO) initially told Alan two but said he (POLITO) would have to negotiate.

20

ROTUNNO told POLITO "we should make at least a dollar on it because we could have given it to your other friend for a least three, throw in a half point, what's that a $100?" ROTUNNO told POLITO you have to tell him (Alan Epstein) it's two and a half and tell him its a personal favor.

A.   Based upon the investigation to date, source information and discussions with the assigned agents, your affiant understands that ROTUNNO arranged for Alan Epstein to pay two and a half points a week interest on a $20,000 loan. This extortionate extension of credit would generate approximately $500 in interest payments, known as "vig" or "vigorish". ROTUNNO and POLITO will keep a "dollar" or $100 of this payment while ROTUNNO must pass the remainder to whomever provided the money to ROTUNNO.

41.   On October 18, 1998, at approximately 1:07 p.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a telephone call to telephone number (954)341-8116. ROTUNNO spoke to an unidentified male (UM) on a speaker phone. The UM asked ROTUNNO for advice relating to a illicit gambling operation. The UM asked ROTUNNO what actions he (ROTUNNO) would take if an individual who is a sub-bookie (i.e. an individual who refers bettors to a bookie in return for a percentage of all losing bets) continually reported that a bettor could not repay a $6,100 gambling debt. ROTUNNO told the UM that, "you gotta go grab this guy (sub-bookie) and you gotta tell him to go get this JB (delinquence bettor). Let me tell you something I would grab the him (sub-bookie) by the throat." ROTUNNO continued to advise the

21

UM, "if it was me I would be very aggressive I would go grab the guy(sub-bookie) , I'd tell'em right now get him (sub-bookie) in the car I wanna talk to you.   I'd say take me to this guy's (delinquence bettor's) house otherwise you're (sub-bookie) gonna have the biggest problem you've ever had."

42.   On October 19, 1998, at approximately 9:19 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone utilized by Al POLITO, (954)298-9154.   ROTUNNO told POLITO that he (POLITO) had to meet Alan Epstein on time.   ROTUNNO told POLITO that he (POLITO) had to meet Alan Epstein on Friday because ROTUNNO meets his "guy" on a Saturday.   ROTUNNO told POLITO that he (POLITO) wanted to open another office and that BURT CASKILL and James LAPOLLA were ready to "do it" and they have 70 players (bettors) between them.   ROTUNNO told POLITO that he (POLITO) had to get everybody that owed him (POLITO) money over there to pay today and Wednesday.   ROTUNNO told POLITO that he (ROTUNNO) needed to collect the money from POLITO because ROTUNNO needed to help "this guy out".   ROTUNNO told POLITO that he met "the guy" yesterday and gave him ("the guy") $27,500. ROTUNNO advised POLITO about how many depositions he (ROTUNNO) had to attend and stated that filing bankruptcy is usually an easy process for most people.

A.   Based  upon  the  investigation  to  date,  source information and discussions with the assigned agents, your Affiant understands that ROTUNNO referred to an extortionate extension of credit currently pending with Alan Epstein.   ROTUNNO also referred

22

to meeting and paying the individual that gave him (ROTUNNO) the money to loan. The term "another office" referred to ROTUNNO's plan to open another illegal gambling business with BURT CASKILL and James LAPOLLA that will involve at least 70 bettors.

43. On October 19, 1998, at approximately 1:27 p.m., a court authorized interception was made on telephone number (954) 295-6672. ROTUNNO placed a call to his girlfriend, Wanda Arias, at telephone number (954) 771-4378. ROTUNNO told Arias that he (ROTUNNO) just finished his deposition pertaining to his (ROTUNNO) filing for bankruptcy. ROTUNNO advised Arias that he (ROTUNNO) had taken all of his jewelry off before going to the deposition but had forgotten to take off his gold watch. ROTUNNO and Arias then discussed the value of the gold watch and whether anyone would know if the watch was real gold or not.

44. On October 19, 1998, at approximately 5:40 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a telephone call to (305)226-9271 and spoke with EMRO "Mike" CAPRI. ROTUNNO told CAPRI to "get an office" with two 800 numbers and six roll-over lines. CAPRI advised ROTUNNO that Gary BRAESEKE was "working on it." ROTUNNO responded to CAPRI, "great let's go make money." CAPRI and ROTUNNO discussed bookmaking figures concerning BURT CASKILL. ROTUNNO advised that BURT CASKILL gave him $26,500 out of $58,000 and will give him (ROTUNNO) the rest tomorrow.

45. On October 20, 1998, at approximately 9:01 a.m. a court authorized interception was made on telephone number (954)295-6672.

23

ROTUNNO placed a call to cellular telephone utilized by Al POLITO,
(954)298-9154. ROTUNNO spoke with POLITO. POLITO asked ROTUNNO if
he (ROTUNNO) knew an accountant who could help Alan LNU. POLITO
stated that he (POLITO) was talking about "laundry" (money
laundering). ROTUNNO told POLITO that CLIFF PIERCE was the best
and that he (ROTUNNO) would put CLIFF PIERCE in touch with Alan LNU
(referring to ROTUNNO's accountant).

46. On October 20, 1998, at approximately 9:13 a.m. a court
authorized interception was made on telephone number (954)295-6672.
ROTUNNO placed a call to a telephone used by EMRO "Mike" CAPRI.
ROTUNNO told CAPRI that he (CAPRI) should look for an office in
Miami. CAPRI told ROTUNNO that he (CAPRI) was working on it.
ROTUNNO stated, "the only way to make money in this business is to
have a lot of volume." ROTUNNO told CAPRI to inform the landlord
that the office was to be used for a collection agency.

47. On October 20, 1998, at approximately 12:04 p.m. a court
authorized interception was made on telephone number (954)295-6672.
ROTUNNO placed a call to telephone number (954)987-0000. ROTUNNO
spoke with Daniel CARVER. CARVER identified himself as ROTUNNO's
nephew. CARVER asked ROTUNNO to meet him (CARVER) for lunch.
CARVER told ROTUNNO that he (CARVER) was currently working with
Marvin at ABCO construction. CARVER told ROTUNNO that he (CARVER)
is under strict supervision with many restrictions. CARVER told
ROTUNNO that he (ROTUNNO) is at the top of his (CARVER's)
restriction list. CARVER told ROTUNNO that he (CARVER) had to be
back to "the house" (half-way house) by 5:00 p.m. otherwise they put

24

more restrictions on him (CARVER).     ROTUNNO and CARVER made arrangements to meet at a later time.

A.     Your Affiant understands that CARVER is presently residing in a half-way house pursuant to his previously imposed federal sentence.

48.   On October 21, 1998, at approximately 10:42 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)215-3437 and spoke with BURT CASKILL.   ROTUNNO told BURT CASKILL that he needed to meet with him (BURT CASKILL) because "something was bothering" him (ROTUNNO).   BURT CASKILL asked ROTUNNO who "Jimmy Brown" was and if he (Jimmy Brown) was the same person as Jimmy Clemenza.   ROTUNNO told BURT CASKILL that Jimmy Brown was not Clemenza but was an old-timer who ROTUNNO used to "do numbers" for in Brooklyn, 30-40 years ago.   ROTUNNO told BURT CASKILL that he (BURT CASKILL) will be working with Gary BRAESEKE from now on instead of EMRO "Mike" CAPRI. ROTUNNO told BURT CASKILL, BRAESEKE was "the main kid right now" and that ROTUNNO "took a lot away from" CAPRI because he (CAPRI) did something ROTUNNO didn't like.   ROTUNNO told BURT CASKILL that he (BURT CASKILL) was involved with CAPRI in attempting to conceal a $10,000 illegal gambling transaction from ROTUNNO.   ROTUNNO told BURT CASKILL he (ROTUNNO) had the best "backer" in the world and didn't want to see him (the backer) lied to or lose money.

49.   On October 21, 1998, at approximately 11:14 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)963-6372 and spoke

25

with Gary BRAESEKE.    ROTUNNO and BRAESEKE discussed an illicit gambling business, money that was owed by various bettors and problems with CAPRI and BURT CASKILL.    BRAESEKE told ROTUNNO that the final "take" for yesterday for all "the plays" was $41,210. BRAESEKE told ROTUNNO that he (BRAESEKE) had one prospective site for a gambling office that he (BRAESEKE) was going to check out.

50.    On October 22, 1998, at approximately 11:04 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone utilized by Al POLITO, (954)298-9154.    ROTUNNO told POLITO that he (ROTUNNO) spoke with HALPERN and told HALPERN to bring "40" with him (HALPERN).

51.    On October 22, 1998, at approximately 6:10 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)215-3437 and spoke with BURT CASKILL.    ROTUNNO told BURT CASKILL to fax him (ROTUNNO) the "figures".    BURT CASKILL told ROTUNNO that he (BURT CASKILL) was going to the new office to check if the toll free lines had been connected.    ROTUNNO told BURT CASKILL to start business in the new office as soon as possible.

52.    On October 23, 1998, at approximately 5:36 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)926-6063.    ROTUNNO spoke with SCOTT MILLER.    MILLER told ROTUNNO, "we discussed yesterday that this guy is protected to this point. I'm (MILLER) giving him until Tuesday afternoon to give me my money and then I'm (MILLER) gonna do whatever I (MILLER) have to do."    ROTUNNO told

26

MILLER, "no one is gonna touch this guy...otherwise its gonna be bad for anyone who disrespects us and I'm (ROTUNNO) telling you in a nice way." ROTUNNO told MILLER that he (MILLER) would have to wait until next week.

A.    Your Affiant understands that the conversation reflects that CAPRI owed money to MILLER regarding illegal gambling activities and ROTUNNO instructed MILLER not to do anything to CAPRI without permission of ROTUNNO.

53.    On October 24, 1998, at approximately 10:31 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to an unidentified male (UM) at telephone number (954)721-2283. ROTUNNO and the UM discussed gambling and ROTUNNO stated, "All I do now, I collect now, I charge protection." ROTUNNO and the UM discussed the $25,000 that ROTUNNO loaned to an individual named "Nicky".

54.    On October 25, 1998, at approximately 9:23 a.m., a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to (954) 963-6372 and spoke with Gary BRAESEKE.    BRAESEKE explained ROTUNNO the weekly "figures" for gambling operations.    BRAESEKE gave ROTUNNO his (BRAESEKE's) figures as well as CAPRI's and BURT CASKILL's figures pertaining to their gambling business.

55.    On October 26, 1998, at approximately 12:23 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone number (954)298-9154 utilized by AL POLITO. ROTUNNO spoke with POLITO concerning an

27

unidentified individual that owed ROTUNNO and POLITO a gambling debt. ROTUNNO discussed a $25,000 extortionate extension of credit made to Alan Epstein and advised, "he (Epstein) had two weeks on the 25 and a month on the other." POLITO then put an individual believed to be JOHN MAMONE on the telephone with ROTUNNO. MAMONE asked ROTUNNO where Huey (STEINHART) had been. ROTUNNO advised MAMONE that he (ROTUNNO) told STEINHART that he (STEINHART) should bring "that guy" (MAMONE) something every month. ROTUNNO advised MAMONE, "I (ROTUNNO) told that guy (STEINHART) you owe this guy (MAMONE) the money, you bring him (MAMONE) the money."

A.    Your Affiant understands that the conversation reflects that STEINHART obtained an extortionate extension of credit from MAMONE.

56.    On October 26, 1998, at approximately 12:23 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)587-1959. ROTUNNO spoke with PERCY MORRIS (Tiny). MORRIS stated he (MORRIS) just got back. ROTUNNO asked how it went. MORRIS told ROTUNNO he (MORRIS) went in and asked for Ellis LNU, and MORRIS was told that Ellis LNU was out of town. MORRIS told ROTUNNO he (MORRIS) left a message for Ellis LNU that MORRIS stopped by and to call "JR" (ROTUNNO) when he (Ellis LNU) got back.

A.    Your Affiant understands that the conversation reflects that MORRIS was attempting to collect an extortionate extension of credit on behalf of ROTUNNO.

28

57. On October 27, 1998, at approximately 9:25 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO spoke with BRAESEKE concerning proceeds and balances from an illicit bookmaking enterprise. ROTUNNO told BRAESEKE, "when I (ROTUNNO) do the collecting I'll (ROTUNNO) make sure you (BRAESEKE) get paid this week."

58. On October 27, 1998, at approximately 10:49 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)926-6063. ROTUNNO spoke with SCOTT MILLER. MILLER told ROTUNNO that he (MILLER) was still waiting to collect a debt from "the guy." ROTUNNO asked MILLER, who he (MILLER) "put his (MILLER's) plays through." MILLER responded that he (MILLER) put his "plays" through Atlanta but would rather put them through ROTUNNO.   ROTUNNO promised that he (ROTUNNO) would talk with "the guy."

59. On October 27, 1998, at approximately 11:26 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (561)738-2549, subscribed to by James LAPOLLA. LAPOLLA told ROTUNNO that an individual named Johnny Canella (PH) called and told him (LAPOLLA) that Al Miniacci wanted to meet LAPOLLA tomorrow night a 7:00 p.m. at some hotel because "they" are doing some kind of deal. LAPOLLA told ROTUNNO that Miniacci knew him (LAPOLLA) from a previous deal.   ROTUNNO gave LAPOLLA permission to attend the meeting as long as he (LAPOLLA) told Miniacci, "regards from Joey the Florist and Tommy (Farese)...so he (Miniacci) will know it's right there."

29

A.   Your Affiant understands that the conversation reflects that ROTUNNO's reference to "Tommy" is Thomas Farese, an incarcerated Colombo Capo.

60.   On October 27, 1998, at approximately 12:59 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)969-8606. ROTUNNO spoke with an unidentified male (UM). ROTUNNO asked the UM how his (UM's) current job was. The UM replied that it was boring and (UM) would almost rather be back in jail with his friend. ROTUNNO agreed that he (ROTUNNO) could never "work" and would rather be in jail than hold a legitimate job.

61.   On October 27, 1998, at approximately 1:04 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)624-8500 and initially spoke with an individual ROTUNNO identified as Frankie LNU. Frankie LNU then put CARVER on the telephone. ROTUNNO told CARVER that he (ROTUNNO) couldn't meet him (CARVER) for lunch but to keep his (CARVER's) schedule clear for breakfast or lunch tomorrow. ROTUNNO asked, "what went on with our friend." CARVER responded, "nothing yet." ROTUNNO told CARVER, "well set up an appointment and I'll meet "this guy". CARVER responded that he (CARVER) would speak with him ("the guy") tonight. ROTUNNO asked CARVER what he (CARVER) was doing this for, ROTUNNO thought he (CARVER) was no longer involved. CARVER stated that he (CARVER) was just doing "the guy" a favor. ROTUNNO told CARVER that he (ROTUNNO) would do anything in the world for "the guy".

30

A.   Your Affiant understands that the conversation reflects that CARVER acknowledged that he was engaged in the collection of an extortionate extensions of credit.

62.   On October 27, 1998, at approximately 1:38 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)377-1830 and spoke with MORRIS.   MORRIS told ROTUNNO that he (UM) was not back yet and asked ROTUNNO what he (ROTUNNO) wanted him (MORRIS) to do.   ROTUNNO instructed "MORRIS" to be nice and leave a message.   ROTUNNO instructed MORRIS to find out when he (UM) will be back.   MORRIS asked ROTUNNO if he would be at the shop because he (MORRIS) needed prescriptions filled and that he (MORRIS) needed to make some money.

A.   The above recited conversation reflects that ROTUNNO and MORRIS are participants in the illegal possession and sale of prescription drugs.

63.   On October 27, 1998, at approximately 3:26 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)587-1959 and spoke with MORRIS.   MORRIS told ROTUNNO that he (MORRIS) tried to locate Jim LNU but he (MORRIS) was told Jim LNU had left the corporation. MORRIS told ROTUNNO that he (MORRIS) had left a message to call Joey.   MORRIS told ROTUNNO that he (MORRIS) tried calling "the guy" and got an answering machine.   ROTUNNO advised that he (ROTUNNO) had a good number for "the guy" which he would give MORRIS.   MORRIS stated the "other guy" lived in a condo with security and he

31

(MORRIS) would go back tonight to see if the security was still in place. ROTUNNO stated that "the creep" owed $8,000 and instructed MORRIS to try to get through security tonight. (Believed to be a collection of gambling debt.)

64. On October 28, 1998, at approximately 9:17 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)646-7051. ROTUNNO told an unidentified male that he (UM) was two weeks behind and needed to meet ROTUNNO soon to settle the debt.

65. On October 28, 1998, at approximately 12:04 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO received a call from SCOTT MILLER. MILLER told ROTUNNO that he (MILLER) contacted CAPRI and asked CAPRI to return the money owed to him (MILLER). ROTUNNO told MILLER that he (MILLER) didn't have to worry because he (MILLER) would be repaid. ROTUNNO asked MILLER if he (MILLER) would resume putting "plays" through CAPRI. MILLER stated that he (MILLER) wouldn't because he (MILLER) didn't want to get in the same position again. ROTUNNO told MILLER not to worry about CAPRI repaying his (CAPRI's) debt because ROTUNNO now guaranteed CAPRI's business and that he (CAPRI) was with ROTUNNO.

66. On October 28, 1998, at approximately 1:34 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)249-1737. ROTUNNO told Nick LNU that he (ROTUNNO) wanted to meet because, "we have a little problem here, we need to straighten out $11,000 or $12,000."

32

Nick LNU told ROTUNNO that he (Nick LNU) had to liquidate some stocks and could have the money by next week. ROTUNNO told Nick LNU that he (ROTUNNO) couldn't wait another week. Nick LNU stated that he (Nick LNU) gambled with POLITO for years and never had a problem. ROTUNNO told Nick LNU that out of respect for POLITO he (ROTUNNO) would give him (Nick LNU) another week.

67. On October 28, 1998, at approximately 1:44 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone (954)298-9154 utilized by Al POLITO. ROTUNNO recounted his (ROTUNNO's) conversation with Nick LNU to POLITO. ROTUNNO told POLITO to charge Nick LNU two or three points "vig" on the outstanding balance. POLITO agreed to charge three points on $12,000 and collect $360 a week and split it with ROTUNNO.

68. On October 28, 1998, at approximately 2:26 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to (305)343-2510 subscribed to by ALEX RUIZ, 105 East Flagler Street, Miami Florida. RUIZ asked ROTUNNO why he (ROTUNNO) didn't come by on Tuesday to pick up his (ROTUNNO's) money. RUIZ told ROTUNNO that "this guy" called him (RUIZ) and wanted to know if he (RUIZ) paid ROTUNNO. ROTUNNO told RUIZ to have "the guy" call him (ROTUNNO) if he (the guy) had a problem with RUIZ paying ROTUNNO.

69. On October 28, 1998, at approximately 2:28 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to (954)587-1959. ROTUNNO told MORRIS to go

33

down "there" and get an envelope. ROTUNNO instructed MORRIS to return to the Flower Shop and call him (ROTUNNO) after he (MORRIS) picked it up.

70. On October 28, 1998, at approximately 3:43 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to (954)377-1830 and spoke with MORRIS. MORRIS asked ROTUNNO how much was supposed to be there. ROTUNNO told MORRIS, $10,900. MORRIS told ROTUNNO that he (MORRIS) only had a check for $9,900. ROTUNNO instructed MORRIS to tell the secretary the amount is $1,000 off. ROTUNNO explained that he was very upset that "MORRIS" received a check instead of cash.

71. On October 29, 1998, at approximately 12:34 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)962-7799. MILLER told ROTUNNO "the guy" who went out to San Diego to collect funds has had, "a whole lot of positive response". Scott LNU told ROTUNNO that "the guy" had located a 1992 Porsche in the area that belonged to a debtor. Scott LNU told ROTUNNO "the guy" had two Rolex Presidentials. ROTUNNO told Scott LNU that he (ROTUNNO) would bring the Rolexs to "a guy" to look at them.

72. On October 29, 1998, at approximately 3:15 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to cellular telephone number (954)298-9154 utilized by Al POLITO. ROTUNNO referred POLITO to a fax concerning balances from illicit gambling operations and loanshark loans. ROTUNNO spoke at length concerning money he (ROTUNNO) has "laid out"

34

and money owed to POLITO and ROTUNNO. ROTUNNO told POLITO that he (ROTUNNO) hoped Marty (HALPERN) knew they (POLITO and ROTUNNO) were doing the right thing, because he (HALPERN) had laid money out and hadn't gotten anything back yet.

73. On October 29, 1998, at approximately 4:04 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)298-4893 and spoke with Harris "Huey" STEINHART. STEINHART told ROTUNNO "the guy" (Bob LNU) called him (STEINHART) and said he (Bob LNU) would get STEINHART the money. ROTUNNO told STEINHART that he (ROTUNNO) had made a call concerning the debt. STEINHART thanked ROTUNNO for his (ROTUNNO's) help. STEINHART told ROTUNNO that he (STEINHART) was working through a private detective to locate (Jeffery) Braverman, another individual who owed STEINHART money. ROTUNNO advised STEINHART that he (ROTUNNO) could assist STEINHART because he (ROTUNNO) had a "hook" at Florida Power and Light, and for $100 ROTUNNO could find out where Braverman activated any new account.

74. On October 31, 1998, at approximately 10:57 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (561)782-5495 and spoke to James LAPOLLA. LAPOLLA told ROTUNNO that "the guy" with the license just called him (LAPOLLA) and he (LAPOLLA) needed Benny LNU's information. ROTUNNO asked LAPOLLA what information he (LAPOLLA) needed from Benny LNU. LAPOLLA told ROTUNNO to get half the money, Benny LNU's height, weight, date of birth, the name and address he (Benny LNU) wanted to use and the first five numbers of

35

his (Benny LNU) social security number. ROTUNNO told LAPOLLA to charge (Benny LNU) $1,300 because he (Benny LNU) was a friend. LAPOLLA told ROTUNNO it cost him (LAPOLLA) $900.

A.   Your Affiant understands that the conversation reflects that LAPOLLA attempted to fraudulently obtain a Florida driver's license for Benny LNU.

75.   On November 2, 1998, at approximately 12:11 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)963-6372. ROTUNNO spoke to Gary BRAESEKE concerning "figures" from BRAESEKE's, CAPRI's and BURT CASKILL's bookmaking operations. BRAESEKE described that CAPRI's customers owed about $15,000 but (CAPRI) was having problems collecting. ROTUNNO instructed BRAESEKE to inform CAPRI that "we are going to go after the people who owe us money." BRAESEKE advised ROTUNNO that the gambling operation earned roughly $40,000 but there may be a few discrepancies. ROTUNNO advised if the "figure" was off $5,000 either way it didn't matter.

76.   On November 2, 1998, at approximately 12:58 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954)992-7768.   EMRO "Mike" CAPRI gave ROTUNNO the total profits derived from an illegal gambling business.   CAPRI told ROTUNNO that the bookmaking operation was making about $30,000 a week. ROTUNNO asked CAPRI if he (CAPRI) needed any help collecting money owed to the bookmaking operation.

36

77. On November 3, 1998, at approximately 4:07 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)343-2510 and spoke to ALEX RUIZ. RUIZ told ROTUNNO that he (RUIZ) put money in the business and wrote checks out of the business in order to pay ROTUNNO. ROTUNNO told RUIZ that anything small, under 20 dimes ($20,000) will be paid on a Tuesday and that anything over $20 dimes ($20,000) will be paid on a Thursday. RUIZ told ROTUNNO that "the guy" keeps calling him and asks for ROTUNNO to call him ("the guy"). ROTUNNO advised RUIZ that he (ROTUNNO) doesn't talk to guys who call the cops and he ("the guy") may be a cop himself.

78. On November 4, 1998, at approximately 5:20 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (305)885-5256 and spoke with Marty HALPERN. ROTUNNO and HALPERN discussed the gambling operations that ROTUNNO was controlling and HALPERN was financing. ROTUNNO advised HALPERN that he (ROTUNNO) had a check for approximately $8000 for HALPERN. ROTUNNO asked HALPERN if he (HALPERN) wanted cash or the check. ROTUNNO explained it would take him (ROTUNNO) until Monday to convert the check to cash. HALPERN told ROTUNNO that he (HALPERN) would take the check and "deposit it here."

79. On November 5, 1998, at approximately 4:05 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to telephone number (954) 926-6063. SCOTT MILLER told ROTUNNO he (MILLER) was sick of waiting for CAPRI to

37

repay his debt to MILLER. MILLER told ROTUNNO he (MILLER) was going to do what he (MILLER) had to do to collect CAPRI's debt. ROTUNNO warned MILLER not to touch CAPRI and he (ROTUNNO) wouldn't allow MILLER to do it.

80. On November 6, 1998, at approximately 1:41 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to a cellular telephone utilized by AL POLITO, (954) 298-9154. ROTUNNO told POLITO to start switching "players" over to the new bookmaking office. POLITO told ROTUNNO he (POLITO) is with "Tiny" (MORRIS) running around doing collections. POLITO told ROTUNNO he (POLITO) used "Tiny" a lot. ROTUNNO replied he (POLITO) should use him (MORRIS) as much as POLITO wanted.

81. On November 6, 1998, at approximately 5:32 p.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to a cellular telephone utilized by AL POLITO, (954) 298-9154. ROTUNNO told POLITO he (ROTUNNO) was contacted by Marty LNU who wanted to give them (POLITO and ROTUNNO) "hedge off work" possibly $10,000, $20,000 or $30,000 on three games. POLITO recommended to ROTUNNO they open an additional office in order to increase their percentage. ROTUNNO recommended they open an account in the Bahama's and advised POLITO "it was wiseguy action."

82. On November 7, 1998, at approximately 9:41 a.m. a court authorized interception was made on telephone number (954)295-6672. ROTUNNO placed a call to a cellular telephone utilized by AL

38

POLITO, (954) 298-9154.   ROTUNNO told POLITO he (ROTUNNO) wanted to
bring the $9,300 from a bettor identified as "the doctor."   POLITO
told ROTUNNO "the doctor" only gave him (POLITO) two checks that
totaled $8,300 and POLITO had to pay $4,000 out to winning bettors.
ROTUNNO told POLITO he (ROTUNNO) would meet POLITO by the Fina
Station in order to get the money.   ROTUNNO advised POLITO he
(ROTUNNO) already paid Marty (HALPERN) $8,000 and ROTUNNO wanted to
make sure he (HALPERN) got the money, "so he (HALPERN) knows."
ROTUNNO told POLITO, "we have to start running this like a
business, this place is no piece of shit business any more.
ROTUNNO stated; "you (POLITO) know this guy Marty (HALPERN) will be
the best money man we ever had."   POLITO told ROTUNNO, "this portion
of my (POLITO's) livelihood is based on my players."   ROTUNNO told
POLITO all that he (ROTUNNO) was trying to do was, "get us (ROTUNNO
and POLITO) a big earn."·

83.   On November 9, 1998, at approximately 11:01 p.m. a court
authorized interception was made on telephone number (954)295-6672.
ROTUNNO placed a call to a cellular telephone utilized by AL
POLITO, (954) 298-9154.   ROTUNNO told POLITO to tell him (Al
Epstein) "the time was up" on his (Epstein's) shylock loan.   POLITO
told ROTUNNO, Epstein was having problems repaying the loan and had
already spoken with Marty (HALPERN) about repaying this debt.
ROTUNNO became enraged and told POLITO he (POLITO) was getting too
close and advised POLITO he (ROTUNNO) would handle it himself.
ROTUNNO told POLITO that when he (ROTUNNO) used the word "we" it
meant that ROTUNNO took all responsibility for POLITO and would do

39

whatever he (ROTUNNO) would have to do to make POLITO earn. ROTUNNO told POLITO he (ROTUNNO) had to answer to Marty (HALPERN) every week regarding "the money" and Epstein was causing ROTUNNO problems.

84. On November 13, 1998, at approximately 3:40 p.m., a court authorized interception was made on (954) 295-6672. ROTUNNO placed a call to telephone number (305) 215-3437 and spoke to BURT CASKILL. ROTUNNO told BURT CASKILL that the (ROTUNNO) re-checked the figures and he (BURT CASKILL) owed $40,000. BURT CASKILL told ROTUNNO he (BURT CASKILL) was having problems collecting. BURT CASKILL told ROTUNNO that "the horse guy" left the book with a debt of $1,600. ROTUNNO told BURT CASKILL to give him (ROTUNNO) "the horse guy's" phone number and address because ROTUNNO wanted to meet him ("the horse guy") and give him a "motherfucking beating." ROTUNNO told BURT CASKILL that he (Rotunno) went and grabbed people for him (BURT CASKILL). ROTUNNO told BURT CASKILL that if he (ROTUNNO) found out BURT CASKILL was referring bettors to Jackie LNU's book, he (ROTUNNO) would break BURT CASKILLS' "fucking head."

## NORMAL INVESTIGATIVE TECHNIQUES

85. We submit this application seeking authorization for the continued interception of wire communications because comparable alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

40

86.   Although the Court authorized wire interceptions have been monitored since October 16, 1998, the goals of the investigation have not been accomplished.   The previously intercepted conversations reflect that the targets of the investigation are involved in a complex and sophisticated criminal enterprise.   The above-named targets continue to speak in guarded terms regarding their criminal activities.   The previous Court authorized interceptions reflect that the named targets continue to conspire with unidentified individuals regarding wide-ranging criminal activities.

87.   The above-recited court authorized wire interceptions reflect that some of the targets of the investigation remain unidentified or are referred to only by first name.   Thus far the investigation has not disclosed admissible evidence concerning the identities and role of other active members of the criminal enterprise.

88.   CS-1 and CS-2 whose information is relied upon in the original Affidavit, incorporated herein, continue to be unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families. Although CS-3 and CS-4 are willing to testify, they do not know all or sufficient detail concerning their co-conspirators' criminal conduct, which is needed to ensure a successful prosecution.   This is, in part, because the targets of this investigation have been and continue to be unwilling to discuss with CS-3 and CS-4 all of the details of their criminal activity.   For example, none of the CSs are in the

41

inner circle of the Colombo Family; they are not privy to the many activities and businesses controlled by members of the Colombo Family.    Members and associates of organized crime keep their respective business dealings compartmentalized, and this has been especially true with respect to the CSs.    Thus, much of the information and evidence needed for prosecution of the targets herein is outside the scope of the CSs' knowledge and involvement. In addition, an attempt by the CSs to have more wide-ranging and far-reaching discussions with the targets would likely raise the targets' suspicions and thereby jeopardize the safety of the CSs as well as the continued viability and ultimate success of this investigation.    Furthermore, even if all sources were willing to testify, tape recordings are an invaluable and persuasive means of corroborating witness testimony, and thereby producing evidence constituting proof of guilt beyond a reasonable doubt, which is one of the stated objectives of this investigation.

89.    Although physical surveillance of the targets herein has been utilized, it has been relatively ineffective in obtaining information and evidence necessary for a prosecutable case. ROTUNNO has been surveilled meeting with various unidentified individuals on October 19, October 20, October 21, October 22, October 23, October 30 and November 4, 1998.    However, these surveillances have failed to reveal the identities of all the participants, the nature of their meetings and have failed to provide admissible evidence of specific criminal activities.

42

Without knowledge of the content of these meetings, surveillance alone is of limited value.

90.     Physical surveillance of individuals involved in organized crime activities must be especially discreet because they are very surveillance-conscious individuals. The targets of the investigation in prior Court authorized interceptions have articulated concern about law enforcement scrutinizing their movements and activities. Moreover, the targets have been reported to exercise caution in their movements in order to avoid law enforcement surveillance. Furthermore, surveillance agents have noticed during surveillances that several of the targets appear to be "looking" for surveillance and taking evasive measures to avoid law enforcement surveillance such as frequently utilizing different vehicles.

91.     In any event, physical surveillance in and of itself is a limited investigative tool.   It is useful mainly in placing individuals together, as set forth above, but provides limited evidence, standing alone, of the purpose of such meetings or the content of conversations.   The information gained from the interception of wire communications will assist in establishing the various roles the targets play within the Enterprise, the nature and scope of their activities, the location of physical evidence, and the like.   In addition, such interception may produce advance information as to planned meetings, including, for example, the date, time, and location, which would enable the FBI to employ other investigative techniques, such as advance preparation for

43

physical surveillance, thereby minimizing the risks of discovery inherent in simply following the targets.

92. Having agents attempt to overhear conversations is also a technique of limited value and prospect for success, inasmuch as typically only a small portion of the conversation can be overheard and, therefore, a full understanding of the conversation cannot be achieved.

93. Use of a federal grand jury, as discussed with the Assistant United States Attorney in charge of this investigation, does not appear to be a promising method of investigation at this time. The witnesses who could provide evidence to the grand jury as to the identities and roles of the racketeering enterprise members and details of their activities are the identified members of the racketeering enterprise themselves and the targets of this investigation. These targets have criminal exposure and therefore are unlikely to testify voluntarily. Nor would it be desirable at this time to seek immunity for any of these individuals in order to compel their testimony; this course would thwart the public policy that they be held accountable for their illegal activities. In addition, it would be premature to grant immunity at this juncture, when the scope of the targets' individual criminal participation and liability is still unknown. Moreover, the targets may refuse to testify even if immunized and under threat of contempt of court particularly given their solid ties to the Colombo Family. In any event, the granting of immunity is premature until the full scope of the illegal activities described above is known. Likewise, the

44

issuance of grand jury subpoenas to non-targets at this time is unlikely to lead to the discovery of critical information and yet undoubtedly would alert the targets to the pending investigation.

94. Although sources have provided valuable information in connection with this investigation, they cannot fully discover the scope and methods of the criminal activities of the targets, and others known as yet unknown. The sources are not privy to all of the details concerning the criminal activities of these individuals. ROTUNNO is secretive in the conduct of his illegal activities. He typically compartmentalizes the activities of criminal associates; that is, typically ROTUNNO does not entrust one of his co-conspirators with details of the criminal activities of other co-conspirators. The result of ROTUNNO's compartmentalization of his operation, information, and personnel, is that few co-conspirators, if any, other than ROTUNNO himself have an overall view of the breadth and details of all or most of the criminal enterprise. For example, while ROTUNNO discusses some criminal activity with the CSs, the CSs are not privy to other conversations between ROTUNNO and other crew members, other Colombo Family members, or other LCN associates. In addition, CSs are not made members of the Colombo Family and thus are not allowed to participate in certain conversations between made LCN members. It appears at the present time that there is no realistic prospect that an undercover agent or informant can infiltrate this criminal enterprise to the degree necessary to obtain the information that is likely to result from the interception of wire communications

45

and that is necessary for a successful prosecution of the targets and others as yet unknown for the offenses set forth in paragraph 5 above. Moreover, even if an undercover agent were to be able to infiltrate this organization, I believe it would take several years for an agent to do so, and even then, it would be highly unlikely that the undercover agent could have significant criminal conversations with high-level members of the Colombo Family. Thus, it is highly unlikely that an undercover operation could yield the requisite evidence within a reasonable investigative time frame.

95. Although not set forth in the probable cause section of this Affidavit, telephone toll records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed telephonic contact between JOSEPH ROTUNNO and known LCN associates. However, like toll record information these records do not provide proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

96. Based upon my experience and the experience of other law enforcement agents, it is my belief that the use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept and the only evidence of a meeting would be the conversations. To date, there is no corroborated information concerning the existence or location of any such records.   T h e Affiant is unaware of any information regarding the location of pertinent documents that may be maintained by the co-conspirators.

97. Further investigation is required in order to determine, among other things, the relationship among the roles played by the various known conspirators, the identities of additional conspirators, and the means and locations they use to further their criminal activities. Based upon all of the foregoing, it is my opinion that the interception of wire communications is essential to assist in uncovering the full scope of the criminal activities of Colombo Family members and their associates in the South Florida area.

## MINIMIZATION

98. All interceptions will be minimized in accordance with Chapter 119 of Title 18, United States Code. The FBI agents and investigative and/or law enforcement officers who are to carry out the requested interceptions have been and will be instructed concerning the steps that they must take to minimize the

47

interceptions. Any interception will cease when monitoring personnel are able to determine that the conversation is not criminal in nature.

## PERIOD OF INTERCEPTION

99. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which JOSEPH ROTUNNO, ALBERT POLITO, EMRO CAPRI, aka Mike CAPRI, FRED SCAROLA, HOWARD MANDEL, REYNOLD MARAGNI, GARY BRAESEKE, JAMES LAPOLLA, DANIEL CARVER, PERCY MORRIS, MARTIN HALPERN, HARRIS STEINHART, JOHN MAMONE, SCOTT MILLER, ALEX RUIZ, BURT CASKILL, CLIFF PIERCE, and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, and the full nature of the criminal conspiracies involved therein,

48

or for a period not to exceed thirty (30) days, such thirty-day
period to begin on the date of the Court's Order.

JOSEPH M. CICINI
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
_____ day of November, 1998

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT JUDGE

49



**Office of the Attorney General**
**Washington, D. C. 20530**

### ORDER NO. 1950-95

**SPECIAL DESIGNATION OF THE ASSISTANT, ACTING ASSISTANT,
ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR
COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS
UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE**

By virtue of the authority vested in me by 28 U.S.C. §§ 509
and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full
recognition that 18 U.S.C. § 2516(1) empowers the Attorney General,
Deputy Attorney General, and Associate Attorney General to
authorize applications to a Federal judge of competent jurisdiction
for orders authorizing the interception of wire and oral
communications, I hereby specially designate the Assistant Attorney
General in charge of the Criminal Division, any Acting Assistant
Attorney General in charge of the Criminal Division, any Deputy
Assistant Attorney General of the Criminal Division, and any Acting
Deputy Assistant Attorney General of the Criminal Division, to
exercise the power conferred by section 2516(1) of title 18, United
States Code, to authorize applications to a Federal judge of
competent jurisdiction for orders authorizing or approving the
interception of wire or oral communications by the Federal Bureau
of Investigation or a Federal agency having responsibility for the

**INTERNAL ORDER/NOT PUBLISHED
IN F.R.**

investigation of the offense(s) as to which such application is
made, when such interception may provide evidence of any of the
offenses specified in section 2516 of title 18, United States Code.

Order No. 1709-93 of April 5, 1993, is revoked effective at
midnight of the day following the date of this order.

Date: February 13, 1995

JANET RENO
Attorney General

- 2 -